FILED
2021 Jul-07  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **MARCELLUS WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JEFFERSON DUNN, ARNALDO** | ) | |
| **MERCADO, SCOTT SIDES,** | ) | |
| **EDWARD ELLINGTON,** | ) | |
| **TERRENCE MCDONNELL, RUTH** | ) | |
| **NAGLICH, MATTHEW BRAND,** | ) | **Case No. _____** |
| **GRANTT CULLIVER, CHARLES** | ) | |
| **DANIELS, JEFFERY WILLIAMS,** | ) | |
| **JENNY ABBOTT, LEON BOLLING,** | ) | |
| **ERROL PICKENS, GARY MALONE,** | ) | |
| **KEVIN WHITE, JACOB WEAVER,** | ) | |
| **LATONYA SCOTT, DERRICK** | ) | |
| **DENT, UNKNOWN SHIFT** | ) | |
| **COMMANDERS, WILBERT** | ) | |
| **HOWARD, WORTHY CRAWFORD,** | ) | |
| **UNKNOWN CORRECTIONAL** | ) | |
| **OFFICERS, and JOHN DOES 1-10,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Marcellus Williams respectfully submits the following for his complaint in the above-styled case:

1

## I.   __INTRODUCTION__

This case arises from unlawful prison conditions and deliberate indifference towards basic human rights protected by the prohibition against cruel and unusual punishment contained within the U.S. Constitution. This pattern of indifference has resulted in the victimization of scores of inmates at St. Clair Correctional Facility ("St. Clair").   One such victim was Marcellus Williams ("Mr. Williams"), the plaintiff in this action.

On or about August 5, 2019, St. Clair inmate Antonio Spencer (hereinafter, "Mr. Spencer") viciously and repeatedly stabbed Mr. Williams within St. Clair.  Mr. Spencer, who was widely known to act violently toward his fellow inmates, was allowed to leave his cell unsupervised and unrestrained and, while wielding a knife, walk out of his "dormitory," cross a hallway to a different dormitory, go down a flight of stairs, and attack Mr. Williams.

Defendants' actions and omissions made this attack foreseeable. The attack resulted from a systemic, top-to-bottom, lack of oversight, security, and protocol at St. Clair, where stabbings, beatings, murders, and rapes are commonplace and much of the prison population possesses contraband weapons.

Defendants have repeatedly been made painfully aware of the dangerous conditions at St. Clair that allowed Mr. Williams to be brutally attacked while

2

incarcerated there. Indeed, the dangerous conditions at St. Clair have been the subject of federal government investigations and numerous inmate lawsuits. These investigations and lawsuits consistently allege that inmates face a serious and immediate security risk at St. Clair because of the proliferation of contraband weapons, lack of supervision and monitoring of inmates, and other similar factors. Defendants have responded with deliberate indifference.

This deliberate indifference was a direct cause of and resulted in Mr. Spencer's attack on Mr. Williams. Mr. Spencer made his way from one end of the building to the other, weapon in hand and in full and open view, without any prison guards in place to detect and prevent the attack on Mr. Williams from happening. And while Mr. Williams struggled to avoid and dodge repeated slashes, the defendant correctional officers remained absent from their assigned posts, failing to perform their assigned duties, and too far away to intervene. As a result, Mr. Williams sustained near life-threatening injuries and trauma from which he may never fully recover.

In the aftermath of the attack, Defendants expressed no shock or surprise at the incident, and simply carried on as if inmate-on-inmate attacks like this are acceptable. Two Defendants even admitted to having previously warned another

Defendant that Mr. Spencer was violent and should not be allowed out of his cell unsupervised.

Mr. Williams brings this action to redress his devastating and life-altering physical and psychological injuries and to improve the environment of abuse and violence that he and other St. Clair prisoners face on a daily basis due to Defendants' blatant, unlawful disregard for their rights to safety and security.

## II.   <u>JURISDICTION AND VENUE</u>

1.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Mr. Williams's rights secured by the U.S. Constitution, particularly his rights under the Eighth Amendment as made applicable to the States through the Fourteenth Amendment.

2.     This Court has jurisdiction over Mr. Williams's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. § 1367.

3.     Venue is proper under 28 U.S.C. § 1391(b). The claims alleged herein arise from an attack which occurred at St. Clair, which is part of the Alabama Department of Corrections (the "ADOC"). As the events and omissions giving rise to Mr. Williams's claims occurred within this judicial district, venue here is proper.

### III.   PARTIES

#### A.   Plaintiff

4.   Plaintiff Marcellus Williams is a 53-year-old man currently serving a 50-year sentence out of Chambers County, Alabama. He entered ADOC custody in July 2003 and was transferred to St. Clair in April 2019, where he was immediately placed into St. Clair's restricted housing unit (hereinafter, "RHU").

#### B.   Defendants

##### 1.   The Defendant Administrative Supervisors

5.   Defendant Jefferson Dunn is currently the Commissioner of ADOC and has been in this role since 2015. He is the highest ranking official in ADOC and oversees all aspects of the operations of ADOC, under the custody and supervision of which Mr. Williams was severely injured as alleged herein.

6.   Defendant Arnaldo Mercado is currently the Director of the Law Enforcement Services Division of ADOC. He is responsible for investigating crimes committed at St. Clair. He failed to ensure Mr. Williams's safety while in custody, failed to thoroughly investigate the attack on Mr. Williams, and failed to discipline Mr. Spencer for his brutal attack on Mr. Williams.

7.   Defendant Scott Sides is currently the Assistant Director of the Law Enforcement Services Division of ADOC. He is responsible for investigating crimes

committed at St. Clair. He failed to ensure Mr. Williams's safety while in custody, failed to thoroughly investigate the attack on Mr. Williams, and failed to discipline Mr. Spencer for his brutal attack on Mr. Williams.

8.     Defendant Edward Ellington was the Institutional Coordinator for ADOC at the time of Mr. Williams's attack.  Upon information and belief, as the Institutional Coordinator responsible for St. Clair, Mr. Ellington was responsible for overseeing St. Clair's Warden's management of St. Clair's operations, safety, and security. His failure to maintain a safe and secure environment permitted Mr. Spencer to brutally attack Mr. Williams at St. Clair.

9.     Defendant Terrence McDonnell was the Associate Commissioner for Plans and Programs for ADOC at the time of Mr. Williams's attack. He was responsible for the Central Records Division, Research and Planning Division, Supervised Re-Entry Program, Religious Programs, Educational and Vocational Education Programs, and Victim-Constituent Services, including prisoner classification. Mr. McDonnell failed to adequately classify and segregate known violent inmates, like Mr. Spencer, from other inmates like Mr. Williams, making possible several violent inmate-on-inmate attacks like the one complained of here.

10.     Defendant Ruth Naglich is Associate Commissioner of Health Services with ADOC. She is responsible for the administration of medical and mental health

services to individuals in custody at St. Clair. Under her leadership, Mr. Williams was denied and continues to be denied adequate follow-up medical and mental healthcare for his attack-related injuries at St. Clair following his discharge from the hospital.

11.     Defendant Matthew Brand currently serves as the Associate Commissioner of Administrative Services with ADOC. He is responsible for training, education, and development of ADOC workforce that was entrusted, but failed, to ensure Mr. Williams's safety while in custody.

12.     Defendant Grantt Culliver is a former Associate Commissioner for Operations and Institutional Security for ADOC. Mr. Culliver first undertook that role in August 2014 and returned to the position in mid-2015 after a demotion in early 2015. He was placed on administrative leave in September 2018 and permitted to retire in December 2018. As Associate Commissioner for Operations and Institutional Security, Mr. Culliver was responsible for ensuring the effective and safe daily operations of prison facilities, including directing and managing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division. Mr. Culliver helped to create the culture at St. Clair and was an integral part of ADOC's deliberate indifference to the violence there.

13.     Defendant Charles Daniels is a former Associate Commissioner for Operations and Institutional Security for ADOC. Mr. Daniels took over the role after Culliver's retirement. As Associate Commissioner for Operations and Institutional Security, Mr. Daniels was responsible for, but failed in, ensuring the effective and safe daily operations of prison facilities, including directing and managing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

14.     Defendant Jeffery Williams is the current Deputy Commissioner of Governmental Relations for ADOC. During the period between when Mr. Culliver went on administrative leave and Mr. Daniels took over as Associate Commissioner for Operations and Institutional Security, Mr. Jeffery Williams took over some or all of the responsibilities of Associate Commissioner for Operations and Institutional Security. His leadership failed to correct the longstanding issues of poor supervision and violence at St. Clair.

15.     Defendant Jenny Abbott is the Director of Facilities Management for ADOC. She is responsible for maintenance operations for ADOC's correctional institutions, including St. Clair. Ms. Abbott failed to maintain adequate gate and cell closures to segregate inmates and prevent inmate-on-inmate violence, including the attack suffered by Mr. Williams.

8

16.     Collectively, Defendants Dunn, Mercado, Sides, Ellington, McDonnell, Naglich, Brand, Culliver, Daniels, Williams, and Abbott are referred to as the "Defendant Administrative Supervisors."

### 2.     Defendant Prison Supervisors

17.     Defendant Leon Bolling is the current Warden of St. Clair and was the Warden at the time of Mr. Williams's attack. As the Warden of St. Clair, he was and is responsible for the day-to-day operations of the prison, the safety and security of all prisoners at the facility, and the supervision of all subordinate employees. Defendant Bolling's responsibilities as Warden included ensuring adequate supervision and monitoring of prisoners, adequate classification and segregation of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of all prison rules and policies, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security. Under his leadership, St. Clair fostered an environment riddled with violence, including the attack suffered by Mr. Williams.

18.     Defendant Errol Pickens was an Assistant Warden at St. Clair at the time of Mr. Williams's attack. From the beginning of his tenure in Spring of 2019

through the relevant time period, Defendant Pickens was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at the facility, and the supervision of all subordinate employees. Defendant Pickens' responsibilities as Assistant Warden included ensuring adequate supervision and monitoring of prisoners, adequate classification and segregation of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of all prison rules and policies, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security. Under his leadership, St. Clair fostered an environment riddled with occurrences of violence, including the attack suffered by Mr. Williams. Upon information and belief, in late 2019, Mr. Pickens was demoted from Assistant Warden to Captain after it was reported to the executive ADOC leadership that he and the other St. Clair wardens had abandoned leadership's plans to implement corrective action to manage the notoriously violent P/Q lock in St. Clair.

19.     Defendant Gary Malone was the Captain in charge of segregation and security at St. Clair at the time of the attack on Mr. Williams.  He was responsible for ensuring the safety and security of prisoners in the RHU and that all RHU and

prison rules and regulations were followed. He failed to perform this role effectively, thereby directly causing the attack suffered by Mr. Williams. His duties also included authorizing all housing assignments at St. Clair.

20.     Defendant Kevin White was employed by ADOC as a Captain at St. Clair leading up to and including the time of Mr. Williams's attack. He was in charge of security and responsible for the safety of all inmates at St. Clair, as well as the supervision of all security activities and subordinate employees. His failure to adequately carry out these responsibilities directly caused numerous inmate-on-inmate attacks at St. Clair, including the attack suffered by Mr. Williams.  He is currently a Captain at another ADOC facility called Childersburg Correctional Facility.

21.     Defendant Jacob Weaver was a Sergeant on duty in the RHU at the time of Mr. Williams's attack. He was responsible for ensuring the safety and security of prisoners in the RHU and for ensuring that all RHU and prison rules and regulations were followed. He failed to do so, thereby directly causing the attack on Mr. Williams.

22.     Defendant Latonya Scott was a Lieutenant Supervisor on duty in the RHU at the time of Mr. Williams's attack. She was responsible for ensuring the safety and security of prisoners in the RHU and for ensuring that all RHU and prison

rules and regulations were followed. She failed to prevent contraband from entering the RHU and failed to ensure that correctional officers were stationed in and performing their assigned duties in Dormitory E at the time of Mr. Williams's attack. She also assigned Mr. Spencer as a "runner" – an assignment that allowed him to freely roam within the RHU at specified times – even though she was aware of the danger he posed to other inmates due to his previous violent behavior. Defendant Scott has since been transferred out of St. Clair and is currently a Captain at another ADOC facility called Donaldson Correctional Facility.

23. Defendant Derrick Dent was a Sergeant Supervisor of the RHU at the time of Mr. Williams's attack. He was responsible for ensuring the safety and security of prisoners in the RHU and for ensuring that all RHU and prison rules and regulations were followed. He failed to do so.

24. Each of the Defendant Unknown Shift Commanders were shift commanders on duty in Dormitories D and E at the St. Clair RHU on the date of Mr. Williams's attack. By failing to perform their assigned roles, Unknown Shift Commanders in Dormitory D permitted Mr. Spencer to leave Dormitory D unsupervised, enter Dormitory E, and attack Mr. Williams. By failing to perform their assigned roles, Unknown Shift Commanders in Dormitory E permitted Mr. Spencer to stab Mr. Williams multiple times without intervention. Unknown Shift

Commanders in both dormitories also failed to provide Mr. Williams any assistance or medical care immediately following the attack.

25.    Mr. Williams refers collectively to Defendants Bolling, Pickens, Malone, White, Weaver, Scott, Dent, and Unknown Shift Commanders as "Defendant Prison Supervisors."

### 3.    Defendant Correctional Officers

26.    Defendant Worthy Crawford was one of the correctional officers who was assigned to be on duty in Dormitory E at the time of Mr. Williams's attack, and who could have prevented the attack on Mr. Williams had he not been absent from his post.  He also failed to keep contraband out of Dormitory E, as well as to provide needed medical help to Mr. Williams immediately following his attack.

27.    Defendant Wilbert Howard was one of the correctional officers who was assigned to be on duty in Dormitory E where he could have prevented the attack on Mr. Williams had he not been absent from his post.  He also failed to keep contraband out of Dormitory E and failed to provide needed medical help to Mr. Williams immediately following his attack.

28.    Defendants Unknown Correctional Officers were correctional officers at St. Clair at the time of Mr. Williams's attack in the RHU. They were responsible during the relevant time period for supervising and monitoring Dormitories D and E

13

generally and the areas where these events took place specifically. They failed to do so.

29.     Plaintiff refers collectively to Defendants Crawford, Howard, and Unknown Correctional Officers as "Defendant Correctional Officers."

30.     Defendants John Does 1-10 include 1) the unknown healthcare providers at St. Clair who have failed to provide necessary follow-up medical and mental health treatment to Mr. Williams following the incident; and 2) any other individuals who contributed to the conditions that permitted the attack on Mr. Williams to occur and not hold Mr. Spencer responsible.

31.     Collectively, all of the above-listed Defendants are referred to as "Defendants." Mr. Williams asserts each and every allegation relating to Defendants individually as to each such Defendant included in such definition, and such pleading referring to such defined Defendants is for convenience and economy only and to avoid repetition.

32.     Mr. Williams sues each of the individual defendants in his or her individual capacity unless otherwise noted. Each of them acted under color of law and within the scope of his or her employment by ADOC when engaging in the misconduct described in this Complaint. Each of the Defendants listed above is above the age of majority.

14

## IV.   DEFENDANTS' FAILURE TO PROTECT MR. WILLIAMS FROM A KNOWN AND SUBSTANTIAL THREAT OF VIOLENCE

### A.   The RHU

33.   Mr. Williams was transferred to the RHU at St. Clair on April 11, 2019. As one of the major institutions for male prisoners with multiple violent offenses whose behavior poses a serious threat to safety and security, St. Clair maintains an RHU to house prisoners who cannot safely be in contact with anyone else without being restrained. Upon information and belief, St. Clair rules and policy requires that prisoners in the RHU be placed in handcuffs before their cell doors are opened, and that only one door in the RHU be open at a time so that prisoners held there do not come in contact with each other

34.   Functionally, the RHU's intended isolation and increased restraint and security has the dual use of a punishment for prisoners who committed disciplinary actions, as well as protection for prisoners endangered by others around them.

35.   The RHU contains a number of 2-story dormitories, with each dormitory housing 24 inmates in 24 cells that are supposed to be locked at all times except when an inmate is being transported by correctional officers. Each dormitory containing these 24 cells also contains a dormitory gate that is similarly supposed to

remain locked at all times except when an inmate is being transported by correctional officers.

36.    Recognizing the need to have a segregation unit and creating policies to implement and maintain one is an admission by Defendants of being on notice that inmates like Mr. Williams were at risk of serious harm if any inmate in the RHU was left unrestrained and allowed unrestricted movement, as Mr. Spencer was.

37.    Yet Defendants have failed to promulgate and enforce adequate and effective policies, procedures, and practices in the RHU so as to keep prisoners isolated from one another for their protection.

38.    Defendant Correctional Officers frequently roll the cell doors open from their cubicles without first placing inmates in handcuffs, thereby allowing for multiple inmates in the RHU to roam freely in the same spaces simultaneously.

39.    Also contrary to St. Clair rules and policy, Defendant Correctional Officers frequently leave dormitory gates open for extended periods of time, thereby allowing inmates with unlocked individual cell gates to roam freely between the two stories of their own dormitory, as well as the other dormitories in the RHU.

**B.    RHU "Runners"**

40.    Furthermore, Defendants have a practice of assigning one inmate to be a "runner" for each dormitory within the RHU. Defendant Correctional Officers

often intentionally unlock the gates to permit the runners to be able to perform their "duties" as a runner – unsupervised.  A runner, though not an officially sanctioned or even permitted position, is responsible for, among other things, retrieving hot water, ice, and food trays for the other inmates, as well as cleaning the halls and the dormitory. These are job activities that the Defendant Correctional Officers are themselves responsible for performing, but instead they assign inmates to do for them. In return for doing this extra and prohibited work, runners often spent shorter periods of time in the RHU, and sometimes would receive an extra tray of food.

41.    The dormitory gates and the runners' cell gates are generally left open while the unsupervised runners perform their responsibilities and then return to their cells when they finish their work. As a result, runners essentially have free reign throughout the two stories of their own dormitory, as well as potentially the other dormitories within the RHU.

42.    Again, this is contrary to the explicit ADOC policies that inmates in the RHU are to be restrained and supervised during any period of movement outside of the inmate's cell. All Defendants were and are aware of this reality but have failed to stop it, which led to the proliferation of contraband, as well the transmission of threats, extortion, and violent assaults.

43.    On the date of the attack, Mr. Williams had been the assigned runner

for Dormitory E. His attacker, Mr. Spencer, was the assigned runner for Dormitory D on the day of the stabbing.

44.    Upon information and belief, Mr. Spencer had been involved in fights and attacks prior to being assigned as runner for Dormitory D. Upon information and belief, Defendant Correctional Officers were aware of Mr. Spencer's violent behavior, and the danger he posed to other inmates, before and at the time he was assigned as runner. Intentionally allowing Mr. Spencer to be outside of his cell while unrestrained, unsupervised, and with freedom to roam the RHU demonstrates Defendants' negligence, wantonness, reckless disregard, and deliberate indifference towards the health and safety of Mr. Williams and other St. Clair inmates.

45.    Mr. Williams's and Mr. Spencer's positions as runners — positions which, upon information and belief, are prohibited by St. Clair policies and procedures but nevertheless were and are still a regular practice — were what allowed Mr. Spencer to attack Mr. Williams within a segregation unit that was constructed to keep inmates from coming into contact with each other for their own protection.

**C.    The Brutal Assault on Mr. Williams in the RHU**

46.    On or about August 5, 2019 at approximately 4:00 P.M., Mr. Spencer stabbed Mr. Williams multiple times in the neck, back, shoulder, top of the head,

and ear.

47.     Upon information and belief, on the day of the attack, all dormitory gates in the RHU were unlocked, and had been unlocked for an extended period of time. Mr. Spencer, who was housed in Dormitory D, left his cell armed with a knife, walked out of Dormitory D with this knife, walked into Dormitory E with the knife, came down the stairs within Dormitory E to Dormitory E's first floor, and brutally stabbed Mr. Williams repeatedly while inside Dormitory E.

48.     While performing his duties as a runner for his dormitory, Mr. Williams was bent over cleaning trays on a tray cart in an area of Dormitory E known as "E-2" when he heard Mr. Spencer yelling accusations at Mr. Williams of stealing his cell phone. Cell phones are illegal contraband at St. Clair, but Mr. Spencer and many other inmates have obtained them and use them regularly. Before Mr. Williams could respond to the allegation or move away to protect himself, Mr. Spencer began stabbing Mr. Williams on the left side of Mr. Williams's body, beginning in the left shoulder. Mr. Spencer continued to stab Mr. Williams in the back, neck, on top of the head, and ear for approximately 1-2 minutes.

49.     Mr. Williams attempted to defend himself but, being unarmed, there was little he could do. As the attack went on and Mr. Williams continued to suffer wound after wound, no one came to Mr. Williams's aid. He was left defenseless and

19

helpless to Mr. Spencer's surprise attack.

50.     Following the attack, Mr. Spencer left Dormitory E by climbing up the same set of stairs from which he came – still unobserved by any Defendant Correctional Officers or any other prison authority.

51.     While many of the 24 inmates housed in E-2 were able to observe Mr. Spencer from their individual cells as he approached and attacked Mr. Williams, and although they made numerous loud sounds lasting throughout the attack, Defendant Correctional Officers did not respond to the noise or intervene during the incident in any way.

52.     Upon information and belief, Defendant Correctional Officers who were assigned to stand guard in E-2 were away from their assigned posts and were instead huddled together by the "D-1" cube within Dormitory D engaged in conversation with a female nurse.

53.     Upon information and belief, there were no security cameras installed anywhere in the RHU—not even in public spaces like where Mr. Williams was attacked.

54.     Upon information and belief, there were no mechanisms or technology set up within the RHU from which Mr. Williams could have called for help from Defendant Correctional Officers.

### D.     The Aftermath of the Attack

55.     Following the attack, as the Defendant Correctional Officers were absent from their assigned posts, Mr. Williams had to make his way, bleeding and wounded, out the door of the RHU, unaccompanied, to the shift commander's office in search of medical help.  As he did so, Mr. Williams continued to bleed profusely.

56.     At the shift commander's office, Mr. Williams informed Defendants Weaver and Scott that he had been stabbed. Sergeant Weaver and Lieutenant Scott then escorted Mr. Williams to the St. Clair infirmary to receive medical treatment.

57.     Defendants Bolling and Malone spoke to Mr. Williams at the infirmary. However, instead of focusing on how Mr. Spencer obtained a weapon in the RHU or why Defendant Correctional Officers were not positioned to prevent the attack from occurring, they focused the discussion on where inmates' cell phones were being charged.

58.     Upon information and belief, Defendant Malone took photographs of Mr. Williams's injuries.

59.     Defendant Correctional Officers Howard and Crawford apologized to Mr. Williams at the infirmary for not being at their assigned posts near the location of the attack and thus not being there to intervene or protect him. Defendants Howard and Crawford also stated they were aware of Mr. Spencer's violent tendencies and

previous stabbings, and for those reasons, had informed Defendant Scott that Mr. Spencer was not a good fit to serve as a runner in the RHU. She ignored these warnings. Upon information and belief, the medical staff at St. Clair's infirmary referred Mr. Williams to the University of Alabama at Birmingham Hospital (hereinafter, "UABH") because they did not feel equipped to manage his wounds and repair his ear in particular.

60.    Mr. Williams received several stitches in his shoulder, back, neck, and ear at UABH. His ear was repaired as best as possible, but was to a significant extent, permanently damaged.

61.    Mr. Williams received continuous wound care for several weeks at the St. Clair infirmary, but upon information and belief, Mr. Williams has received no further follow-up treatment despite his wounds not fully healing when he stopped receiving treatment.

### E.    Mr. Williams's Return from the Hospital to St. Clair

62.    Following his return from UABH, Mr. Williams spent a few nights in the infirmary before being returned to the same cell in Dormitory E of the RHU in which he was housed prior to the attack.

63.    Mr. Williams remained in the RHU until he was transferred into a "population" dormitory at St. Clair on August 21, 2019. A "population" dormitory

is the standard living condition within the prison and is not subject to the heightened security protocols and other restrictions to which the RHU is, theoretically, subject.

64.     Mr. Williams experienced severe pain for several weeks following the attack and still experiences pain and difficulty performing certain activities, such as raising his arm and engaging in recreational and other routine activities.

65.     Far more severe than the physical pain, however, is the psychological harm that Mr. Williams has experienced in the aftermath of the attack and continues to experience as an inmate at St. Clair.

66.     Because he informed prison staff of the attack in order to receive medical treatment, Mr. Williams has been labeled a "rat" and a "snitch" by his fellow inmates. He has consequently been ostracized and alienated from his fellow inmates and suffers from real anxiety and fear of reprisal by Mr. Spencer or other inmates who may seek to do further harm to Mr. Williams. This anxiety and fear cause him to sleep poorly and experience extreme anxiety  and agitated by commonplace noises like cell gates closing or handclapping.

67.     Upon Mr. Williams's information and belief, no disciplinary action was taken against Mr. Spencer. Also, upon information and belief, every disciplinary infraction (except very minor ones) at St. Clair results in a disciplinary hearing where witnesses are called to provide evidence of the infraction. Mr. Williams was never

called as a witness for a disciplinary hearing relating to Mr. Spencer's attack and therefore believes no disciplinary hearing or action was ever taken against him.

68.     To this day, Defendants have failed to inform Mr. Williams whether they have disciplined Mr. Spencer.

69.     After the attack, Defendants encouraged Mr. Williams to take no action in response to being attacked. As a result, prior to commencing this litigation, Mr. Williams has not done so.

## V.     DEFENDANTS HAD KNOWLEDGE OF THE COMMONPLACE VIOLENCE AND DEFICIENT INMATE SUPERVISION AT ST. CLAIR PRISON BUT FAILED TO ADEQUATELY PREVENT, DETECT AND RESPOND TO SAME

### A.     The Widespread Violence at St. Clair is Widely Acknowledged

70.     Vicious, and even deadly, interactions between inmates such as the attack on Mr. Williams, are not the exception at St. Clair. They have been the well-documented norm for years.

71.     The Defendants had knowledge of the substantial risk of serious harm facing prisoners such as Mr. Williams at St. Clair based on incident reports for the below-identified assaults, as well reports by ADOC's Investigations & Intelligence Division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, and/or prisoner lawsuits.

72.     ADOC's publicly available reports in the timeframe leading up to the attack of Mr. Williams at St. Clair reflected that injuries, deaths, and fighting were a systemic problem at St. Clair.

73.     Nonetheless, the Defendant Administrative Supervisors and Defendant Prison Supervisors failed to take meaningful corrective actions, in response to these reports, to reduce the substantial risk of serious harm facing prisoners such as Mr. Williams at St. Clair.

74.     In October 2014, following an alarming number of violent attacks and murders at St. Clair, the Equal Justice Initiative ("EJI") filed a class action lawsuit on behalf of St. Clair prisoners seeking injunctive relief to reduce the violence at St. Clair. *See Cheatham* Complaint, a true and correct copy of which is attached hereto as Exhibit 1.

75.     The *Cheatham* Complaint described the policies and practices fueling the outbreak of violence at St. Clair, including inadequate supervision and monitoring of the facility, failure to address the widespread proliferation of contraband weapons at the facility, creation of a dangerous culture of violence and abuse, and failure to respond appropriately to violence and rape.

76.     Each of the Defendant Administrative Supervisors and Prison Supervisors were put on notice of the *Cheatham* litigation and deficiencies identified

25

therein long before the near fatal stabbing of Mr. Williams. Defendant Dunn specifically received notice of the allegations in the *Cheatham* Complaint and became a defendant in the action when he took over as ADOC Commissioner in January 2015.

77.   In the aftermath of the *Cheatham* lawsuit, the Defendant Supervisors again failed to take reasonable, necessary and appropriate steps to remedy the dangerous conditions at St. Clair. Nonetheless, the violence at St. Clair continued to escalate.

78.   In October 2016, the United States Department of Justice ("DOJ") opened an investigation into whether the conditions in Alabama's prisons for men violated the Eighth Amendment of the U.S. Constitution. The DOJ investigation included inquiries into whether ADOC adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners and provides prisoners with safe living conditions.

79.   The Defendant Administrative Supervisors and Prison Supervisors received notice of the DOJ investigation. Nonetheless, they failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair.

80.   The *Cheatham* litigation settled in November 2017, with ADOC

agreeing to implement an internal classification system to protect prisoners and staff by identifying risks and needs, rather than randomly assigning people to beds; create an incident management system that would allow the prison to prevent, track, and respond to violent incidents; replace faulty locks and install surveillance cameras; and create a transitional unit for prisoners released from segregation, among other things. *See* Equal Justice Initiative, *Alabama Department of Corrections Agrees to Reforms at St. Clair Prison in Response to EJI Lawsuit* (Nov. 8, 2017), available at https://eji.org/news/alabama-settles-eji-lawsuit-on-st-clair-prison/ (last visited on Feb. 17, 2021).

81.    The Defendant Administrative Supervisors and Prison Supervisors were on notice of the settlement agreement in *Cheatham*. However, they failed to take meaningful corrective actions in response to reduce the substantial risk of serious harm facing prisoners at St. Clair.

82.    In June 2018, Equal Justice Initiative ("EJI") notified Defendant Administrative Supervisors, including Defendant Dunn, that ADOC had failed to implement the necessary reforms and comply with the settlement agreement.

83.    In a letter dated September 6, 2018, less than one year before the August 2019 stabbing of Mr. Williams at St. Clair, EJI notified Defendant Dunn of a "concerning increase in serious incidents of violence" at St. Clair. EJI specifically

27

warned Defendant Dunn that "weapons contraband continues to saturate the prison and continues to contribute to serious incidents of violence at St. Clair," and that "contraband searches continue to be sporadic and ineffectual."

84.     EJI further noted in its letter: "Nationally recognized experts who have reviewed operations at St. Clair have recommended specific, detailed steps that are necessary to the detection and elimination of contraband at the facility," including "to completely lock-down the facility 'for several days' and 'conduct a thorough unannounced shake down of all areas including living areas and administrative or program areas before releasing inmates,'" as the "first step in creating a 'sterile' environment," to be followed by a "'regular, routine and effective practice of searching the prison.'" *Id.*

85.     However, Defendant Administrative Supervisors and Prison Supervisors including Defendant Dunn failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair following receipt of EJI's letter. The violence at St. Clair continued unabated.

86.     Stemming from its investigation beginning in 2016, DOJ issued an extensive Notice Letter to ADOC in April 2019 outlining ADOC's failures with regard to protection of prisoners.

87.     DOJ's April 2019 Notice Letter notified the Defendant Administrative

Supervisors and Defendant Prison Supervisors that ADOC was violating the Eighth Amendment rights of prisoners by failing to prevent prisoner-on-prisoner violence and sexual abuse and failing to provide safe conditions. DOJ April 2019 Notice Letter, a true and correct copy is hereto attached as Exhibit 2.

88.     DOJ's April 2019 Notice Letter concluded that the constitutional "violations are severe, systematic, and exacerbated by serious deficiencies" including those in "ineffective housing and classification protocols"; "inadequate incident reporting"; "inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons"; "ineffective prison management and training"; "the use of segregation and solitary confinement to both punish and protect victims of violence and/or sexual abuse"; and "a high level of violence that is too common, cruel, of an unusual nature, and pervasive." *Id.* at 1-2. And further, DOJ found that "an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis." *Id.* at 2.

89.     DOJ's April 2019 Notice Letter made clear that officials and correctional officers at Alabama prisons, including Defendants, knew about the violence, contraband, and corruption at St. Clair well before DOJ initiated its investigation in 2016. It included a specific admission from Defendant Dunn that "the current level of violence [in Alabama prisons] is 'unacceptably high.'" *Id.* at 9.

90.     DOJ has engaged in multiple rounds of negotiations with Defendants beginning in spring 2019. Defendants have failed or refused to correct the unconstitutional conditions in Alabama's prisons for men.

91.     At the time of Mr. Williams attack at St. Clair, the unconstitutional policies and practices identified in the *Cheatham* litigation, and subsequently in EJI and DOJ letters, were ongoing at St. Clair.

92.     The violence at St. Clair has continued unabated, and DOJ filed a lawsuit on December 9, 2020 after concluding that constitutional compliance could not be secured by voluntary means. Complaint, Dkt. 1, *United States v. State of Alabama and Alabama Department of Corrections*, Case 2:20-cv-01971 (N.D. Ala. Dec. 09, 2020).

93.     Over the past few years, multiple inmates have filed individual complaints alleging assaults at knifepoint at St. Clair and detailing the dangerous conditions at St. Clair, the prevalence of stabbings and other forms of violence there, and the failures of its leadership and personnel to conduct adequate supervision, monitoring, and contraband searches at the prison, including: Complaint, Dkt. 1, *McGregor v. Thomas, et al.*, Case 4:17-cv-00593 (N.D. Ala. Apr. 12, 2017); Amended Complaint, Dkt. 11, *Miller v. Dunn, et al.*, Case 4:17-cv-00180 (N.D. Ala. Mar. 28, 2017); Complaint, Dkt. 1, *Townsel v. Thomas, et al.*, Case 4:17-cv-00516

(N.D. Ala. Mar. 31, 2017); and  Complaint, Dkt. 1, *Ezell v. Dunn, et al.*, Case 4:20-cv-02058 (N.D. Ala. Dec. 12, 2020).

94.    Despite having notice of the substantial risk of serious harm facing prisoners at St. Clair during the time leading up to Mr. Williams's attack at St. Clair, the Defendant Administrative Supervisors and Prison Supervisors failed to take reasonable steps to address and reduce the risk of violence to Mr. Williams and numerous other inmates at St. Clair.

95.    In 2018, the year prior to Mr. Williams's attack, St. Clair had, upon information and belief, the highest per capita prisoner-on-prisoner homicide rate of all of the men's prisons in Alabama, which, in turn, had the highest prisoner-on-prisoner homicide rate in the nation for a state prison system.

96.    The violence at St. Clair increased sharply beginning in 2010.

97.    In fiscal year 2010, the number of reported assaults at St. Clair was just 23.

98.    The number of reported assaults has grown, upon information and belief, at the following astonishing rate: 59 in fiscal year 2011; 78 in fiscal year 2012; 101 in fiscal year 2013; 127 in fiscal year 2014; 157 in fiscal year 2015; 249 in fiscal year 2016; 132 in fiscal year 2017; and 163 in fiscal year 2018.

99.    The rate of reported assaults at St. Clair in the years leading up to Mr.

31

Williams's attack far exceeded typical levels of violence at comparable facilities across the nation, even without taking into account that the reported assaults grossly underestimated the violence at St. Clair because so many assaults went undocumented.

100.   According to *USA Today*, in 2019, more inmates were killed by other inmates in ADOC's prison facilities than in any year in the prior decade; 16 inmates were killed, 14 at the hands of fellow inmates. *See* Kristine Phillips and Melissa Brown, *Alabama Prisons Remain Deadly by Kristine Phillips and Melissa Brown*, USA TODAY (Mar. 9, 2020), *available at* https://www.usatoday.com/in-depth/news/politics/2020/03/08/alabama-prisons-remain-deadly-year-after-dojs-civil-rights-report/4644789002/ (last visited on Feb. 17, 20221).

101.   According to ADOC Monthly Statistical Report for September 2019 – an internal set of statistics – the entire Alabama prison system experienced an average of 158 assaults a month for the fiscal year of October 2018 to September 2019, during which Mr. Williams was attacked. St. Clair specifically experienced 97 incidents of assault during this same time 12-month period. *See* September 2019 ADOC Monthly Statistical Report, http://www.doc.state.al.us/docs/MonthlyRpts/DMR%2009%20September%20201 9PUB.pdf.

102.   Below are specific examples of violence allegedly occurring within the RHU at St. Clair that others have alleged in the years proceeding Mr. Williams's attack. According these allegations, the number and intensity of the attacks further highlight that the Defendants were aware of and deliberately indifferent to the fact that ADOC policies for the RHU were not being followed and that  substantial risk of serious harm to those housed in the RHU was plainly present.

    a.   In May 2015, a prisoner was supposed to be on "walk-alone" in the RHU but was instead brought out with everyone else. Another prisoner took out a knife and stabbed him in the arm and the chest. The prisoner stabbed was handcuffed at the back and could not defend himself. The assault was reportedly witnessed by at least two officers – one of which did nothing while the other laughed. The victim received nine staples in his arm.

    b.   In October 2017, a prisoner was stabbed in the RHU after a correctional officer let another prisoner out of his cell to clean the hallway, then left the officer cubicle's door open. The prisoner reportedly went into the cubicle, opened another prisoner's cell door, entered that cell, and stabbed him while he was sleeping.

33

c.  In February 2018, a handcuffed prisoner was stabbed in the RHU when another prisoner there escaped from his own handcuffs.

d.  That same month, a prisoner kicked another prisoner in the groin while they were on their way to the RHU's walk yard. A correctional officer reportedly would not allow him to get medical treatment and said that if the prisoner continued to complain, he would change the report to indicate that the victim had kicked the attacker. The prisoner thus went without medical treatment.

e.  In July 2018, a prisoner was stabbed twice in the head by another prisoner while he was shaving in the RHU. They began fighting and during the fight the first prisoner attacked also stabbed the initial aggressor. The initial aggressor was released from the RHU the next day, while the other prisoner was given a disciplinary for assault with a weapon and remained in segregation.

f.  In August 2018, a prisoner was stabbed through the tray hole in his cell in B Block by a prisoner who was working as an RHU runner.

34

g.  In August or September 2018, a runner in the RHU had attempted to stab another prisoner through the tray door of his cell following an argument over property missing from his cell.

h.  In October 2018, a prisoner in the RHU was stabbed in the throat.

i.  That same month, a prisoner assaulted another prisoner while both men were on the walk yard in the RHU. The attacker reportedly was allowed by a sergeant to slip out of his handcuffs and attack the other prisoner. The sergeant was reportedly upset that the victim had made a PREA complaint against him. The assault was written up as "Disorderly Conduct" after the sergeant told the victim that if he protested and insisted on a body chart, he would write up the incident as assault with the victim as the assailant and vice versa.

j.  In December 2018, a prisoner was stabbed in the hand in the RHU by a B-block runner.

k.  In November 2019, a prisoner was assaulted in the RHU by another prisoner. Officers present and observing the attack then tackled the attacker and caused him significant injuries. The two prisoners were supposedly going to the infirmary, but the

35

attacker was allowed out of his cell uncuffed and immediately

charged the victim, hitting him several times in the head.

103.   Below are specific examples of allegations of violence at St. Clair

(outside of the RHU) that others have alleged in the years proceeding Mr. Williams's

attack:

a.   In January 2015, a prisoner was raped at knifepoint in

Block L-2. The attacker threatened to kill the victim if he

reported the rape.

b.   In February 2015, another prisoner was raped at knifepoint

in the Therapeutic Community or H dorm.

c.   The same type of attack also occurred in April 2015 to

another prisoner in Block N-2.

d.   In November 2015, a prisoner was stabbed and killed in P-

block after a man on his enemy list who was in the RHU

paid another inmate to assault the victim.

e.   In May 2016, a prisoner was killed in L-block the same day

he returned to population from the RHU where he had been

placed for protective reasons after a serious stabbing. After

36

being repeatedly strangled, the victim's body was found in a cell three days following his death.

f.  In January 2017, a prisoner was assaulted by two men in a day room in Q-block within sight of the Warden. The prisoner was stabbed in the left temple.

g.  In February 2017, a prisoner was stabbed 9 times by three men who came into his cell and attacked him.

h.  In March 2017, a prisoner was raped and later found by officers having been beaten and tied to a chair.

i.  That same month, at least four other prisoners were stabbed.

j.  In April 2017, two men were hospitalized with stab wounds after a knife fight.

k.  That same month, another stabbing occurred that left a prisoner in a coma.

l.  In May 2017, a large violent incident occurred in which 15 prisoners were stabbed.

m.  That same month, a prisoner suffered a broken jaw when he was assaulted by another prisoner who used a lock placed in a sock as a weapon.

n.  In July 2017, a prisoner was found dead by staff with his hands tied to a bedpost, with clear strangulation marks on his neck.

o.  That same month:

   i.  Another prisoner was killed, a second was stabbed in the neck, and a third was stabbed in his sleep;

   ii.  A prisoner told officers that he was unsafe in Q block and was being extorted, yet staff ordered him to return to Q block, where he was held hostage, raped, and stabbed;

   iii.  A violent incident in Q-block resulted in the stabbing of 4 prisoners;

   iv.  A knife fight occurred in P-block and officers witnessed the fight but did nothing to intervene; and,

   v.  The same prisoner stabbed at least 5 people, in 3 separate incidents.

38

p.  In August 2017, a prisoner was stabbed in his own cell after confronting another prisoner about stealing his property.

q.  That same month:

   i.   A prisoner was stabbed near the cubicle in block P-2 by a prisoner who was intoxicated on crystal methamphetamine;

   ii.  A prisoner was stabbed 13 times in block P-1 shortly after being released from segregation; and,

   iii. Another prisoner was stabbed in block P-1.

r.  In September 2017, a prisoner was found under his bed in block Q-2 with multiple stab wounds.

s.  That same month:

   i.   A prisoner was raped;

   ii.  A prisoner was stabbed by a known enemy, in a fight that lasted for over 20 minutes before anyone intervened;

   iii. Four prisoners were involved in a fight with box cutters and knives; and,

   iv.  A knife fight in G-Yard involved at least six prisoners.

t.  In October 2017, a prisoner took another prisoner hostage in his cell and assaulted him over a period of two days.

u.  That same month:

    i.  A prisoner was sexually assaulted in the H dorm;

    ii.  Officers observed a prisoner walk onto the yard wearing only a blanket and socks, after he had been severely beaten and burned on his face;

    iii.  Three additional prisoners were stabbed in two separate incidents; and,

    iv.  Another prisoner slit a prisoner's throat in the O block after improperly gaining access to the housing unit.

v.  In November 2017, a prisoner was held hostage and sexually assaulted over three days by four prisoners in Q block. The prisoner had recently been released from segregation.

w.  That same month:

    i.  Another prisoner was raped at knifepoint;

    ii.  A prisoner stabbed another prisoner who was being escorted by two correctional officers, and then was

allowed to escape without recovery of the knife;

   iii.  A prisoner stabbed another prisoner who was trying to sexually assault him; and,

   iv.  Two prisoners fought with large machete-type knives in the chow hall and then out onto the G-yard, while three officers watched but did not intervene.

x.  In December 2017, two prisoners were sexually assaulted, one at knifepoint.

y.  That same month:

   i.  A prisoner was stabbed 16 times in front of the P/Q blocks.

   ii.  A prisoner was stabbed in his back, knees, and legs while helping another prisoner move his belongings into Q block.

   iii.  A prisoner was stabbed 12 times in the arm, side, and back in H-dorm, in view of an officer who was nearby but did not intervene;

   iv.  Another prisoner was robbed and assaulted in the N/O blocks;

   v.  Another prisoner was stabbed four times; and,

41

vi.  A transgender prisoner was assaulted by a prisoner wielding a metal pole.

z.  In January 2018, a prisoner was sexually assaulted at knifepoint in O block. The assailant had previously been reported as the assailant in a number of sexual assaults at St. Clair.

aa.  That same month, a prisoner was stabbed repeatedly in his cell in O block by prisoners carrying out a robbery.

bb.  In February 2018, a prisoner was stabbed repeatedly in Q block.

cc.  That same month:

i.  Another prisoner was killed in a knife fight by a prisoner with an extensive history of being disciplined for possession of knives;

ii.  A prisoner was stabbed in the back of the head near the P/Q blocks right after being released from segregation;

iii.  Another prisoner was stabbed in the P/Q blocks;

iv.  A prisoner was repeatedly physically and sexually assaulted over the course of several days by his cell mate,

42

who was also extorting him;

v.   Another prisoner was stabbed in the G dorm; and,

vi.   Another prisoner was killed outside of L-block by a fellow inmate who accused the decedent of stealing property from another inmate's cell in a different block.

dd. In March 2018, a prisoner was stabbed in the P/Q blocks while the prison was on lockdown, and the knife was still embedded in his body when he emerged from the blocks.

ee.  That same month:

i.   A prisoner was stabbed in the chest at the doorway to Q block;

ii.   A prisoner was stabbed in the leg during an attempted robbery in the gym; and.

iii.   At least five other stabbing incidents occurred.

ff.  In April 2018, a prisoner was kidnapped and raped in Q block.

gg.  That same month:

i.   A knife fight in P block resulted in a prisoner being stabbed 13 times, including in the chest and head;

    ii.   A prisoner was threatened with rape by two men armed with knives, and was able to escape from them only by cutting his wrists with a razor blade so that he could report what happened to a mental health officer; and,

    iii.  A prisoner was stabbed in front of the gym by a prisoner who had recently been released from segregation.

hh. In May 2018, a prisoner was held hostage by four other prisoners and sexually assaulted. During the two days, officers did not enter the cell and simply asked how many men were inside when they conducted counts. The victim did not press charges after an investigator told him reporting would put his life in danger and promised that he would be transferred if he did not report.

ii.  That same month:

    i.   A prisoner was stabbed in his sleep in his cell in Q block;

    ii.   A prisoner was sexually assaulted at knifepoint by another prisoner;

    iii.  A prisoner was stabbed and beaten outside the doorway to the L/M blocks;

44

    iv.  Another prisoner was stabbed seven times in the G yard;

    v.  Another prisoner was stabbed in front of officers on his way to a GED class; and,

    vi.  Another prisoner was held in a cell and beaten with a wooden paddle.

jj.  Also in May 2018, a prisoner was stabbed by a group of prisoners outside the entry to Q block. The apparent motive for the attack was that the assailants had seen a document suggesting that the prisoner had provided staff with information related to a prior stabbing.

kk.  In July 2018, three prisoners physically assaulted and attempted to sexually assault another prisoner who returned to P block following a prior sexual assault. The group of prisoners locked him in a cell and beat him with a belt buckle.

ll.  That same month:

    i.  A prisoner was stabbed by his cellmate and several other prisoners because he refused to move out of his cell in P block;

45

ii.   A prisoner was stabbed in his sleep in his cell in Q block;

iii.   Another prisoner was stabbed in Q block;

iv.   Yet another prisoner was stabbed in his cell in Q block after confronting other prisoners about taking his belongings;

v.   A prisoner taped knives to both his hands and repeatedly stabbed yet another prisoner in Q block;

vi.   Another prisoner was stabbed in the P/Q hallway;

vii.   Another prisoner was stabbed on the porch of the P/Q blocks;

viii.   A robbery resulted in the stabbing of another prisoner, who passed out from blood loss; and,

ix.   A prisoner slit the throat of another prisoner with a razor in the common area of A block in an attack that was witnessed by a correctional officer who did not intervene.

mm.   In August 2018, a prisoner was stabbed over 20 times by a group of prisoners in the P/Q hallway in August 2018, in front of a cubicle officer who observed the incident but did not intervene;

46

nn.

oo. That same month:

   x.  A prisoner was stabbed over 10 times in the Q block in relation to a debt;

  xi.  A prisoner was given a drink laced with a substance that caused him to lose consciousness; stabbed by several prisoners in the P-2 dayroom while he was unconscious; and left there for about 30 minutes while other prisoners tried to get help from officers who refused to intervene; and,

  xii.  At least six other separate incidents occurred in which prisoners were stabbed.

pp. In September 2018, a prisoner was murdered by another prisoner or prisoners outside a prison housing block after attempting to break up a fight when he was stabbed fourteen to seventeen times. Because the area was completely unattended by prison staff at the time, his fellow inmates placed him on a garbage cart and wheeled him toward the prison command station.

qq. That same month:

    i.   A prisoner was stabbed in his bed in H dorm by an intoxicated prisoner, who was then attacked and stabbed by another group of prisoners; and,

    ii.   A prisoner was stabbed in the stomach and the leg, and forced to attempt to sew up the lacerations himself, which eventually became infected.

    iii.   In October 2018, a prisoner was sexually assaulted in P block at knifepoint; and,

rr. That same month, a prisoner was stabbed by several men in a cell in Q block.

ss. In November 2018, a prisoner was stabbed in the P/Q blocks by an intoxicated prisoner who was acting erratically before the assault.

tt. That same month, another prisoner was stabbed in the H dorm.

uu. In December 2018, a prisoner was stabbed and killed by another prisoner in an altercation that took place in part in the P/Q blocks.

vv. That same month:

    i. A group of prisoners assaulted and threatened to stab a prisoner who had just been released from the RHU; and,

    ii. An argument between two inmates, both heavily involved in trafficking prison contraband, culminated in one stabbing the other to death. St. Clair was only locked down for a short period of time following the incident.

104.   While the foregoing lists of alleged violence at St. Clair are staggering, upon information and belief, even more violence goes unreported.

**B.   The Known Prevalence of Weapons at St. Clair**

105.   Inmates at St. Clair have ready access to weapons. In 2017, *The New York Times* reported that the estimated percentage of inmates at St. Clair that are armed with some kind of weapon "run from well over half to just about everyone." Campbell Robertson, *An Alabama Prison's Unrelenting Dissenting to Violence*, THE NEW YORK TIMES (Mar. 28, 2017), https://www.nytimes.com/2017/03/28/us/alabama-prison-violence.html (last visited on Feb. 17, 2021).

106.   In a January 2017 report in the *Montgomery Advertiser*, former St. Clair correctional officer Jonathan Truitt was quoted that weapon contraband was "out of

control" and that inmates were "assaulted in every way imaginable." Truitt noted that a single 24-person cell block at St. Clair could contain "30 to 40" contraband knives. Cam Ward, *Alabama Correctional Officer Numbers Down 20%*, MONTGOMERY ADVERTISER, Jan. 8, 2017.

107.   A September 6, 2018 letter written by EJI founder Bryan Stevenson to Defendant Dunn referred to EJI "monitoring reports" that found more than 400 knives documented in St. Clair incident reports from November 1, 2017 to June 30, 2018. The same letter also noted that St. Clair has not made contraband detection a priority.

108.   Near the time of Mr. Williams's attack, it was common knowledge among St. Clair staff that the inmate population had easy access to weapons and was heavily armed.

109.   For example, WBRC, a radio station in Birmingham, Alabama, reported that prison personnel sold two St. Clair inmates hacksaw blades, bolt cutters, and a handgun that they then used to escape in 2017. Beth Shelbourne, *Prisoners Used Bolt Cutters, Hacksaw and Handgun to Escape Maximum-Security Prison in Alabama*, WBRC (Dec. 3, 2018), https://www.wbrc.com/2018/12/03/prisoners-used-bolt-cutters-hacksaw-handgun-escape-maximum-security-prison-alabama/  (last visited on Feb. 17, 2021).

110.   Additionally, DOJ's April 2019 Notice Letter reported that shift commanders in the Alabama prisons, including at St. Clair, estimate that anywhere from 50-75 percent of prisoners at the time were armed with some form of weapon. *See* Exhibit 2 at 25.

111.   One former correctional officer, David Ellis, recalled to a WBRC reporter that he had witnessed knives made out of vent slats, ice picks sharpened from copper plumbing rods, and even homemade zip guns fashioned with a wooden block, a nail, rubber bands, and a bullet. Beth Shelbourne, *How Did A Sword Get Inside An Alabama Prison?*, WRBC (Apr. 8, 2019), https://www.wbrc.com/2019/04/09/how-did-sword-get-inside-an-alabama-prison/ (last visited on Feb. 17, 2021).

112.   Mr. Ellis further recalled to WBRC an encounter with an inmate carrying ***a sword*** inside St. Clair in 2017. Mr. Ellis stepped into the G-Gate "guard shack," and two minutes later an inmate was standing outside pointing that sword at Mr. Ellis's chest.

113.   Defendant Culliver has admitted that the contraband search protocols at St. Clair were inadequate during his tenure there.

114.   Some prison personnel actually encouraged inmates to obtain and use weapons. Similarly, an inmate who was later stabbed repeatedly by another inmate

51

alleged in his complaint against St. Clair that "[w]hen [he] arrived at St. Clair, a correctional officer immediately told him about the rampant violence at St. Clair and advised him that he would need a knife." *McGregor,* Dkt. No. 1, at 15 (defendants answering that they were "without sufficient information to either admit or deny" this specific allegation and litigation ending in a stipulation of dismissal by Plaintiff).

115.   The foregoing facts demonstrate that Mr. Williams and his fellow inmates effectively lived in a war zone where violence and the threat of serious injury were ever-present. Each of the foregoing facts is publicly available and each Defendant was personally aware of the substantial risk of violence inmates faced each day just by being incarcerated at St. Clair. Nevertheless, each Defendant deliberately failed to take reasonable steps to address and reduce the proliferation of weapons, lack of supervision, and overall risk of violence.

## VI.   DEFENDANTS WERE AWARE OF AND IGNORED CRITICAL STAFFING SHORTAGES AND DEFICIENCIES IN POLICIES AND PROCEDURES TO PROTECT INMATES

116.   As documented in DOJ's April 2019 Notice Letter, and known by all Defendants, St. Clair was dangerously understaffed at the time of Mr. Williams's assault. Exhibit 2, at 9-11.

117.   DOJ's April 2019 Notice Letter noted that, as of June 2018, St. Clair employed a mere 28 percent of its authorized correctional officers, which posed a

severe understaffing problem. Additionally, it found that a correctional officer at St. Clair in 2017 with a base pay of $38,426 earned almost $80,000 in overtime, meaning the officer averaged 90-95 hours per week. *Id.* at 9-11.

118.   DOJ's April 2019 Notice Letter described the acute awareness of Defendant Dunn and ADOC of the substantial risk of harm caused by the dangerous level of understaffing during the relevant time period. Specifically, Defendant Dunn stated that "there is a direct correlation between the shortage of officers in our prisons and the increase in violence." *Id.* at 9.

119.   Because of this severe understaffing, the limited number of correctional officers employed at St. Clair were overworked. The understaffing has resulted in officers having to frequently work shifts as long as 12, 16 or even 20 hours.

120.   The chronic understaffing, and the overworking of that staff, at St. Clair interfered with critical security functions, including, among other things, monitoring of inmates and conducting regular prison-wide searches for contraband.

121.   Defendants knew that the combination of these security deficiencies gravely contributed to numerous violent incidents in the years preceding Mr. Williams's attack. Defendants also knew that their failure to adequately supervise inmates created a dangerous environment conducive for inmates to assault and murder other inmates, including the attack on Mr. Williams.

122.   Despite knowledge that existing policies and practices were deficient and created a substantial risk of harm to inmates, Defendants failed to take any meaningful preventive or corrective action.

123.   Thus, Defendants chose to leave inmates exposed to a continuing risk of serious harm as a result of known chronic understaffing and deficiencies in policies and procedures to protect inmates, thereby demonstrating deliberate indifference to their safety.

## VII.   DEFENDANTS' DELIBERATE INDIFFERENCE CAUSED THE ATTACK ON MR. WILLIAMS

124.   Allowing unrestrained and unrestricted movement in the RHU, along with the proliferation of weapons contraband, understaffing, and inadequate supervision, put Mr. Williams at risk. The Defendants' own policies for St. Clair, especially with respect to the RHU, show that they were aware of that risk and deliberately indifferent to it.

125.   Each Defendant was in a position to take actions that could have prevented the brutal attack on Mr. Williams, but through deliberate indifference, failed to do so.

126.   Instead, and in spite of the *Cheatham* case, the DOJ investigation, the myriad public scrutiny of St. Clair conditions, and their own personal observations

of St. Clair conditions, Defendants failed to take reasonable, necessary and appropriate steps to remedy the dangerous conditions at St. Clair, which resulted in violence at the prison continuing to escalate and culminating in Mr. Williams's attack and grave injuries.

### A. Defendant Administrative Supervisors (Dunn, Mercado, Sides, Ellington, McDonnell, Naglich, Brand, Culliver, Daniels, Williams, and Abbott)

127. Defendant Administrative Supervisors had supervisory responsibilities over ADOC, including control over policies and practices relating to St. Clair security, operations, staffing, and training.

128. With knowledge of the extreme violence, mismanagement, and understaffing that plagued St. Clair, each Defendant Administrative Supervisor could have acted to improve staffing, supervision, monitoring and training, curtail the widespread availability of contraband weapons and dangerous housing assignments, and reduce violence at St. Clair, all of which would have prevented the attack on Mr. Williams.

129. Instead, each Defendant Administrative Supervisor fostered and enabled the accumulation of weapons through at least the following procedures and practices: (a) the encouragement of violence; (b) inadequate staffing; (c) inadequate patrolling; (d) inadequate monitoring of St. Clair housing blocks; (e) inadequate

search procedures; (f) inappropriate responses when weapons were recovered; and (g) failure to take corrective action in response to high rates of violence and assaults.

130.   Specifically, each Defendant Administrative Supervisors could have and should have taken actions to ensure that (a) inmates like Mr. Spencer did not have access to weapons, (b) multiple correctional officers were assigned to each dormitory in the RHU, (c) correctional officers were present at their assigned cubes during their shifts, and (d) additional correctional officers would be near enough to defuse violent altercations that had grown commonplace and subsequently administer any necessary medical aid. Any one of those actions would have prevented, or at least greatly diminished the likelihood of, Mr. Williams's attack and severe injuries. Accordingly, the deliberate indifference of the each of Defendant Administrative Supervisors to the well-documented issues at St. Clair caused the grave attack on Mr. Williams.

### B.   Defendant Prison Supervisors (Bolling, Pickens, Malone, White, Weaver, Scott, Dent, and Unknown Shift Commanders) and Defendant Correctional Officers (Howard, Crawford, and Unknown Correctional Officers)

131.   Each of the Defendant Prison Supervisors and Defendant Correctional Officers were responsible for ensuring adequate supervision and monitoring of inmates, adequate classification of inmates, appropriate housing assignments for

inmates, adequate staffing levels, appropriate discipline and deterrence of inmate and staff misconduct, the conduction of and review of investigations into such misconduct, adherence by staff to search protocols, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security.

132.   Mr. Williams was vulnerable to attack because of frequent violence at St. Clair; the failure of Defendant Prison Supervisors, Defendant Correctional Officers, and certain individuals presently unknown (Defendant Unknown Correctional Officers, and John Does 1-10) to monitor the housing units; and the failure by the Defendant Prison Supervisors (as individually identified above) to (a) install an intercom system, cameras, or other technology to alert other officers about activities within the RHU, (b) adequately staff the prison, and (c) instituted and enforced patrolling policies to combat the pervasive risk of violence inside St. Clair.

133.   The Defendant Prison Supervisors failed to sufficiently staff the prison, maintain adequate security cameras, position correctional officers such that they had adequate sightlines into each part of the RHU dormitories, and institute and enforce patrolling policies by assigning adequate numbers of correctional officers to consistently patrol the dormitories.

134.   For example, security staff at St. Clair did not regularly conduct prison-

wide searches and other standard prison search protocols and procedures to root out contraband or weapons. Each Defendant Prison Supervisor also turned a blind eye to noncompliance with search protocols at St. Clair.

135.   Upon information and belief, when any of these Defendant Prison Supervisors and Defendant Correctional Officers recovered weapons from inmates, they responded with indifference, often declining to discipline inmates found with knives.

136.   As with each of Defendant Administrative Supervisors and other Defendant Prison Supervisors identified above, Defendant Bolling failed to take corrective action to improve safety at St. Clair.

137.   In addition, Defendant Correctional Officers recklessly failed to monitor the RHU and prevent or intervene during Mr. Spencer's attack on Mr. Williams.

138.   As a result of the failures of Defendants, no officers were on hand to provide immediate medical care or summon additional assistance following Mr. Williams's attack. Instead, Mr. Williams was left to fend for himself and seek help outside of the RHU.

## VIII.  MR. WILLIAMS'S DAMAGES

139.   As a result of the Defendants' wrongful actions, Plaintiff has suffered

severe physical injuries and emotional trauma.

140.   While not currently housed in the RHU, Mr. Williams still faces prospective harm in "population" (the general prison population) within St. Clair based on Defendants' continued fostering of an environment of violence. As a St. Clair inmate, he is also at risk of returning to the RHU now and/or in the future, where, upon information and belief, policies and practices are virtually identical to what they were at the time of Mr. Williams's attack in August 2019.

## IX.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

141.   There are no administrative remedies within ADOC for Mr. Williams to exhaust.

## X.   SPECIFIC COUNTS

### Count I
### 42 U.S.C. § 1983 -
### Eighth Amendment Failure to Protect
### Against All Defendants

142.   Mr. Williams incorporates each of the foregoing paragraphs of this Complaint as if fully restated here.

143.   Pursuant to the Eighth Amendment of the United States Constitution, and under clearly established law, Mr. Williams is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

144.   Defendants, acting individually and in conspiracy with other Defendants, failed to protect Mr. Williams from such harm.

145.   Defendants knew of and consciously disregarded the substantial risk that Mr. Williams would be injured while in custody at St. Clair, failing to protect him from harm.

146.   The misconduct described in this Count was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of Mr. Williams and others, and was objectively unreasonable.

147.   Defendants' misconduct directly and proximately caused Mr. Williams to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages, including pain, scarring, suffering, fear, anxiety, self-isolation, and other harmful physical and psychological harms, both from the brutal assault and its traumatizing aftermath.

### Count II
### 42 U.S.C. § 1983 -
### Eighth and Fourteenth Amendment State-Created Danger
### Against All Defendants

148.   Mr. Williams incorporates paragraphs 1 through 133 of this Complaint as if fully restated here.

149.   Pursuant to the Eighth and Fourteenth Amendment of the United States

Constitution, Mr. Williams is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State, including from a State-created danger.

150.   Defendants limited Mr. Williams's ability to care for himself in prison.

151.   Defendants affirmatively placed Mr. Williams in a position of danger that he would not have otherwise faced.

152.   In violation of Mr. Williams's Eighth and Fourteenth Amendment rights, Defendants knew of and consciously disregarded the substantial risk that Mr. Williams would be injured while in custody at St. Clair, including from a State-created danger.

153.   Defendants, acting individually and in conspiracy with other Defendants, then failed to take reasonable steps to address the known and unreasonable risk of serious harm to Mr. Williams resulting from the State's creation.

154.   The misconduct described in this Count was undertaken with deliberate indifference, malice, willfulness, and reckless indifference to the rights of others, and was objectively unreasonable.

155.   Defendants' misconduct directly and proximately caused Mr. Williams to be subjected to an unreasonable risk of serious harm, and caused him to suffer

damages, including pain, scarring, suffering, fear, anxiety, self-isolation, and other harmful physical and psychological harms, both from the brutal assault and its devastating aftermath.

## Count III
### 42 U.S.C. § 1983 - Failure to Intervene
### Against All Defendants

156.   Mr. Williams incorporates each paragraph of this Complaint as if fully restated here.

157.   One or more Defendants knew that Mr. Williams's rights were being violated, and had the realistic opportunity to intervene to prevent or stop the constitutional misconduct alleged above, but failed to do so.

158.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Williams's constitutional rights.

159.   As a result of the Defendants' failure to intervene, Mr. Williams's constitutional rights were violated and he suffered damages.

## Count IV
### Intentional Infliction of Emotional Distress
### Against All Defendants

160.   Mr. Williams incorporates each paragraph of this Complaint as if fully restated here.

62

161.   The acts of Defendants as set forth above were both extreme and outrageous.

162.   Defendants intended to cause, or acted in reckless disregard of the probability that they would cause, severe emotional distress to Mr. Williams.

163.   The misconduct described above was undertaken with malice, willfulness, and reckless indifference to Mr. Williams's rights.

164.   As a direct and proximate result of the misconduct described above, Mr. Williams's rights were violated and he suffered damages.

**Count V**
**Negligence**
**Against All Defendants**

165.   Mr. Williams incorporates each paragraph of this Complaint as if fully restated here.

166.   Defendants owed a duty of care to Mr. Williams.

167.   Defendants breached that duty of care by the acts and omissions set forth above.

168.   In doing so, Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

169.   Defendants' breach of their duty of care to Mr. Williams directly and proximately caused Plaintiff to suffer damages, including physical and emotional

63

pain and suffering.

## RELIEF SOUGHT

170.   As relief, Mr. Williams seeks the following:

    a.    That Mr. Williams be awarded such compensatory damages proven at trial;

    b.    That Mr. Williams be awarded such punitive damages that are proven at trial;

    c.    That Mr. Williams be awarded prejudgment and post judgment interest at the highest rates allowed by law;

    d.    That Mr. Williams be awarded the costs of this action, reasonable attorney's fees, and reasonable expert witness fees;

    e.    That Mr. Williams be awarded such other and further relief to which he is justly entitled.

## JURY DEMAND

Mr. Williams demands a trial by struck jury.

*s/Benjamin R. Little*
Benjamin R. Little
**DENTONS SIROTE PC**
201 S. Court Street, Suite 725
Florence, Alabama 35630
Tel.:   (256) 367-5832
benjamin.little@dentons.com

*s/Meghan S. Cole*
Meghan S. Cole
**DENTONS SIROTE PC**
2311 Highland Avenue South
Birmingham, Alabama 35205
Tel.:   (205) 930-5100
meghan.cole@dentons.com

*s/Patrick F. Linehan (PHV Application forthcoming)*
Patrick F. Linehan
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel.:   (202) 429-8254
plinehan@steptoe.com

*Counsel for Plaintiff Marcellus Williams*

Exhibit 1

FILED

2014 Oct-14  AM 10:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ANTONIO CHEATHAM; MARK DUKE; JAMES EDWARDS; DALE GILLEY; FRANKY JOHNSON; MICHAEL MAYS; DERRICK WHITE; ALLAN WILLIAMS and ROBERT WOODS, on behalf of themselves and all others similarly situated | * * * * * * * * * | |
| PLAINTIFFS, | * | Civil Action No. _____ |
| vs. | * | |
| | * | |
| COMMISSIONER KIM THOMAS; ASSOCIATE COMMISSIONER JAMES DELOACH; ASSOCIATE COMMISSIONER TERRANCE MCDONNELL; DEPUTY COMMISSIONER GREG LOVELACE; INSTITUTIONAL COORDINATOR GRANT CULLIVER; WARDEN CARTER DAVENPORT; ASSISTANT WARDEN ERIC EVANS; ASSISTANT WARDEN KAREN CARTER; CAPTAIN CARL SANDERS; CAPTAIN GARY MALONE, in their official capacities, | * * * * * * * * * * * * * * * * * | |
| DEFENDANTS. | * | |

_____

## CLASS ACTION COMPLAINT

_____

## PRELIMINARY STATEMENT

Plaintiffs are men presently confined in the custody of the Alabama Department of Corrections ("ADOC") at St. Clair Correctional Facility ("St. Clair" or "the Facility"), where mismanagement, poor leadership, overcrowding, inadequate security, and unsafe conditions, including broken and nonfunctioning locks on the majority of cell doors, have lead to an extraordinarily high homicide rate, weekly stabbings and assaults, and a culture where violence is tolerated, creating conditions of confinement that violate the Eighth and Fourteenth Amendments to the United States Constitution. Because of poor management, drugs and other contraband – in many cases contraband that is brought into the Facility and sold to prisoners by officers or DOC staff – are prevalent. Furthermore, correctional staff fail to follow policies and procedures and sometimes ignore urgent pleas for assistance that then results in serious violence. The potential for violence is exacerbated by the dearth of basic hygiene supplies, including soap, toilet paper, and underclothing, that can only be obtained by purchase or favor. It is also exacerbated by new policies eliminating or severely cutting back mental health and drug treatment services, rehabilitative programming, and removing books and other constructive activities from the housing units. The lack of basic hygiene supplies and opportunities to engage in activities, including reading, creates an oppressive and monotonous environment that

2

accommodates abuse and violence, as well as drug abuse in a population with a high rate of mental illness and prior addiction.

Defendants have failed to reasonably and adequately respond to this extremely high rate of prisoner-on-prisoner assaults and homicides and the dangerous conditions that facilitate the incidents and culture of violence.   Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for injunctive and declaratory relief to redress Defendants' violations of their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Each paragraph in this complaint incorporates, repeats, and realleges every other paragraph in this complaint.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). Plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201.   Venue is proper pursuant to § 1391(b).

## PARTIES

PLAINTIFFS:

2. Plaintiffs Antonio Cheatham, Mark Duke, James Edwards, Dale Gilley, Franky Johnson, Michael Mays, Derrick White, Allan Williams, and Robert Woods are prisoners at St. Clair Correctional Facility.   Each named Plaintiff has suffered

physical harm or is in immediate danger of future harm.  They seek to represent themselves and all other current and future prisoners at St. Clair.

DEFENDANTS:

3.     Defendant Kim Thomas is the Commissioner of the Alabama Department of Corrections.  As Commissioner, Defendant Thomas is responsible for the direction, supervision, and control of the Department of Corrections.  He is the highest ranking official in the Alabama Department of Corrections.  Defendant Thomas is sued in his official capacity as Commissioner of the Alabama Department of Corrections.

4.     Defendant James Deloach is the Associate Commissioner for Operations for the Alabama Department of Corrections.  As Associate Commissioner, Defendant Deloach is responsible for ensuring the effective daily operations of prison facilities.  He supervises the Classification Review Board, the Training Division, the Transfer Division, and the Institutional Coordinators.  Defendant Deloach is sued in his official capacity.

5.     Defendant Terrance G. McDonnell is the Associate Commissioner for Plans and Programs for the Alabama Department of Corrections.   As Associate Commissioner, Defendant McDonnell is responsible for the Central Records Division, Research and Planning Division, Supervised Reentry Program, Religious Programs, Educational and Vocational Education Programs, and Victim-Constituent Services.

4

Defendant McDonnell is sued in his official capacity.

6.     Defendant Greg Lovelace is the Deputy Commissioner for Maintenance for the Alabama Department of Corrections. As Deputy Commissioner, Defendant Lovelace is responsible for the maintenance and construction of correctional facilities. Defendant Lovelace is sued in his official capacity.

7.     Defendant Grant Culliver is the Institutional Coordinator for the Northern Region of the Alabama Department of Corrections.  Defendant Culliver is responsible for planning, monitoring, and reviewing day-to-day operations of correctional institutions in his assigned area, including St. Clair Correctional Facility.  Defendant Culliver is sued in his official capacity.

8.     Defendant Carter Davenport is the Warden of St. Clair Correctional Facility in Springville, Alabama.  As warden, Defendant Davenport is responsible for the day-to-day operations of the prison, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Davenport is sued in his official capacity.

9.     Defendant Karen Carter is an Assistant Warden of St. Clair Correctional Facility in Springville, Alabama.  As assistant warden, Defendant Carter is responsible for the day-to-day operations of the prison, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Carter is sued

in her official capacity.

10.     Defendant Eric Evans is an Assistant Warden of St. Clair Correctional Facility in Springville, Alabama.  As assistant warden, Defendant Evans is responsible for the day-to-day operations of the prison, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Evans is sued in his official capacity.

11.     Defendant Carl Sanders is a Captain at St. Clair Correctional Facility in Springville, Alabama.  As a Captain, Defendant Sanders is responsible for safety of all inmates at the Facility, for supervising the security activities of St. Clair, and the supervision of all subordinate employees.  Defendant Sanders is sued in his official capacity.

12.     Defendant Gary Malone is a Captain at St. Clair Correctional Facility in Springville, Alabama.  As a Captain, Defendant Malone is responsible for safety of all inmates at the Facility, for supervising the security activities of St. Clair, and the supervision of all subordinate employees.  Defendant Malone  is sued in his official capacity.

## FACTUAL ALLEGATIONS

13.     Defendants are aware of the extremely high rate of violence at St. Clair. There have been six homicides at the Facility in the past 36 months, three of which

6

occurred in 2014.  This constitutes a rate of prisoner-on-prisoner homicides at St. Clair that is drastically higher than the national average in state prisons.  Based on the Bureau of Justice Statistics' most recent available annual data from 2011, the national homicide rate in state prisons was approximately 5.4 homicides per 100,000 prisoners. The homicide rate at St. Clair during the same time period was approximately 75.4 homicides per 100,000 prisoners.  The homicide rate at St. Clair in 2012 was 75.6 per 100,000 prisoners, 77.7 per 100,000 prisoners in 2013, and the homicide rate to date **for 2014 is approximately 232.4 per 100,000 prisoners**.

14.     There is also a high rate of stabbings and serious assaults.  Based on the most recent data made available by the Alabama Department of Corrections, the rate of serious  assaults at St. Clair from January to May 2014 was 848.8 serious assaults per 100,000 prisoners and the rate of fights and assaults combined was 4,321 per 100,000 prisoners.

15.     Defendants are aware of this extreme level of serious life endangering violence at St. Clair.  In a news article from March 16, 2012, Defendant Davenport referred to the overcrowding, contraband, and violence at St. Clair as a "security nightmare."  There has been media coverage of each of the prisoner-on-prisoner homicides, which has included official statements from ADOC.

16.     Furthermore, undersigned counsel sent a letter to Defendant Thomas on

April 22, 2014, regarding the alarming rise in violence and unprecedented homicide rate at St. Clair under Warden Davenport's leadership and met with the Commissioner to emphasize these concerns.

17.    Less than two months after this meeting regarding the alarming rise in fatalities at St. Clair, another homicide occurred.  Jodey Waldrop was killed inside his cell on June 3, 2014.

18.    On June 9, 2014, following the murder of Mr. Waldrop, undersigned counsel sent a second letter to Defendant Thomas which documented the high rate of violence and the number of homicides at St. Clair in the preceding 30 months.  In this letter, and in meetings with the Commissioner and his staff, undersigned counsel detailed the mismanagement and violent conditions at St. Clair and called for immediate reform and change in leadership.

19.    No changes were made following these communications and the violence at St. Clair continued.  On September 16, 2014, another prisoner was killed at St. Clair.

20.    Defendants' knowledge of the violent and dangerous conditions is also established by institutional reports prepared by Defendants' employees describing violent incidents and lawsuits filed by prisoners challenging the abuse of authority and conditions of confinement.

8

21.     Defendants are responsible for the care, custody and control of prisoners in their custody, and, through their acts and omissions, Defendants have allowed a dangerous and violent environment to flourish.   Upon information and belief, Defendants have not made  significant efforts, and have not implemented adequate changes in policy or practice to address, or to improve, the conditions at St. Clair that allows violence to proliferate.   Despite the extraordinary rate of violence and homicides at St. Clair, Defendants have failed to take reasonable, necessary and appropriate steps to prevent and remedy these dangerous conditions.

22.     Where Defendants have responded, their response has been unreasonable. Verbally abusive and physically aggressive intervention by staff heightens the tension and makes the prison more dangerous.   This behavior is modeled by the highest ranking staff in the prison including Defendants Warden Davenport, Captain Sanders, and Captain Malone.

23.     It has been widely publicized that in 2012, Defendant Warden Davenport reportedly punched a handcuffed prisoner in the face.   Warden Davenport was not demoted or removed from his command.

24.     Upon information and belief, Defendant Captain Sanders engages in arbitrary and unpredictable bullying tactics that keep the prison on edge including an incident in 2013 when Captain Sanders snatched a food tray from a prisoner's hands

causing a dangerous and volatile situation to erupt leading to serious injuries to officers and prisoners. Upon information and belief, Captain Sanders has taunted prisoners and responded to their safety concerns by telling them to, "get a knife," "kill him or kill yourself," and "if you really don't like him, stab him."

25.   A group of high ranking officers have used excessive force and promulgated the culture of violence through their own actions. This, combined with Defendants' failure to appropriately supervise staff with patterns of incidents involving excessive force or abusive interactions, has created an environment where the risk of physical harm is likely. This is reflected in the numerous assaults on prisoners by a group of correctional staff who have been the subject of repeated complaints of abuse, including but not limited to:

a.   In 2014, Captain Carl Malone punched a prisoner, who was handcuffed, in the head, chipping the prisoner's tooth.

b.   In July 2014, Correctional Officers Donald Lukima and Christopher Smith, officers on Lt. Carter's shift beat a prisoner. Officers Lukima and Smith ordered the prisoner out of his cell in the middle of the night, took him into the hallway outside his block, handcuffed him, and then hit him in the back of the head with handcuffs wrapped around their knuckles, causing injuries requiring staples. Upon information and belief, Lt. Carter observed the assault but did

not intervene.

c.      In May 2014, Lt. Carter put his hands around an inmate's neck and applied pressure until he lost consciousness. The inmate had to be taken to UAB hospital due to his injuries.

d.      In May 2014, Lt. Carter forced Dale Gilley to stand outside the shift office facing the wall for fourteen hours and, at one point during that period of time, slammed his head against the wall and punched him in the face.

e.      Jermaine Tillman was assaulted in February 2013, by Officers Chad Cleveland, M. Desnides, and W. Howard. The officers assaulted Mr. Tillman when he was returning to his cell from the showers and was restrained in handcuffs behind his back. The officers hit Mr. Tillman in the face, slammed his head into a window, and continued to punch, kick, and beat him when he fell to the floor. Mr. Tillman's injuries included swelling to his head and bruising on his face.

f.      Upon information and belief, inmate Richardo Eason was beaten by multiple St. Clair officers while handcuffed in February 2013. While assigned to the segregation unit, Mr. Eason was placed in handcuffs before being allowed to leave his cell for a shower. Officer JaMichael Howard left his post and approached Mr. Eason, asked him a question, then punched Mr. Eason

several times in the face. Officers Taylor Knight and Chad Cleveland then assisted Howard in slamming Mr. Eason onto the floor.

g.      Upon information and belief, inmate Darrious Mabry was beaten by Officer Matthew Moore in October 2012.  In a dispute over Mr. Mabry leaving the dining hall with extra cake, Officer Moore left his post and attacked Mr. Mabry, who suffered a broken nose, split lip, broken tooth, injured eye, and head contusions.

h.      Upon information and belief, on January 20, 2012, inmate Joseph Shack was beaten by Sgt. John Mason and suffered hearing loss as a result.  Mr. Shack was handcuffed and shackled during the beating.  Sgt. Mason punched him in the head, face, and ear, stomped on his back, kicked him and yelled racial epithets at him.  Mr. Shack had requested the presence of a witness at a disciplinary hearing, and Sgt. Mason responded: "This is what I do to a [n . . .] that tries to tell me how to do my job." Mr. Shack was treated for a ruptured ear, fractured thumb, internal bleeding, and possibly fractured ribs.  He was fitted for a hearing aid following the rupture.

i.      Upon information and belief, James Bonds was beaten by officers and suffered a severe eye injury in September 2011.  Three correctional officers shook down his cell, forced him to remove clothes and to squat and cough.

After they found a cell phone in his cell, the officers sprayed Mr. Bonds with a chemical agent and struck him with batons, then handcuffed him. After Mr. Bonds was handcuffed, Officer Donald Lukima arrived at the scene and struck Mr. Bonds in the eye while Mr. Bonds was handcuffed. Mr. Bonds suffered a serious eye injury, including an orbital wall fracture to his left eye and massive bleeding. His injuries required multiple treatments and surgeries at outside hospitals.

26.    Defendants have also failed to promulgate, implement and enforce adequate policies, procedures, and practices necessary to adequately supervise and monitor the housing units and common areas in the Facility and to maintain the safety and security of prisoners at St. Clair. Defendants are aware that the inadequate supervision by correctional staff has created a dangerous environment, has contributed to numerous homicides and assaults in the Facility, and creates a substantial risk of serious harm. As stated by Defendant Davenport, the conditions at St. Clair make it a "security nightmare." They have failed to take reasonable measures to change their practices, policies, procedures to improve safety and security of the prisoners in the general population housing units.

27.    Defendants fail to adequately supervise and monitor the housing blocks in general population. Upon information and belief, St. Clair has six cellblocks, J, K,

13

L, M, N, O, P, and Q, that house prisoners in general population.  Each cellblock is divided into two separate sides, so that they are designated as J1, J2, K1, K2, etc. Blocks J and K are paired blocks that are connected by a hallway, as are L and M, N and O, and P and Q.   Each side of a cellblock is comprised of 24 two-man cells, so that 48 prisoners live on each side of a block and 96 prisoners live in each block as a whole.   Each cell has a steel door through which prisoners enter and exit their cell. The locking mechanisms on the majority of cell doors are broken or ineffectual and provide no protection.  (See ¶¶ 40-44 below.)

28.    A single officer is assigned to supervise and monitor each of the housing blocks and the 96 prisoners housed there.  The officer is stationed in a "cube," which has windows that allow the officer to see into both sides of the block.  Upon information and belief, the cube officer is not permitted to leave their post during their shift.  Random patrols of the housing blocks by additional officers occur extremely infrequently.  Upon information and belief, most days, officers only walk through the blocks during scheduled count times that occur three to five times in a 24 hour period. Therefore, the cube officer is the only officer monitoring both sides of each block the vast majority of the time.  Upon information and belief, the officers in the cube are, at times, asleep, on the telephone, or otherwise not paying attention to the prisoners they are supervising.

29.    Upon information and belief, there are blind spots in all of the blocks that cannot be seen by the cube officer, including the shower area, the TV/day room, and inside all of the cells.   There are few, if any, functioning cameras in the housing blocks.   Consequently, large sections of the housing blocks in general population are not within the view of any officer the majority of the day.

30.    The only means for prisoners to communicate with the officer in the cube is by banging on the glass windows.   If a prisoner is in a locked cell, there is no way for a prisoner in his cell to contact the officer in the cube except by banging on his cell door.

31.    Each of the cellblocks open onto a common yard, referred to as the "G-Yard" and doors leading to the G-Yard from the blocks are located in the hallways that connect the paired blocks together.   The gymnasium used by all of the prisoners in general population is located on the G-Yard.   The prisoners who live in H-dorm and G-dorm also use the G-Yard and the gymnasium.

32.    There are between 200 and 400 prisoners on the yard or in the gym during yard call and gym call.   Upon information and belief, there is one officer assigned to supervise the yard and the gym during yard and gym call and between two and four roving officers.   However, there are often less officers present than are assigned to the gym and yard.

15

33.     There are also two open bay dorms at St. Clair.  The first is known as "H-Dorm," where prisoners enrolled in the Therapeutic Communities program ("TC"), a substance abuse treatment program, reside.  Upon information and belief, there are approximately 260 prisoners who currently reside in H-Dorm.  The other dorm is known as G-Dorm.  It is a part of the infirmary and typically, prisoners requiring medical care live there.  Upon information and belief, there are approximately 58 prisoners who live in G-dorm.

34.     Upon information and belief, there is one officer who is assigned to sit at a desk at the entrance of H-dorm and who is responsible for supervising the prisoners who reside in the dorm.  That officer is not permitted to leave his assigned post during his shift and is unable to see inside the bathrooms, as well as the back of the dorm where some prisoners' beds are located, from the desk where he sits.  Upon information and belief, random patrols of the dorms by additional officers occur extremely infrequently.  Most days, officers only walk through the blocks during scheduled count times that occur three to five times in a 24 hour period.  Therefore, the officer assigned to the desk is the only officer monitoring each block the vast majority of the time and the officers at the desk are, at times, asleep, on the telephone, or otherwise not paying attention to the prisoners they are supervising.

35.     Upon information and belief, there are blind spots in the dorms.  The

officer assigned to monitor the dorm from the desk near the entrance is not able to see a portion of the back of the dorm where some prisoners' beds are located. Additionally, the officer is not able to see into the bathrooms from his or her post. There are few, if any, functioning cameras in the dorms. Consequently, portions of the dorms are not within the view of any officer for large parts of the day.

36.    Defendants are aware that the inadequate supervision in general population contributes to the high rate of prisoner-on-prisoner violence. Inattentive officers, the inability to contact officers in an emergency, and blind spots in the units have contributed to numerous violent incidents, many of which have been stabbings, that have resulted in serious injury or death, including but not limited to:

a.    In June 2014, Jodey Waldrop was stabbed and killed inside his cell, a blind spot to the cube officer, by a prisoner who entered his cell, when the blocks are supposed to be on lock down and no prisoner should have been out of his cell.

b.    In June 2014, Derrick White, who lived in P block, was assaulted in the hallway between P and Q blocks during a movement time by a prisoner who, upon information and belief, was not assigned to either block. There were no officers present when Mr. White was assaulted. He was strangled and then dragged while unconscious into the showers in Q. He was in the showers from

17

approximately 7:30 a.m. until 1 p.m. and was never found by staff, despite the fact that, upon information and belief, a count was conducted during the time he was missing.

c.      In May 2014, Derrick White was stabbed in the gym by another prisoner. Mr. White's assailant also stabbed another prisoner during this incident.  There were approximately 20 prisoners present in the gym and 200 prisoners in the yard at the time of the stabbing.  Upon information and belief, there was one officer supervising the yard and no officers present in the gym.

d.      In May 2014, Antonio Cheatham was assaulted by another prisoner in the bathroom of the H-dorm, a known blind spot, while no correctional officers were in view.  Part of his ear was bitten off and flushed down a toilet before any officers responded to the struggle.

e.      In February 2014, a prisoner was stabbed inside his cell, a blind spot to the cube officer.

f.      In January 2014, Marquette Cummings was stabbed and killed in the TV room, a blind spot to the cube officer.

g.      In January 2014, Michael Mays  was stabbed by another prisoner on the way to the chow hall.  Mr. Mays was stabbed in the neck, in the back, and in the elbow.  Mr. Mays had to be taken to an outside hospital for treatment.

18

h.      In September 2013, Franky Johnson was burned in his cell in the middle of the night by a prisoner who was able to exit his own cell and enter Mr. Johnson's cell.  That prisoner threw powder hair remover that had been heated in a microwave on Mr. Johnson while he was sleeping, resulting in severe chemical burns.

i.      In July 2013, Mark Duke was stabbed several times by another prisoner in the G-Yard and suffered a punctured lung.

j.      In 2013, a prisoner was stabbed multiple times with an ice pick outside the gym by another prisoner.  At the time there were approximately 200 inmates in the area, but no officers were present to intervene in the conflict. The prisoner made it to the infirmary unassisted and was eventually transported by ambulance to an outside hospital because of the seriousness of his wounds.

k.      In May 2012, John Rutledge was strangled to death inside his cell in the middle of the night when the cells should have been locked down.  Multiple assailants were able to enter Mr. Rutledge's cell and hog-tie and strangle him without being observed by officers.  His cell mate discovered him and reported his condition to the cube officer.  By the time officers reached the cell, Mr. Rutledge was dead from strangulation.

l.      Upon information and belief, Muhammad Al-Ameen, also known as

Terry Rivers, was repeatedly stabbed on the yard by another inmate in May 2012. There were numerous inmates on the yard, but no officers were present when Mr. Al-Ameen was stabbed. Mr. Al-Ameen underwent surgery on his neck and surgery on his hand to repair damaged tendons.

m.      In October 2011, Jabari Bascomb was stabbed to death in his cell, a blind spot to the cube officer, after another prisoner broke into his cell.

n.      Upon information and belief, in January 2011, Anthony Moss was assaulted in his cell, a blind spot to the cube officer, and suffered an injury which caused him to lose the use of his left eye.

37.     Defendants have also failed to promulgate and enforce adequate and effective policies, procedures and practices in the segregation housing units meant to keep prisoners isolated from one another for their protection. Upon information and belief, policy requires that prisoners in segregation be placed in handcuffs before their cell door is opened, and that only one door be open at a time so that prisoners in segregation do not come in contact with each other. In practice, the cube officer frequently rolls the doors from his cube without the placement of handcuffs, allowing for multiple people in segregation to be on the hallway and in the showers at the same time.

38.     DOC staff also fail to adequately conduct searches for contraband and

knives in segregation. The failure to follow the policies of  permitting only one

prisoner out of his cell at a time and searching for contraband creates a significant risk

of serious harm because these conditions have been the cause of multiple violent

assaults, including but not limited to:

a.      In August 2014, a prisoner was stabbed by the same prisoner that fatally

stabbed Jammy Bell in 2013, after the prisoner was assigned to clean the halls

in the segregation unit. The officers failed to secure the food-tray slots on the

cell doors prior to sending the prisoner into the unit and the other man was able

to stab the prisoner in his leg by sticking a knife attached to a broom handle

through his open tray slot.

b.      In August 2013, Jammy Bell was fatally stabbed by another prisoner in

the segregation unit after an officer failed to follow proper protocol for opening

the cell doors.

c.      Upon information and belief, Jovar Gamble was stabbed multiple times

in August 2012, while housed in the segregation unit.  Mr. Govar was in

handcuffs on the walk when another segregation inmate stabbed him.

d.      Upon information and belief, Orlando Porch was assaulted by another

inmate while both men were housed in segregation in January 2012.

39.     Defendants are aware of the locations and circumstances in which these

homicides and assaults have occurred and that inadequate supervision was one of the

dangerous conditions that made it possible for these incidents to occur. However, they

have failed to adequately increase patrols and supervision of the units, have not

installed cameras or provided means for prisoners to call for help in an emergency, nor

taken any other reasonable action to increase and improve the quality of supervision

in general population, leaving the plaintiff class exposed to the continuing real and

imminent substantial risk of serious harm.

### DEFENDANTS' FAILURE TO PROVIDE SECURE LOCKING MECHANISMS ON INDIVIDUAL CELL DOORS PLACES INMATES AT RISK OF VIOLENT ASSAULT.

40.     The locking mechanism on the majority of cells are broken and have not

been repaired. Defendants rely on a system of locked, secure cells to house inmates

safely, rather than visual monitoring, yet Defendants are aware that the locks in the

majority of doors at the Facility can be easily tampered with so that they do not lock.

Without locking cell doors, prisoners in the cell blocks have no means of protecting

themselves inside their cells. Defendants have refused requests to fix cell doors and

have failed to take adequate measures to repair the broken cell locks.

41.     The locks on the cell doors in general population can be easily tampered

with by using items such as piece of plastic, a razor blade, or paper clips to jam the

locking mechanism. Once the locking mechanism is jammed, it does not engage and

22

the door can be "tricked," meaning it can be opened from the inside or from the outside with a plastic ID card which all prisoners carry.  The locks on some of the doors in general population are broken and do not work, even if nothing is jamming the mechanism.  In some doors, the entire mechanism is missing.  Cell doors in general population remain open all day, making it possible for prisoners to jam the locks in other prisoners' doors.  The locks on the doors in segregation can also be easily tampered with by jamming an object, such as a toothbrush, in the mechanism that rolls the door, which prevents the lock from engaging.

42.    Consequently, Plaintiffs cannot keep other prisoners from entering their cells and prisoners are able to enter or exit their own and other prisoners' cells at any time, even during lockdown. This creates a particularly dangerous environment because cells are "blind zones" in the blocks, meaning that officers in the cube cannot see inside the cells and there is no way for a prisoner to call an officer for help in the event of an emergency, other than banging on the cell to try to get the attention of the cube officer. (See ¶¶ 28-29 above)  Because cube officers are frequently asleep or are otherwise inattentive, this is not an effective means for a prisoner being assaulted to get help.

43.    Defendants know that the locks on most cells do not work.  St. Clair staff have made comments demonstrating their knowledge, have used their own ID cards

to open cell doors, and have seen prisoners come out of their cells when the unit is supposed to be on lockdown.  Upon information and belief, there is an indicator light panel in the cube that indicates to the cube officer when cell doors are not locked. Furthermore, Defendants are aware that the lack of functioning locks creates dangerous conditions because prisoners have been assaulted in their cells during times when the unit was on lockdown.  These incidents include, but are not limited to:

a.    In June 2014, Jodey Waldrop was murdered in his cell by another prisoner, who was able to enter Mr. Waldrop's cell in the middle of the night when the block was on lockdown, due to the cell door not locking.

b.    In August 2013, Jammy Bell was stabbed by another prisoner in segregation after his cell door was tampered with.

c.    In May 2012, John Rutledge was strangled to death by other prisoners who entered his cell in the middle of the night, when the cells should have been on lockdown.

d.    Upon information and belief, in May 2011, Derrick Averhart was stabbed in the arm, head, and face by another inmate while handcuffed in his cell in segregation.

44.    Defendants have failed to respond in a reasonable manner to the continuing real and imminent substantial risk of serious harm posed to the plaintiff

class by the broken locks on the general population cell doors. Defendants do not adequately train younger staff how to determine if a door is tricked, do not regularly check cell doors to make sure the lock is functioning properly or repair locks they know are broken, have refused Plaintiffs' requests to repair broken locks, and have taken no other reasonable or adequate action to ameliorate the risk of harm created by cell doors that do not lock.

### VULNERABLE INMATES, INCLUDING THE DISABLED AND ELDERLY, ARE HOUSED IN VIOLENT UNITS WHERE THEIR RISK OF VIOLENT ATTACK IS INCREASED.

45.    Defendants' lack of risk assessment and classification system puts prisoners at risk of violence. Defendants fail to effectively separate prisoners who are at risk for a violent conflict. Defendants fail to adequately screen incoming prisoners to determine if they have enemies in the Facility, based either on personal conflicts, prior conflicts at other facilities in ADOC, or gang-based conflicts, and do not adequately take such considerations into account when making housing assignments. Without the ability to identify enemies and vulnerable inmates, St. Clair cannot appropriately manage risks of violence, thus exposing prisoners to harm.

46.    Upon information and belief, Defendants do not adequately factor in a prisoner's security level, including his offense of conviction, sentence, and disciplinary record, in making housing assignments. Minimum, medium, and

25

maximum custody prisoners can be, and are, assigned to the same units and cells as each other.  Therefore, prisoners with short term of years sentences, convictions for relatively minor offenses and clean or only minor disciplinary histories can be assigned to the same unit, and assigned to share a cell with, prisoners who have life sentences, were convicted of more serious offenses, or with a violent institutional history.  It is unreasonable of Defendants to fail to make housing assignments based on security classification status or other vulnerabilities.

47.    Upon information and belief, Defendant Sanders, the captain of general population is responsible for authorizing all housing movement and has repeatedly assigned older, physically disabled, or otherwise vulnerable prisoners to units and cells with young prisoners with a history of violent conduct.  He has also failed to authorize a change in housing assignment when such prisoners request a bed change based on fear for their safety.  (See ¶¶ 52-53 below.)

a.    James Edwards, who is 56 years old, has recently been assigned to cells with much younger prisoners who engage in risky activities that put him at risk and who steal his property. In 2012, while living in a prior block, Mr. Edwards' cell mate would leave the cell door unlocked at night in order to obtain drugs and engage in other prohibited behavior. Mr. Edwards complained to Captain Sanders and requested a bed transfer because his cell mate was using drugs and

taking his property. Captain Sanders refused to move him and told him, "When I see one of y'all on a stretcher, I know it's a problem."

b.      In June 2014, a 60 year old, physically disabled prisoner, was robbed at knife point by another prisoner, who, upon information and belief, is a 23 year-old mentally ill prisoner.  The prisoner was robbed less than 24 hours after being transferred from the Honor Dorm to L Block, a much more violent block, housing younger inmates.

c.      Robert Woods was recently reassigned by Defendant Sanders from a block where many older prisoners live, to a violent block where he is vulnerable because he is 57 years old and physically disabled.  When he expressed fear for his safety to Defendant Sanders, Sanders responded "If you ain't got a knife, I'll give you one."  When Mr. Woods' property box was broken into in his cell and he reported the theft to Defendant Sanders, Sanders responded that he had moved Mr. Woods so that something like that would happen to him.  When Mr. Woods spoke to Defendant Davenport about Defendant Sanders' response to his fears, Defendant Davenport responded by asking Mr. Woods if he had a knife yet.  When Mr. Woods responded that he had not, Defendant Davenport told Mr. Woods to do what he needed to do to survive on his new block.  Mr. Woods made one final request to Defendant

27

Sanders to move him from his new block and Defendant Sanders responded by placing several box cutters on a table and told Mr. Woods to make a knife to protect himself.

48.     Upon information and belief, Defendants fail to adequately and effectively separate prisoners who have had violent confrontations at St. Clair. Defendants do not have reasonable policies and procedures in place that would enable re-classification of prisoners who may be identified as violent as a result of actions in the Facility.

49.     In response to violence between prisoners, Defendants place the victim and the aggressor in punitive isolation for an indefinite period.  The victim is then placed in a catch-22 position of remaining indefinitely in punitive isolation or signing a "living agreement" with the other inmate(s) involved in the altercation in order to be released from segregation back into general population. Upon information and belief, once a living agreement has been signed, Defendants can and do assign prisoners who have engaged in violence or threatened each other to the same unit. Defendants' requirement that victims of violent assaults must either remain in segregation or sign a "living agreement," and then be placed back in contact with the prisoner(s) who assaulted them, is not a reasonable response to violent incidents between prisoners.

28

50.    Defendants do not adequately consider an inmate's mental health status or history of violent conflict with other prisoners in making housing assignment. Upon information and belief, inmates with serious mental health problems and histories of repeated violent conflict live in general population and do not get adequate treatment or supervision.   Defendants also fail to provide adequate training or supervision to staff on how to respond to prisoners who report threats of violence made by prisoners with known histories of mental instability and violent conflict. Defendants' failure to adequately classify and treat prisoners with mental illness and histories of repeated violent assaults, as well as their failure to provide adequate training or supervision of staff on how to respond to mentally ill or violent prisoners has resulted in substantial harm to Plaintiffs.

51.    Defendants have failed to create and enforce adequate procedures, practices, and policies for investigating and responding to inmate requests to be moved to a new cell assignment based on threats or fear for their safety in their current housing assignment.  Defendants have rejected inmate requests for movement out of hand with little or no effort made to determine the veracity and seriousness of the threat.

52.    Upon information and belief, all bed change requests must be approved by Defendant Sanders.  Defendant Davenport, as well as Captain Sanders, Lieutenant

Carter, and Lieutenant Scott have responded to Plaintiffs' requests to move based on threats to their safety by telling them to arm themselves with knives, by making comments to the effect that they are tough enough to handle the potential violence, by telling the threatened prisoners that Defendants do not care what happens to them, or by telling them that the only option for transfer is to be moved into segregation. If a threatened prisoner agrees to move to segregation for his safety, Defendants have also denied that request.

53.    Defendants are aware that their refusal to classify prisoners and refusing to investigate and grant movement requests based on a prisoner's safety concerns creates a substantial risk of serious harm because prisoners have been assaulted after their requests to move housing assignments were denied. These incidents include, but are not limited to:

a.    In June 2014, prior to being assaulted, Derrick White requested to be moved back to segregation because he believed his life was in danger. His request was refused and he was stabbed soon after.

b.    In June 2014, a 60 year old, physically disabled prisoner, was robbed at knife point by another prisoner, who, upon information and belief, is a 23 year-old mentally ill prisoner.

c.    In February 2014, a prisoner requested to be moved out of his unit after

his cell mate tried to stab him and threatened to kill him.   His request was denied without adequate investigation and he was later stabbed by his cell mate inside his cell.

d.      In September  2013, Allan Williams was stabbed by a prisoner, who, upon information and belief, is a mentally ill prisoner.  Mr. Williams was stabbed while he was walking back from his shower.  Upon information and belief, the man who stabbed Mr. Williams had a violent history and had stabbed another prisoner a few years before he stabbed Mr. Williams.

e.      Upon information and belief, Freddie James Stallworth was stabbed multiple times by another prisoner who was his cell mate.  The stabbing caused serious injuries including a punctured lung, and required surgery at a free world hospital.   Prior to attack, Mr. Stallworth notified Lt. Carla Graham in November 2013, that he was in danger from his cell mate, and requested a move.  His request was denied without adequate investigation.  He was stabbed soon thereafter.

f.      In 2011, a prisoner was stabbed by another prisoner, who had requested to go to segregation for his own protection but his requests were denied.  Upon information and belief, the assailant feared for his safety due to outstanding debts he owed other prisoners for drugs and attacked the prisoner in order to get

31

moved into segregation where he felt he would be safer.

54.    These incidents of violence demonstrate Defendants' awareness that the failure to classify prisoners based on security status, a history of conflict, and mental health status and to investigate housing movement requests based on fear or threats of violence creates a substantial risk of serious harm.  Even though Defendants know that their current policies and practices contribute to serious incidents of violence, they have failed to take adequate action to address the problems in classification. Upon information and belief, there have not been significant or effective changes to the classification system or to how Defendants respond to movement requests in response to these violent incidents, leaving the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

**DEFENDANTS' FAILURE TO ADEQUATELY ENFORCE HOUSING ASSIGNMENTS PUTS PRISONERS AT RISK OF VIOLENCE.**

55.    Defendants do not take reasonable measures to ensure prisoners only have access to the housing unit where they are assigned. Despite the fact that prisoners are required to wear colored wristbands that correspond to their housing assignment, Defendants fail to regularly enforce dorm assignments and officers in the cube will frequently let prisoners into a unit where they are not assigned without verifying they reside in the unit.   In the absence of officer enforcement, prisoners are forced to forge

associations with other prisoners for their protection in the blocks.  In the absence of officer supervision and enforcement, movement between blocks and block occupancy is enforced through physical threats and violence.

56.     Upon information and belief, despite regulations that require that only one unit at a time to move to meal, work, shower, and mail call, the doors to the housing units regularly remain unlocked during movement times and all units on G-Yard have yard call at the same time. Upon information and belief, during movement times, regulations require that an officer be posted to the door or hallways in and out of the unit to ensure only prisoners assigned to the unit are allowed to enter but officers are very rarely or never posted to these locations during movement times. Therefore, it is easy for prisoners to enter a unit they are not assigned to.

57.     Upon information and belief, staff conduct a bed roster count twice a week, making it possible for prisoners to stay overnight in a unit or cell to which they are not assigned.

58.     Defendants are aware that the failure to enforce housing assignments contributes to the high rate of violence and creates a significant risk of serious harm. There have been numerous incidents of violence where the failure to enforce housing unit assignments has contributed to the circumstances that made the assault possible and where a prisoner was assaulted in their unit by another prisoner who was not

assigned to that unit, including but not limited to:

a.     In June 2014, Derrick White was attacked when another prisoner strangled him in the hallway between P and Q and was able to drag Mr. White into Q-2, which required him to go through the main unit doors.   Upon information and belief, Mr. White's assailant was not assigned to either P or Q.

b.     In July 2013, Mark Duke threatened at knife point in an attempted robbery in his cell by a prisoner who was not assigned to his block.

c.     Upon information and belief, Stanley Joe Flambo was assaulted in July 2013, by another prisoner, who was armed with a knife and punched him and attempted to force him over the top tier railing of the cell block.  His assailant was not assigned to his cell block.

d.     Upon information and belief, Benjamin Howlet was stabbed in his cell in November 2011, when correctional officers permitted two unauthorized inmates to enter Mr. Howlet's cell.  Mr. Howlet suffered numerous injuries to his face, rib area, and stomach requiring surgery at an outside hospital.

59.     Despite Defendants' knowledge that the failure to enforce block and cell assignments contributes to serious violent incidents, Defendants have failed to implement adequate changes in procedure and practice to address the substantial risk of serious harm.  Upon information and belief, there has been no meaningful increase

in enforcement of housing assignments following the incidents of violence, leaving the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

### DEFENDANTS FAIL TO PROVIDE ADEQUATE REHABILITATIVE PROGRAMMING AND THERAPEUTIC SERVICES.

60.    In addition to creating an environment where abuse and violence are the norm, Defendants have failed to provide adequate positive, rehabilitative, recreational, or religious programming, as well as treatment and services for drug addiction and mental illness.   Upon information and belief, Defendants provide inadequate counseling services that are aimed at addressing mental illness, disability and drug addiction, despite data that show that the vast majority of prisoners suffer from one or both of these afflictions.   The failure to provide adequate treatment for these conditions contributes to the high level of violence.   Furthermore, rather than providing services, Defendants respond to prisoners suffering from mental illness, disability and drug addiction by placing them in punitive segregation, which isolates them and can exacerbate their symptoms.  These prisoners are then released back into general population more impaired and more traumatized.

61.    Upon information and belief, Defendants have severely restricted programs that are aimed at reducing violence, giving prisoners a forum to voice

concerns and resolve issues, incentivizing good behavior, and providing prisoners an opportunity to educate themselves. Upon information and belief, Defendants have drastically limited access to outside religious organizations that minister to prisoners. The unavailability of positive and constructive programming contributes to conflicts and tensions among prisoners and to the high rate of violence.

62.     Upon information and belief, Defendant Davenport has eliminated or drastically limited prisoners' access to books. Upon information and belief, Defendant Davenport removed most or all of the books from the housing units that were previously available to prisoners, including religious books, self-help books, educational books for men trying to earn their GEDs, and novels.

### DEFENDANTS' FAILURE TO MONITOR AND POLICE THE ROLE OF DOC STAFF IN PROFITING FROM THE CIRCULATION OF CONTRABAND PUTS PRISONERS AT RISK OF VIOLENCE.

63.     Because of poor management, drugs, including methamphetamine, methadone, heroin, suboxone, and marijuana, are prevalent at St. Clair and drug abuse and addiction among prisoners is widespread. Upon information and belief, many of the drugs are brought into the Facility by DOC staff. Over the past two years, there have been dozens of reports of staff willfully violating DOC policy, including smuggling in contraband. This has enabled widespread corruption among officers and officers are able to extort money and favors from prisoners in exchange for drugs.

64.     Drugs create a substantial risk of serious harm and are a major source of conflict at St. Clair, both because of behavior stemming from addiction, for which Defendants have failed to provide adequate services and treatment, and because of the dynamics of debt created by officers' and prisoners' participation in drug sales.

65.     Defendants are indifferent to the circulation of drugs in the Facility and have failed to adequately prevent officers bringing in and participating in the sale of drugs to prisoners in the Facility.  Upon information and belief, Defendants do not employ effective search protocols and procedures when officers enter the Facility. Furthermore, Defendants' failure to provide meaningful incentives, programming, and treatment, contributes to prisoners engaging in risky behavior, such as gambling and drug use.  (See ¶¶ 60-62 above.)  Defendants' failure to reasonably and adequately respond to the prevalence of drugs in the Facility leaves the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action on behalf of all present and future prisoners at St. Clair Correctional Facility.  This action is brought pursuant to the Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2).  The class meets the requirements of Rule 23 as follows:

a.     There are approximately 1,300 prisoners confined at any one time to St.

Clair Correctional Facility, who are subject to a substantial risk of a violent assault. The membership of this class continually changes, rendering joinder of all members impracticable. Upon information and belief, dozens of incidents of violent assaults are filed each year. Many more incidents go unreported.

b.      The questions of law and fact presented by the named Plaintiffs are common to all members of the class, and include whether Defendants' policies and practices subject prisoners to a substantial and unreasonable risk of significant harm. The policies and practices include whether Defendants have failed to adequately monitor and supervise prisoners at St. Clair; whether Defendants have failed to adequately assess prisoners for risk of violence and failed to implement an adequate classification system; whether Defendants have failed to adequately enforce housing block, dorm, and cell assignments; whether Defendants have failed to adequately investigate housing movement requests based on fear of harm; whether Defendants have failed to provide secure locking mechanisms on individual cell doors; whether Defendants have failed to adequately monitor and police the role of ADOC staff in the availability of contraband items; whether Defendants have failed to adequately train, supervise, and discipline staff with a history of harassing and abusing prisoners, and whether supervisory Defendants have failed to adequately

38

screen, assign, train and supervise staff.  As a result, every prisoner confined to St. Clair risks being subjected to  these unlawful practices.  The claims and practices alleged in this complaint are common to all members of the class.

c.      The violations suffered by the named Plaintiffs are typical of those suffered by the class.  The entire plaintiff class will benefit from the injunctive and declaratory relief sought.

d.      Plaintiffs Antonio Cheatham, Mark Duke, James Edwards, Dale Gilley, Franky Johnson, Michael Mays, Derrick White, Allan Williams, and Robert Woods are presently incarcerated at St. Clair Correctional Facility.  These named Plaintiffs will fairly and adequately protect the interests of the class.

e.      The named plaintiffs are represented by The Equal Justice Initiative, a non-profit legal services organization with decades of experience challenging unconstitutional conditions of confinement.

f.      The Defendants have acted or failed to act, on grounds generally applicable to the class, thereby making injunctive relief appropriate with respect to the class as a whole.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

67.    There are no administrative remedies within the Alabama Department of Corrections for named Plaintiffs or other members of the plaintiff class to exhaust.

## CLAIMS FOR RELIEF

## CAUSE OF ACTION

### Cruel and Unusual Punishment

68.     Defendants, through their policies, practices, acts and omissions, exhibit deliberate indifference to the continuing real and imminent substantial risk of serious physical harm, in violation of the right of plaintiff class of prisoners to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

69.     Defendants, through their policies, practices, acts and omissions, subject the plaintiff class of prisoners to be free from unnecessary and wanton infliction of pain, and emotional and physical injury in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

70.     With deliberate indifference to the substantial risk of serious harm to the plaintiff class, Defendants failed to appropriately train, assign, and supervise staff, subjecting the plaintiff class to substantial risk of serious bodily harm in violation of the Eighth and Fourteenth Amendment to the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.    Assume jurisdiction over this action;

2.    Personally conduct an unannounced inspection of St. Clair Correctional Facility and all relevant institutional records and files;

3.    Grant Plaintiffs a full trial and discovery in this matter;

4.    Adjudge and declare that the acts and omissions of the Defendants with regard to the classmembers violate the Eight and Fourteenth Amendments to the United States Constitution;

5.    Order Defendants to comply with the Constitution and enjoin Defendants from subjecting Plaintiffs to cruel and unusual punishment;

6.    Award Plaintiffs appropriate costs for expert fees and collateral litigation expenses; and

Exhibit 2

**U.S. Department of Justice**

---

April 2, 2019

The Honorable Kay Ivey
Governor of Alabama
Alabama State Capitol
600 Dexter Avenue
Montgomery, Alabama  36130

Re:   Notice Regarding Investigation of Alabama's State Prisons for Men

Dear Governor Ivey:

We write to report the results of the investigation into the conditions of confinement in Alabama's State Prisons for Men (Alabama's prisons) by the Civil Rights Division and the Alabama United States Attorneys' Offices, conducted under the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997.  Consistent with the statutory requirements of CRIPA, we provide this Notice of the alleged conditions that we have reasonable cause to believe violate the Constitution.  We also notify you of the supporting facts giving rise to, and the minimum remedial measures that we believe may remedy, those alleged conditions.

After carefully reviewing the evidence, we conclude that there is reasonable cause to believe that conditions at Alabama's prisons violate the Eighth Amendment to the Constitution and that these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Eighth Amendment.  In particular, we have reasonable cause to believe that Alabama routinely violates the constitutional rights of prisoners housed in the Alabama's prisons by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions.  The violations are exacerbated by serious deficiencies in staffing and supervision and overcrowding.[1]

We are obligated to advise you that 49 days after issuance of this Notice, the Attorney General may initiate a lawsuit under CRIPA to correct the alleged conditions we have identified if Alabama officials have not satisfactorily addressed them.  42 U.S.C. § 1997b(a)(1).  The Attorney General may also move to intervene in related private suits 15 days after issuance of this letter.  42 U.S.C. § 1997c(b)(1)(A).

---

[1] The Department's investigation of Alabama's prisons was opened to investigate three issues:  (1) whether Alabama's prisons are protecting prisoners from physical and sexual violence at the hand of other prisoners; (2) whether Alabama's prisons are providing safe and sanitary living conditions; and (3) whether Alabama's prisons are protecting prisoners from excessive force and sexual abuse from staff.  This Notice Letter applies to the first two issues.  The Department's investigation into third issue is ongoing because the Department's petition to enforce its subpoena for documents relevant to that issue is pending with the court.

- 2 -

We hope, however, to resolve this matter through a more cooperative approach and look forward to working with you to address the alleged violations of law we have identified.  The lawyers assigned to this investigation will be contacting the Alabama Department of Corrections to discuss this matter in further detail.  Please also note that this Notice is a public document.  It will be posted on the Civil Rights Division's website.

If you have any questions, please call United States Attorney Jay E. Town at (205) 244-2001 or Steven H. Rosenbaum, Chief of the Civil Rights Division's Special Litigation Section, at (202) 616-3244.

Sincerely,


Eric S. Dreiband
Assistant Attorney General
Civil Rights Division


Louis V. Franklin, Sr.
United States Attorney
Middle District of Alabama


Jay E. Town
United States Attorney
Northern District of Alabama


Richard W. Moore
United States Attorney
Southern District of Alabama


cc:     Steven T. Marshall
        Attorney General
        State of Alabama

        Jefferson Dunn
        Commissioner
        Alabama Department of Corrections

        Deborah Toney
        Warden
        Bibb Correctional Facility
        565 Bibb Lane
        Brent, AL  35034

Patrice Richie
Warden
Bullock Correctional Facility
P.O. Box 5107
Union Springs, AL  36089

Christopher Gordy
Warden
Donaldson Correctional Facility
100 Warrior Lane
Bessemer, AL  35203

Walter Myers
Warden
Easterling Correctional Facility
200 Wallace Drive
Cilo, AL  36017

Joseph Headley
Warden
Elmore Correctional Facility
3520 Marion Spillway Road
Elmore, AL  36025

Mary Cooks
Warden
Fountain Correctional Facility
Fountain 3800
Atmore, AL  36503

Guy Noe
Warden
Hamilton Aged & Infirmed Correctional Facility
223 Sasser Drive
Hamilton, AL  35570

Cynthia Stewart
Warden
Holman Correctional Facility
Holman 3700
Atmore, AL  36503

Leon Bolling
Warden
Kilby Correctional Facility
P.O. Box 150
Mt. Meigs, AL  36057

DeWayne Estes
Warden
Limestone Correctional Facility
28779 Nick Davis Road
Harvest, AL  35749

Karla Jones
Warden
St. Clair Correctional Facility
1000 St. Clair Road
Springville, AL  35146

John Crow
Warden
Staton Correctional Facility
P.O. Box 56
Elmore, AL  36025

Michael Strickland
Acting Warden
Ventress Correctional Facility
379 Alabama Highway 239 North
Clayton, AL 36016

Attachment:  Section 1997b Notice

# INVESTIGATION OF
# ALABAMA'S STATE PRISONS FOR MEN



United States Department of Justice
Civil Rights Division

United States Attorney's Offices for the
Northern, Middle, and Southern Districts of Alabama

April 2, 2019

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.  INVESTIGATION .................................................................................................... 3

III. BACKGROUND ...................................................................................................... 5

IV.  CONDITIONS IDENTIFIED .................................................................................. 5

  A.   ADOC's Overcrowding Contributes to Serious Harm to Prisoners. ................. 8

  B.   ADOC's Severe Understaffing Exposes Prisoners to Serious Harm. ................ 9

  C.   ADOC Does Not Reasonably Protect Prisoners from Rampant Violence. ...... 11

    1.   ADOC Must Accurately Classify the Deaths That Occur Within Its Custody. .......... 11

    2.   The Excessive Number of Deaths Due to Violent, Deadly Assaults Demonstrates that ADOC Is Unable to Adequately Keep Its Prisoners Safe. ........................................ 13

    3.   ADOC Is Routinely Unable to Adequately Protect Prisoners Even When Officials Have Advance Warning. ............................................................................................ 14

    4.   ADOC Must Accurately Track the Deaths that Occur Within Its Custody. ............... 15

    5.   High Numbers of Life-Threatening Injuries Are Additional Strong Evidence that ADOC Is Not Adequately Protecting Its Prisoners. .................................................. 16

    6.   Unchecked Extortion Presents a Risk of Serious Harm. ........................................... 23

    7.   Access to Dangerous Weapons Contributes to Serious Violence. ............................ 25

    8.   Ineffective and Unsafe Housing Assignments Increase the Risk of Violence........... 26

    9.   ADOC's Failure to Protect Prisoners from Harm Also Negatively Impacts the Safety of Correctional Staff. ................................................................................................. 27

  D.   ADOC's Failure to Prevent Illegal Drugs Within Alabama's Prisons Results in Prisoner Deaths and Serious Violence. .......................................................................................... 30

  E.   ADOC Is Not Adequately Protecting Prisoners from Sexual Abuse by Other Prisoners. 34

    1.   Sexual Abuse Is Highly Prevalent in ADOC Correctional Facilities. ....................... 34

    2.   Inadequate Supervision Allows Sexual Abuse to Continue Undeterred. ................... 35

    3.   Deficiencies in ADOC's PREA Screening and Housing Contribute to the Unsafe Environment.............................................................................................................. 40

    4.   ADOC's Sexual Abuse Investigations Are Incomplete and Inadequate. .................. 41

    5.   ADOC Discourages Reporting of Sexual Assaults..................................................... 43

    6.   ADOC Improperly Subjects Victims of Sexual Abuse to Segregation. ..................... 43

  F.   Facility Conditions in Alabama's Prisons Violate the Constitution. .............................. 45

  G.   Evidence Suggests Some ADOC Officials Are Deliberately Indifferent to the Risk of Harm. ........................................................................................................................... 47

V.   MINIMAL REMEDIAL MEASURES.................................................................... 50

  A.   Immediate Measures ..................................................................................... 51

  B.   Long-Term Measures .................................................................................... 54

VI.  CONCLUSION........................................................................................................ 55

## I.      INTRODUCTION

The Civil Rights Division and the three U.S. Attorney's Offices for the State of Alabama ("Department" or "Department of Justice") provide notice, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §§ 1997 *et seq.* ("CRIPA"), that there is reasonable cause to believe, based on the totality of the conditions, practices, and incidents discovered that: (1) the conditions in Alabama's prisons for men (hereinafter "Alabama's prisons")[1] violate the Eighth Amendment of the U.S. Constitution; and (2) these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Eighth Amendment.  The Department does not serve as a tribunal authorized to make factual findings and legal conclusions binding on, or admissible in, any court, and nothing in this Notice Letter ("Notice") should be construed as such.  Accordingly, this Notice is not intended to be admissible evidence and does not create any legal rights or obligations.

Consistent with the statutory requirements of CRIPA, we write this Notice to notify Alabama of the Department's conclusions with respect to numerous constitutional violations, the facts supporting those conclusions, and the minimum remedial measures necessary to address the identified deficiencies.[2]

There is reasonable cause to believe that the Alabama Department of Corrections ("ADOC") has violated and is continuing to violate the Eighth Amendment rights of prisoners housed in men's prisons by failing to protect them from prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions, and that such violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights secured by the Eighth Amendment.  The violations are severe, systemic, and exacerbated by serious deficiencies in staffing and supervision; overcrowding; ineffective housing and classification protocols; inadequate incident reporting; inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons; ineffective prison management and training;

---

[1] At present, there are 13 such correctional facilities:  Bibb Correctional Facility; Bullock Correctional Facility; Donaldson Correctional Facility; Easterling Correctional Facility; Elmore Correctional Facility; Fountain Correctional Facility; Hamilton Aged & Infirmed; Holman Correctional Facility; Kilby Correctional Facility; Limestone Correctional Facility; St. Clair Correctional Facility; Staton Correctional Facility; and Ventress Correctional Facility.  We also investigated the conditions at Draper Correctional Facility; however, in late 2017, the Alabama Department of Corrections ("ADOC") closed that facility.  We did not review the conditions in other ADOC facilities, such as work release facilities or the Julia Tutwiler Prison for Women.

[2] The Department's investigation of Alabama's prisons was opened to investigate three issues:  (1) whether ADOC is protecting prisoners from physical and sexual violence at the hand of other prisoners; (2) whether ADOC is providing safe and sanitary living conditions; and (3) whether ADOC is protecting prisoners from excessive force and sexual abuse from staff.  This Notice applies to the first two issues.  The Department's investigation into third issue is ongoing because the Department's petition to enforce its subpoena for documents relevant to that issue is pending with the court.

insufficient maintenance and cleaning of facilities; the use of segregation and solitary confinement to both punish and protect victims of violence and/or sexual abuse; and a high level of violence that is too common, cruel, of an unusual nature, and pervasive.

Our investigation revealed that an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis.  Indeed, a review of a single week in Alabama's prisons—a week in September 2017—provides a window into a broken system that too often disregards prisoners' safety.

The "Hot Bay" at Bibb[3] was a housing unit populated exclusively with prisoners with disciplinary infractions.  It had limited supervision and no programming.  On a Friday in September 2017, three days before the Department of Justice arrived at Bibb for the first full facility tour of our investigation, two prisoners stood guard at the doors of the Hot Bay, an open dormitory housing men in bunkbeds multiple rows deep, watching for rarely-seen correctional officers.  At the back of the dormitory and not visible from the front door, two other prisoners started stabbing their intended victim.  The victim screamed for help.  Another prisoner tried to intervene and he, too, was stabbed.  The initial victim dragged himself to the front doors of the dormitory.  Prisoners banged on the locked doors to get the attention of security staff.  When an officer finally responded, he found the prisoner lying on the floor bleeding from his chest.  The prisoner eventually bled to death.  One Hot Bay resident told us that he could still hear the prisoner's screams in his sleep.

That same day, at Staton, a prisoner was stabbed multiple times by another prisoner and had to be medically evacuated by helicopter to a nearby hospital.  The following day, at Elmore, a prisoner was beaten and injured by four other prisoners.  At Ventress, officers performed a random pat down on a prisoner, finding 17 cigarettes laced with drugs, a plastic bag of methamphetamine, and a bag filled with another hallucinogen drug referred to as "cookie dough."[4]

On Sunday, a prisoner asleep in the honor dormitory—a dormitory reserved for prisoners with good behavior—at St. Clair was woken from sleep when two prisoners started beating him with a sock filled with metal locks.  The victim was injured so severely that he was transported to an outside hospital for emergency treatment.  That same day at Ventress, a prisoner was punched so forcefully in the eye by another prisoner that he was sent to an outside hospital.  Another prisoner was stabbed by two other prisoners with homemade knives.  A different

---

[3] The "Hot Bay" is an internal nickname for what is also called the "Behavior Modification" dormitory or "restricted housing unit."  It is where prisoners who have been disciplined for drugs or violence are placed and are not allowed to leave the dormitory for meals or the canteen line, are not given a microwave or television, or allowed to attend any outside programs or jobs.  Since we inspected Bibb and informed ADOC of our initial findings that the Hot Bay was critically dangerous, the Hot Bay at Bibb has been closed, but "Behavior Modification" dormitories continue to operate at other facilities.

[4] "Cookie dough" is a brown or white synthetic crystalline powder made of poisonous chemicals that is mixed with tobacco and smoked.  It causes extreme paranoia, severe hallucinations, and violent nausea.  It is sometimes referred to as "Brown Clown."

Ventress prisoner was punched so hard in the face by prisoners with shirts covering their faces that he was transported to an outside hospital for treatment.  At Staton, a prisoner threatened a correctional officer with a knife measuring seven inches in length.  And another prisoner reported that he had been sexually assaulted by a fellow prisoner after he had only agreed, in exchange for three store items, to lower his pants for that prisoner to view his buttocks while masturbating.

On Tuesday, at Fountain, a prisoner set fire to another prisoner's bed blanket while he was sleeping, leading to a fight between the two men.  Officers searching a dormitory at Ventress found 12 plastic bags of an unknown substance, 79 cigarettes laced with drugs, two bags containing "cookie dough," and a bag of methamphetamine.

On Wednesday morning, a prisoner at Easterling was sexually assaulted inside of a segregation cell by an inmate.  Four days prior, this same prisoner had been forced at knifepoint to perform oral sex on two other prisoners.

On Thursday, at Ventress, a prisoner was so severely assaulted by four other prisoners that he had to be transported to an outside hospital for treatment.  A different Ventress prisoner reported being sexually assaulted.

At Bullock, a prisoner was found unresponsive on the floor by his bed and later died; his death was caused by an overdose of a synthetic cannabinoid.  On Friday at Ventress, an officer observed a prisoner bleeding from the shoulder due to a stab wound; the prisoner was transported to an outside hospital for treatment.

These incidents in Alabama's prisons are just some of those reported in ADOC's own records during one week.  And based on what we learned from our investigation and statements made by ADOC's head of operations, it is likely that many other serious incidents also occurred this week but were not reported by prisoners or staff.

## II.    INVESTIGATION

In October 2016, the Department opened a CRIPA investigation into the conditions in ADOC facilities housing male prisoners.  The investigation focused on whether ADOC (1) adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners; (2) adequately protects prisoners from use of excessive force and staff sexual abuse by correctional officers; and (3) provides prisoners with sanitary, secure, and safe living conditions.

Five experienced expert consultants in correctional practices assisted with this investigation.  Three of these experts are former high-ranking corrections officials with significant experience leading state and local corrections departments; the remaining two are nationally recognized experts in medical care and sexual safety in prisons.  At least two of the experts accompanied us on site visits to Alabama prisons, interviewed ADOC staff and prisoners, reviewed documents, and provided their expert opinions and insight to help inform the investigation and its conclusions.  The remaining experts reviewed documents and provided their

expert opinions and insights to assist the Department in forming conclusions and recommending remedies to tackle the significant problems encountered during the investigation.

Between February 2017 and January 2018, we conducted site visits to four Alabama prisons:  Donaldson, Bibb, Draper, and Holman.  Our investigation was aided by numerous sources of information.

Throughout the course of this investigation, we interviewed approximately 55 ADOC staff members.  Our site visits included interviews with wardens, deputy wardens, captains, Prison Rape Elimination Act ("PREA")[5] compliance officers, sergeants, medical staff, mental health staff, classification staff, and maintenance managers.  In addition, we also met with staff of ADOC's central office, including the Deputy Commissioner of Operations, the head of the Intelligence and Investigations Division ("I&I"), the PREA Coordinator, and other members of ADOC management and the investigations branch.

We also interviewed over 270 prisoners.  In addition to four site visits, we sent two Department investigators to interview prisoners in seven Alabama prisons—Limestone, Donaldson, Staton, Ventress, Easterling, Bullock, and Fountain.  ADOC did allow prisoners to access a toll-free number with direct access to Department personnel.  As a result, the Department conducted over 500 interviews with prisoners and family members by phone.  We received and reviewed more than 400 letters from ADOC prisoners.  We also received hundreds of emails from prisoners and family members to a special email address established specifically for this investigation.

We augmented our site visits by requesting and reviewing hundreds of thousands of pages of documents and data from 2015 to 2018.  In order to inform our understanding of ADOCs practices, we reviewed incident reports, medical records, autopsies, policies and regulations, training materials, mental health records, personnel files, staffing plans, shift rosters, duty post logs, and a limited number of investigative files.  ADOC produced its entire incident report database from 2015 through June 2017 and a portion of its incident report database from June 2017 through April 2018.

In some sections of this Notice, we provide more examples to illustrate the variety of circumstances in which the violation occurs, while in others we focus on one or two examples that demonstrate the nature of the violations we found.  The number of examples included in a particular section is not indicative of the number of violations that we found.  These examples comprise a small subset of the total number of incidents upon which we base our conclusions. And though there may be more examples from facilities we visited and certain others from which we received more information, given the enormous breadth of ADOC's Eighth Amendment violations—including the lack of certain statewide policies, our concerns with ADOC management, and the fact that prisoners are frequently transferred to different facilities—it is evident the examples described in this Notice are typical of the system as a whole.

---

[5] 34 U.S.C. §§ 30301-30309.

## III.    BACKGROUND

ADOC currently houses approximately 16,000 male prisoners in 13 prisons with varying custody levels.  Based on the most recent ADOC Annual Report available, five of these facilities—Donaldson, Holman, Kilby, Limestone, and St. Clair—are maximum, or close custody, meaning they are "designed for incarcerating the most violent and highest classified offenders admitted to ADOC."  In the close custody facilities, many of the prisoners are housed in cells, as opposed to open dormitory-style housing.  They range in population from just over 900 prisoners at St. Clair to over 2,000 at Limestone.  ADOC classifies eight of its facilities—Bibb, Bullock, Easterling, Elmore, Fountain, Hamilton Aged & Infirmed, Staton, and Ventress—as medium custody, which are "less secure than close custody for those inmates who have demonstrated less severe behavioral problems."  Hamilton houses fewer than 275 prisoners, while Bibb houses almost 1,800.  Many of the prisoners housed in medium custody facilities live in open dormitories; however, even in these facilities, there are a number of segregation cells.

ADOC operated a fourteenth men's prison called Draper at the time that we opened our investigation.  We inspected Draper in October 2017, and discovered numerous dangerous and unsanitary conditions within the prison.  For example, there was open sewage running by the pathway we used to access the facility.  Numerous prisoners informed us that toilets and plumbing pipes in dormitories and segregation required frequent maintenance, yet were still often overflowing or clogged, with standing sewage water on the floors.  In addition, there were reports of rats and maggots in the kitchen.  After the inspection, our experts informed ADOC of their shock at the state of the facility.  In fact, during our inspection of Draper, one of our experts had to leave the kitchen area before becoming sick from the toxic fumes of the cleaning chemicals.  Approximately one month after our site visit, we learned through press reports that ADOC was closing Draper after engineering experts hired by ADOC concluded that the facility was "no longer suitable to house inmates, or to be used as a correctional facility."

## IV.    CONDITIONS IDENTIFIED

ADOC fails to protect prisoners from serious harm and a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993); *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).  The combination of ADOC's overcrowding and understaffing results in prisons that are inadequately supervised, with inappropriate and unsafe housing designations, creating an environment rife with violence, extortion, drugs, and weapons.  Prisoner-on-prisoner homicide and sexual abuse is common.  Prisoners who are seriously injured or stabbed must find their way to security staff elsewhere in the facility or bang on the door of the dormitory to gain the attention of correctional officers.  Prisoners have been tied up for days by other prisoners while unnoticed by security staff.  Prisoners are often found in unauthorized areas.  Some prisoners sleep in dormitories to which they are not assigned in order to escape violence.  Prisoners are being extorted by other prisoners without appropriate intervention of management.  Contraband is rampant.  The totality of these conditions pose a substantial risk of serious harm both to prisoners and correctional officers.

*Laube v. Haley*, 234 F. Supp. 2d 1227, 1245 (M.D. Ala. 2002); *see also Helling*, 509 U.S. at 33 ("That the Eighth Amendment protects against future harm to inmates is not a novel concept. The Amendment . . . requires that inmates be furnished with the basic human needs, one of which is reasonable safety.").

The Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment and prohibits the infliction of "cruel and unusual punishments." *Estelle v. Gamble*, 429 U.S. 97, 101 (1976). The Eighth Amendment's ban on cruel and unusual punishments applies to the "treatment a prisoner receives in prison and the conditions under which he is confined." *Farmer*, 511 U.S. at 832; *Bass v. Perrin*, 170 F.3d 1312, 1316 (11th Cir. 1999). The conditions in Alabama's prisons are objectively unsafe, as evidenced by the high rate of prisoner-on-prisoner homicides and violence, including sexual abuse. Alabama is incarcerating prisoners under conditions that pose a substantial risk of serious harm, even when that harm has not yet occurred. Alabama is deliberately indifferent to that harm or serious risk of harm and it has failed to correct known systemic deficiencies that contribute to the violence. The deplorable conditions within Alabama's prisons lead to heightened tensions among prisoners. And, as a result, the violence is spilling over so that it is affecting not only prisoners, but ADOC staff as well.

That ADOC's prisons are dangerous appears to be acknowledged at all levels. The following data highlights that danger. Alabama prisoners endure an extraordinarily high rate of violence at the hands of other prisoners. Based on the latest data available from the Department of Justice's Bureau of Justice Statistics, Alabama's prisons have the highest homicide rate in the country. In 2014, the national average homicide rate in prisons was seven homicides per 100,000 prisoners. During fiscal year 2017, ADOC publicly reported nine homicides in its men's prisons, which house about 16,000 prisoners (a rate of homicide of 56 per 100,000 prisoners). This is approximately eight times the 2014 national rate.

Our experts observed that, based on their experience, the amount of prisoner-on-prisoner violence in Alabama's prisons was much higher than other similar systems. Based on ADOC's publicly reported statistics, the number of prisoner-on-prisoner violent incidents has increased dramatically over the last five-and-a-half years.



*Chart 1: ADOC's reported instances of prisoner-on-prisoner violence*

This increase in violent incidents has persisted and continued even after our investigation began. Our experts have consistently raised concerns about the levels of violence with ADOC leadership and suggested potential solutions throughout our investigation.

ADOC correctional staff are also harmed by the violence. Shortly before we notified ADOC of our investigation, a correctional officer was stabbed to death at Holman. ADOC's own incident reports indicate that, since 2017, correctional officers have been stabbed, punched, kicked, threatened with broken broomsticks or knives, and had their heads stomped on. One officer at Donaldson was quoted as saying, "Walking out of these gates, knowing you're still alive, that's a successful day." At the same time, dozens of ADOC correctional officers have been arrested in the past two years for crimes related to drug trafficking and other misconduct within Alabama's prisons. And ADOC told us that ADOC staff are bringing illegal contraband into Alabama's prisons.

As detailed below, there is reasonable cause to believe that there is a pattern or practice of Eighth Amendment violations throughout the ADOC system. To establish a pattern or practice of violations, the United States must prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). It must "establish by a preponderance of the evidence that . . . [violating federal law] was . . . the regular rather than the unusual practice." *Bazemore v. Friday*, 478 U.S. 385, 398 (1986) (quoting *Teamsters*, 431 U.S. at 336); *see also EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1188 (4th Cir. 1981) (explaining that a "cumulation of evidence, including

statistics, patterns, practices, general policies, or specific instances of discrimination" can be used to prove a pattern or practice).

### A.     ADOC's Overcrowding Contributes to Serious Harm to Prisoners.

One factor leading to the overwhelming amount of violence within Alabama's prisons is severe overcrowding.  Alabama has one of the most overcrowded prison systems in the nation.  In 2013, Alabama had an imprisonment rate of 646 per 100,000 residents—the fourth highest in the nation and well above the average U.S. incarceration rate of 417 per 100,000 residents.  The Alabama rate was well above the rates for other similarly situated states, such as Georgia and South Carolina.

According to recent data published by ADOC, Alabama's prisons have a system-wide occupancy rate of 165%.  ADOC houses approximately 16,327 prisoners in its major correctional facilities, but the system was designed to hold 9,882.  However, the average occupancy rate at the 13 major correctional institutions that we reviewed is approximately 182%, after excluding work release and other facilities.  For example, Staton, a medium security prison, is designed to hold 508 prisoners and held 1,385 in November 2018 for an occupancy rate of 272.6%.  And Kilby, a close security prison, has a design capacity of 440 beds, and held 1,407 prisoners at the end of November 2018—an occupancy rate of 319.8%.  This severe overcrowding remains despite the fact that Alabama convened a Prison Reform Task Force in February 2014, to recommend solutions to the problem of overcrowding.  Based on the Task Force's recommendations, the Legislature passed Senate Bill 67, which took effect in January 2016.  In an effort to decrease the prison population, the law created a new class of felonies for low-level drug and property crimes and reformed parole boards.  However, it did not apply retroactively and the effect on Alabama's prison population has been minimal.  In the two years that this investigation has been ongoing, the prison population in male correctional facilities has decreased by approximately 1,615 prisoners, but, because ADOC closed one major correctional facility during that time, the average occupancy rate per facility has not decreased.

While overcrowding is not an Eighth Amendment violation on its own, it can cause and exacerbate unconstitutional conditions.  *See Rhodes v. Chapman*, 452 U.S. 337, 347-50 (1981); *Collins v. Ainsworth*, 382 F.3d 529, 540 (5th Cir. 2004); *French v. Owens*, 777 F.2d 1250, 1252-53 (7th Cir. 1985) (holding that overcrowding was unconstitutional where it led to unsafe and unsanitary conditions).

In *Brown v. Plata*, the Supreme Court affirmed a three-judge court ruling that overcrowding in the California state prison system had overtaken the limited resources of prison staff; imposed demands well beyond the capacity of medical and mental health facilities; and created unsanitary and unsafe conditions.  *Brown v. Plata*, 563 U.S. 493, 518-19 (2011).  The Court also upheld the lower court's order that California reduce its state prison population to 137% of capacity to attain a reasonable level of safety.  *Id.* at 540-41.

In another case, *Mobile County Jail Inmates v. Purvis*, the district court entered a finding of contempt when a county failed to correct unconstitutional conditions of overcrowding.  *Mobile Cty. Jail Inmates v. Purvis*, 551 F. Supp. 92, 94 (S.D. Ala. 1982) ("'Overcrowding is the

root and basic problem' contributing to the deplorable physiological and psychological effects of the Mobile County Jail . . . ."). The Eleventh Circuit later affirmed. *Mobile Cty. Jail Inmates v. Purvis*, 703 F.2d 580 (11th Cir. 1983) (unpublished table decision).

Similarly, in *Maynor v. Morgan County*, 147 F. Supp. 2d 1185 (S.D. Ala. 2001), the district court made a preliminary finding that conditions in a county jail violated the Eighth Amendment when inmates were forced to sleep on the floor under bunks, on the floor between bunks, on tables, and between tables. *Maynor v. Morgan Cty.*, 147 F. Supp. 2d 1185, 1186, 1188 (S.D. Ala. 2001) ("Plaintiffs have carried their burden of showing that the conditions extant in the Morgan County Jail violate their rights to the minimal civilized measures of life's necessities and protection from a substantial risk of serious harm under the Eighth Amendment.").

In Alabama's prisons, the overcrowding combined with understaffing is driving prisoner-on-prisoner violence. *See Laube*, 234 F. Supp. 2d at 1245 (holding that a combination of substantial overcrowding and significantly inadequate supervision in open dormitories deprives inmates of their right to be protected from the constant threat of violence).

### B.   ADOC's Severe Understaffing Exposes Prisoners to Serious Harm.

Staffing in Alabama's prisons is at a crisis level. For fiscal year 2017, ADOC publicly reported "critical levels of authorized staffing shortages." In January 2019, ADOC's Commissioner, Jefferson S. Dunn, announced to the Legislature that he would request funding to hire 500 more correctional officers, which is a fraction of the additional staff deemed necessary by ADOC's own analysis. One month later, in February 2019, ADOC acknowledged that it needs to hire over 2,000 correctional officers and 125 supervisors in order to adequately staff its men's prisons. Commissioner Dunn explained to the Legislature that "there is a direct correlation between the shortage of officers in our prisons and the increase in violence," noting that the current level of violence is "unacceptably high."

This egregious level of understaffing equates to inadequate supervision that results in a substantial risk of serious harm. *See Alberti v. Klevenhagen*, 790 F.2d 1220, 1227-28 (5th Cir. 1986) (upholding district court's finding that inadequate staffing and supervision, among other factors, led to a pattern of constitutional violations); *Ramos v. Lamm*, 639 F.2d 559, 573 (10th Cir. 1980) ("Violence and illegal activity between inmates . . . is further facilitated by the inadequacy of the staffing levels."); *Van Riper v. Wexford Health Sources, Inc.*, 67 F. App'x 501, 505 (10th Cir. 2003) ("When prison officials create policies that lead to dangerous levels of understaffing and, consequently, inmate-on-inmate violence, [there is a violation of the Eighth Amendment.]"). ADOC does not have sufficient staff to supervise its overcrowded prisons. Dormitories of prisoners, housing up to 180 men, are often unsupervised for hours or shifts at a time.

Staffing levels of line correctional officers in Alabama's prisons are at dangerous levels. According to ADOC's staffing report from June 2018, Alabama's prisons employ only 1,072 out of 3,326 authorized correctional officers. Three prisons have fewer than 20% of the authorized correctional officers: Easterling—17%; Bibb—19%; and Holman—19%. Four prisons have 30% or less of the authorized correctional officers: Bullock—24%; Fountain—26%; St. Clair—

28%; and Ventress—30%.  Three others have less than 40%:  Donaldson—35%; Staton—35%; and Kilby—36%.  Only three remaining prisons also have correctional officer staffing levels over 40%:  Elmore—41%; Limestone—56%; and Hamilton—75%.  Hamilton A&I (which houses approximately 275 elderly and sick prisoners and is authorized for only 45 officers) at 75% staffing is still dangerously understaffed.  A former ADOC warden stated that with this level of understaffing, "the convicts are in extreme danger and the correctional officers working there are in extreme danger."  Correctional staffing levels have decreased over time as shown in the following chart:



*Chart 2: ADOC's reported correctional officer staffing levels*

In reality, the deficit in the number of security staff working any given shift can be worse than 20% below required levels.  For example, the Warden at Holman told us that, on any given day, she estimates that she has "probably 11" security staff, both officers and supervisors, per shift for the entire complex—a prison population of approximately 800.  And the Warden at Bibb stated that he currently has only 66 assigned security staff, both officers and supervisors, covering approximately 1,800 prisoners over four shifts.  Leadership at the facilities have used a variety of measures to fill the extreme shortages.  These include mandated overtime, which allows supervisors to require that correctional officers stay an additional four hours past the end of their 12-hour shift.

In another stop-gap measure intended to address the extreme understaffing, officers are required to work oxymoronic "voluntary mandatory overtime," which requires officers to work two additional 12-hour shifts a month.  It is not uncommon for officers to be disciplined for refusing to stay for mandated time or for mandatory overtime, leaving prisons even more understaffed.  By the same token, staffing prisons with exhausted staff makes for ineffective and, in this system, potentially life-threatening outcomes.

In fiscal year 2017, a correctional officer at St. Clair with a base pay of $38,426.60, earned almost $80,000 in overtime. Extrapolating that amount in overtime pay, the officer averaged 90-95 hours per week. Within Alabama, ADOC is the state department with the highest total amount of overtime paid to employees—$31.6 million. The next highest state department paid $6.77 million in overtime. Officers are tired and the hours are affecting job performance and officer morale. Prisoners report seeing officers asleep on duty. And incident reports reflect that officers are often disciplined for sleeping. One officer at Donaldson revealed that he has been so tired on duty that he "fell asleep on his feet and hit the floor."

## C.   ADOC Does Not Reasonably Protect Prisoners from Rampant Violence.

The Eighth Amendment's ban on cruel and unusual punishments requires that ADOC "take reasonable measures to guarantee the safety" of all prisoners. *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). When a state takes a person into custody, the Constitution imposes upon the state a corresponding duty to assume some responsibility for his safety and well-being. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 199-200 (1989)). The Eleventh Circuit has held that "an excessive risk of inmate-on-inmate violence . . . creates a substantial risk of serious harm . . . ." *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016) (citing *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014)). The Eleventh Circuit has also found a substantial risk of harm where prisoners were housed in conditions that included routine understaffing, dysfunctional locks on cell doors, and the ready availability of homemade weapons. *See Marsh v. Butler Cty.*, 268 F.3d 1014, 1030, 1034 (11th Cir. 2001) (en banc) ("[A]n Eighth Amendment violation can arise from unsafe conditions of confinement even if no assault or similar physical injury has yet occurred." (citing *Helling*, 509 U.S. at 33-34, *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007).

ADOC officials must take precautions to protect prisoners from violence, and are "not free to let nature take its course." *Farmer*, 511 U.S. at 833-34. It is clear from the number of deaths, fights, and stabbings in Alabama's prisons that ADOC is failing to protect its prisoners and nature is taking its course.

### 1.   ADOC Must Accurately Classify the Deaths That Occur Within Its Custody.

According to ADOC's public reports, between January 2015 and June 2018, 24 prisoner deaths have occurred as a result of a homicide (eight in 2015; three in 2016; nine in 2017; and four from January through June of 2018). We definitively identified three additional homicides—two in 2017 and one in the first half of 2018. These unreported homicides provide reasonable cause to believe that ADOC's homicide rate is higher than what ADOC has publicly reported. There are numerous instances where ADOC incident reports classified deaths as due to "natural" causes when, in actuality, the deaths were likely caused by prisoner-on-prisoner violence. This is especially concerning given that these incident reports are used for public statistical reporting as required by law. For example:

11

- A prisoner died in February 2018, from wounds he sustained four days earlier in a knife fight at Kilby. The autopsy details multiple stab wounds to the prisoner's head, abdomen, back, and arm. One stab wound extended "through the scalp and impact[ed] the skull and [was] associated with a depressed skull fracture 1/4 inch in diameter." The toxicological analysis report also revealed the presence of methamphetamine in his system. The incident report listed this prisoner's death as "Natural," despite the original incident report narrative describing an altercation with a weapon. Though ADOC reported the death as "Natural," the autopsy report definitively states that manner of death was "homicide."

- In November 2017, a prisoner was rushed to a hospital from Elmore with a brain bleed. Prior to the transfer, the prison's health care unit had refused to provide medical attention to the prisoner—even though he was "bleeding from his head"—because he appeared to be "under the influence." At the hospital, he ultimately required emergency brain surgery. Further investigation revealed that another prisoner had physically assaulted the decedent. The incident report does not detail how the assault occurred. Approximately one month later, following readmission, the hospital informed ADOC officials that the prisoner died. ADOC classified the death as "Inmate Death – Natural." In contrast, the autopsy report describes "multiple contusions present on the right upper chest, wrists and arms." The autopsy concludes that the manner of death was "homicide" caused by "blunt force head trauma," which resulted in a subdural hematoma (a pool of blood between the brain and its outermost covering).

- In October 2017, a correctional officer observed a prisoner lying on the bathroom floor, "nonresponsive," in a dormitory at Elmore. The incident report notes that "Brown Timberland steel toe boots" were taken into evidence, but gives no indication of what injuries the prisoner had and why these boots were evidence. The prisoner died three days later. A spreadsheet of prisoner deaths from 2017, which ADOC's medical contractor produced to us, indicates that he died from a "[p]ossible assault—[f]acial bleeding and [o]ccipital [fracture]." The incident report, however, lists the cause of the prisoner's death as "Inmate Death – Natural." The autopsy report contains a detailed description of his death: "This 55-year-old male . . . was an inmate at Elmore Correctional Facility when he smoked a synthetic cannabinoid on 10/02/17. Another inmate reportedly began to punch, kick, and slam [him] who was likely unable to resist due to his intoxicated condition. [He] was taken to the shower room in an attempt to arouse him from his 'high.' Correctional officers determined that [he] was unresponsive and he was transported to Kilby Health Center, then onward to Jackson Hospital for a higher level of care. [He] expired on 10/05/17 from his injuries." The autopsy report noted injuries to the scalp, a skull fracture, and bleeding on the surface of the brain. The prisoner also sustained a fractured rib, which caused bleeding into the right chest cavity. The autopsy report concludes that the manner of death was "homicide" as caused by "blunt force injuries of the head and chest."

2.      *The Excessive Number of Deaths Due to Violent, Deadly Assaults Demonstrates that ADOC Is Unable to Adequately Keep Its Prisoners Safe.*

Our investigation revealed that an alarming number of prisoners are killed by other prisoners using homemade knives. The knives used in these assaults are frequently long and sharp, thus able to easily penetrate the victim's body and puncture vital organs. Several prisoners who were stabbed to death also had been stabbed in past incidents. ADOC, with the knowledge that previously stabbed prisoners were at risk for further violence, took no meaningful efforts to protect these prisoners from serious harm—harm that was eventually deadly. As detailed by the examples of killings described below, ADOC does not protect prisoners in its custody from death caused by prisoner-on-prisoner violence.

- In September 2018, a prisoner was stabbed to death at St. Clair. The autopsy classified the death as a homicide caused by multiple sharp force injuries resulting in significant blood loss. It further described stab wounds to the neck, left back, and right back. One of those stab wounds penetrated approximately 5½ inches. The prisoner had previously been stabbed in July 2017 while incarcerated at St. Clair.

- In July 2018, a prisoner was stabbed to death at Ventress. The autopsy noted that "another prisoner with a prison-made 'shank' reportedly stabbed him." And the autopsy further noted that "[t]he cause of death was a stab wound of the chest. A sharp force injury of the left chest injured the left lung and the heart, causing massive bleeding into the left chest cavity." In January 2016, this same prisoner was stabbed in the back by several prisoners at Holman.

- In August 2017, two prisoners got into a knife fight in the institutional yard at Staton. The fight apparently broke out because one prisoner stole a contraband cellphone from the other prisoner. The incident was discovered when the correctional officer in the tower observed a group of prisoners gathered by the volleyball court and called for assistance. When two other officers arrived, they deployed pepper spray to compel the prisoners to disperse and get down on the ground. At that point, they discovered that a prisoner had been stabbed in the chest. ADOC recovered an 11-inch knife with a four-inch handle and a 10-inch knife with a three-inch handle near the scene. The injured prisoner died four days later, and his death was classified as a homicide due to "[s]tab wound of the chest".

- In July 2017, a prisoner at St. Clair was found tied up and strangled to death. The incident report listed the incident type as "Death – Inmate-on-Inmate" but contained no details about the nature of the death. The incident report said only that at 2:15 p.m., officers entered the cell and observed the prisoner lying unresponsive on the floor and when he was checked, "appeared not to be breathing." The report stated that a nurse was escorted to the cell and reported that the prisoner "had no signs of life." A photograph from the aftermath of the murder painted a different, gruesome picture. It clearly showed that the decedent's hands remained tied to a bedpost when prison officials found his lifeless body. The strangulation marks on his neck are clearly

13

visible.  The autopsy classified the death as a homicide caused by "Asphyxia due to Ligature Strangulation."  It further noted the presence of ligature contusions to both wrists.

- In May 2017, a prisoner at Bibb was stabbed to death in the chest.  The autopsy noted that the wound penetrated the prisoner's heart:  "The blade is seen to incise the heart at the AV junction on the right with an incision of the right atrium and ventricle approximately 1 inch in length.  This wound is associated with a right hemothorax of approximately 2 liters."  The incident report classified the death as the result of an "Inmate-on-Inmate" assault.  The incident report stated that at 10:50 a.m., an officer observed several prisoners fighting with a weapon and called for back-up.  When his supervisor arrived, he noticed a prisoner bleeding from the chest and took him to the medical unit.  From there, he was sent by ambulance to the hospital where he was pronounced dead.

### 3.   ADOC Is Routinely Unable to Adequately Protect Prisoners Even When Officials Have Advance Warning.

ADOC is frequently unable to protect its prisoners from violence, despite having advance notice that the prisoners may be in danger.  Our investigation uncovered numerous instances where prisoners explicitly informed prison officials that they feared for their safety and were later killed.  In other cases, prisoners were killed by individuals with a lengthy history of violence against other prisoners.

- In February 2018, a prisoner was killed at Bullock—one day after expressing concern for his safety to prison officials.  On the day prior to his death, the prisoner entered the Shift Commander's office and informed officials that he had been threatened over a cellphone that another prisoner had stolen while he was guarding it.  The prisoner said that he had been "slapped a few times" for nonpayment related to the missing cellphone, and was afraid.  The autopsy classified his death as a homicide by blunt-force head trauma that caused intracranial bleeding, as well as hemorrhages in the brainstem.

- A prisoner was killed in a knife fight at St. Clair in February 2018, by another prisoner with an extensive history of being disciplined for possessing knives.  The knife fight occurred in the front of a dormitory around 11:30 a.m.  The victim was rushed to the hospital but was pronounced dead at 12:58 pm.  The autopsy noted multiple stab wounds to the right lung, heart, liver, spleen, colon, and soft tissues.  The assailant had been involved in a different knife fight at Holman in June 2016.  He was found with knives in December 2016, and again in January 2017, when he was housed in segregation.

- In September 2017, a prisoner at Bibb died of stab wounds to the chest.  The autopsy report described at least 22 puncture wounds.  These included several stab wounds to the neck, a fact not referenced in the incident report.  Since April 2017, the victim had been involved in at least two other physical altercations at Bibb with two separate

14

prisoners.  And, in October 2016, while the victim was housed at Fountain, a correctional officer witnessed a different prisoner repeatedly stabbing him.

- A prisoner at St. Clair was strangled to death in May 2016.  When officers found the prisoner, he was lying face down in his bed, and his face was flattened, indicating that he had been dead for quite some time.  At some point, the assailants appeared to have urinated on the victim.  Additionally, staff noted that the numbers "1636" had been carved post-mortem into the decedent's ribcage.  The victim was a known gang member, and the number 1636 is a gang-related reference to "cardinal sin," indicating that the person is a traitor or snitch.  Less than two weeks before his death, the victim had been assaulted over a debt.  Following that assault, the victim was placed in segregation for his protection.  He was released from segregation hours before he was killed.

### 4.      ADOC Must Accurately Track the Deaths that Occur Within Its Custody.

In order to properly assess and respond to prisoner violence and dangerous conditions posed by drug trafficking and other contraband within Alabama's prisons, it is essential to track and review prisoner mortalities and other serious incidents to identify necessary corrective actions.  However, ADOC does not have a reliable system of tracking the deaths of prisoners that occur within its custody.  In response to our subpoena, ADOC and its medical contractor separately produced spreadsheets compiling prisoner deaths from January 2015 through 2017.  After comparing those spreadsheets with autopsy reports produced by other agencies, we identified at least 30 deaths that ADOC did not disclose to the Department.  ADOC was unable to provide an explanation for these omissions.  ADOC cannot address and prevent recurring harmful situations if it is unaware of the scope of the problems within Alabama's prisons.  As some of the following examples show, some of the missing deaths resulted from prisoner-on-prisoner violence:

- In May 2017, a prisoner at Bullock died after being stabbed multiple times by multiple fellow prisoners.  The incident report described the prisoner "running towards the grillgate in Dormitory I1 bleeding from his facial area."  I&I investigated the matter as a murder.  One prisoner informed I&I that he had witnessed an altercation earlier in the day when several prisoners were bullying the victim for having same-sex relationships.  It is unknown why this prisoner's death does not appear on the list of prisoner deaths that ADOC produced to the Department.

- In February 2017, a prisoner died at the Staton Health Care Unit.  I&I investigated the matter and found that the victim and another prisoner began fighting near the officer cubical because the victim felt the other prisoner was standing too close to him.  Once the two were separated, the victim followed the other prisoner back to the bed area.  The assailant produced a homemade knife and another fight ensued in which the victim was stabbed and ultimately died.  The autopsy detailed numerous stab wounds to the victim's back and chest.  ADOC could not explain why this prisoner's death does not appear on the list of prisoner deaths that they produced to the Department, but does appear on a list of deaths that its private medical care provider tracked.

15

- In February 2017, a prisoner died two days after being assaulted by several prisoners at Elmore. An incident report described the prisoner as being "laid out on the floor" of the dormitory with a serious injury. The I&I Investigative Report indicates that the prisoner was fighting with another prisoner and was hit in the head, knocked out, and fell so that he hit his head again on the floor. The unconscious prisoner had to be carried to the health care unit and taken by helicopter to a local hospital where he died two days later. Elmore's incident report classified the prisoner's death as "Inmate Death – Natural." In contrast, the I&I Investigative Report states that, according to the autopsy report, the cause of death was Blunt Force Head Trauma and the manner of death was Homicide.

In addition to not accurately tracking deaths within its custody, ADOC has acknowledged that it does not maintain a centralized repository for all autopsies that have been performed. And, even apart from maintaining autopsies and tracking deaths, ADOC has no other mechanism in place to identify patterns in causes of death. As discussed in more detail below, this is particularly troublesome given the level of contraband that is readily available within the system, including knives and a significant amount of illicit substances that have caused and/or contributed to a number of deaths.

### 5. High Numbers of Life-Threatening Injuries Are Additional Strong Evidence that ADOC Is Not Adequately Protecting Its Prisoners.

In March 2018, from his glass cube, an officer at Donaldson observed a prisoner come to the door of one of the two cellblocks he was responsible for observing. The cellblocks at Donaldson house approximately 96 prisoners each. The prisoner "appeared to be severely injured" and "was unable to talk due to the injuries to his mouth." The officer manually opened the door of the dormitory from the cube and allowed the prisoner into the corridor, where the prisoner collapsed. The officer radioed a correctional sergeant for assistance. The sergeant arrived and found the prisoner lying on his back and severely injured. The prisoner was sent by ambulance to the nearest emergency room where, in addition to other observable injuries, it was discovered that a broomstick had been inserted into his rectum. Emergency surgery was necessary to remove the object. Four prisoners were identified as suspects and received disciplinary violations for Assault on an Inmate with a Weapon and Sexual Assault (forcible). Yet no ADOC staff member was aware of the assault until the seriously injured victim sought out a correctional officer for help

This incident is just one of hundreds of similar incidents that are documented by ADOC throughout Alabama's prisons. Prisoner-on-prisoner violence is systemic and life-threatening. ADOC is failing to adequately protect its prisoners from harm, in violation of the Eighth Amendment. Prisoners have "a constitutional right to be protected from the constant threat of violence and from physical assault by other inmates." *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) (per curiam). Constitutional conditions of confinement include the requirement to "take reasonable measure[s] to ensure the safety of the inmates." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (citing *Farmer*, 511 U.S. at 832). "[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the

16

government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833.

Courts have held that protecting prisoners from violence requires adequate supervision and staffing. *Alberti*, 790 F.2d at 1225-28 (upholding district court's order requiring specific staffing and hourly visual inspections by guards to address high violence and sexual assault at jail); *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977) (upholding requirement for hourly guard visits, and disapproving not having a guard on each floor); *see also Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir. 1992) (holding that while low staffing levels do not, by themselves, constitute due process violations, they provide support for a conclusion that the inmates are treated "recklessly or with deliberate indifference" to their safety); *Ramos*, 639 F.2d at 573 ("Violence and illegal activity between inmates . . . is further facilitated by the inadequacy of the staffing levels."); *Tillery v. Owens*, 719 F. Supp. 1256, 1276-77 (W.D. Pa. 1989) (holding that officials failed to provide adequate security in violation of the Eighth Amendment largely on the basis that staffing shortages resulted in deficient supervision), *aff'd*, 907 F.2d 418 (3d Cir. 1990).

Evidence of prisoner-on-prisoner violence in Alabama's prisons abounds—weekly in some prisons, daily in others—and is documented in ADOC's incident reports. In many instances, prisoners were so gravely injured that they had to be airlifted or taken by ambulance to local hospitals for emergency treatment. The following are just a few examples from among the hundreds in ADOC's incident reports:

- In March 2018, two Staton prisoners were involved in a fight. An officer ordered them to stop, but they refused, so the officer sprayed them with pepper spray. One prisoner then dropped a 10-inch long homemade knife. One of the prisoners had to be airlifted to an outside hospital due to a stab wound in his stomach.

- In October 2017, at Holman, a cubicle officer observed two prisoners yelling at each other in an open dormitory and called for assistance. When officers arrived, a prisoner was standing at the gate of the housing unit bleeding from his stomach and face. The victim was transported to a local community hospital where he was then taken by helicopter to a larger medical center where he was successfully treated.

- In September 2017, at St. Clair, when a lieutenant was conducting rounds in two open dormitories, he observed two prisoners fighting with box cutters and homemade knives. The lieutenant radioed for assistance and waited for other officers to arrive. As two officers escorted one of the prisoners to the health care unit, a third prisoner quickly approached and stabbed the escorted prisoner in the back. Officers sprayed the third attacker with pepper spray while a fourth prisoner tried to stab the third attacker with a knife and he too was sprayed with pepper spray. One of the prisoners was taken by ambulance to an outside emergency room for treatment of his stab wounds.

- In July 2017, at Elmore, an officer working alone in an open dormitory observed a prisoner stab another prisoner. He radioed for help and ordered the attacker to drop the knife. The prisoner refused and ran away with the knife in his hand. He only stopped

when another officer responded to the call for assistance and sprayed the attacker in the face with pepper spray. The victim was taken by helicopter to an outside emergency room for treatment.

- In March 2017, at St. Clair, an officer saw a prisoner being stabbed by two other prisoners and radioed for help. The two prisoners had attacked their victim from behind while he was on the way to the dining hall. When the officer yelled for them to stop, one of the assailants ran from the officer, while the other continued stabbing the victim. Four other officers eventually arrived and stopped the assault. The victim was transported to an outside emergency room for treatment of stab wounds to the back, a perforated lung, and a stab wound to the head.

Many of ADOC's incident reports document life-threatening injuries to prisoners—only discovered by officers after the injury occurred. These incident reports demonstrate a strong pattern of evidence of deficient supervision and ADOC's systemic failure in its duty to "provide humane conditions of confinement" and to "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832-33. The following are a few of the hundreds of grave injuries to prisoners that were inflicted out of the sight of ADOC correctional officers:

- In April 2018, a Bullock prisoner, his shirt covered in blood, approached an officer and stated that he had been stabbed by several other prisoners. He had to be airlifted to an outside hospital for treatment.

- In April 2018, an officer at Kilby noticed a crowd of prisoners gathered in the back of an open dormitory. When the officer approached, he discovered a prisoner with a bleeding, partially detached ear. He had been fighting with another prisoner who tried to bite off his ear. The prisoner was ultimately taken to an outside hospital for treatment.

- In March 2018, a prisoner at Kilby approached an officer with visible burns on his body. The prisoner told the officer another prisoner had thrown hot shaving cream on him—hot enough to cause second degree chemical burns. The prisoner was taken to an outside emergency room, but his condition was so bad that he had to be transported by ambulance to a hospital an hour and a half away.

- In February 2018, a Fountain prisoner was stabbed 10 times by another prisoner, including stab wounds to his medial lower elbow through the fascia, left upper shoulder, left bicep, left inner upper arm, left palm, left upper thigh, left upper medial calf, lower medial calf, and behind his right knee. He was airlifted to an outside hospital. A search recovered a homemade weapon that was approximately nine inches long.

- In February 2018, a Holman officer noticed a prisoner walking toward the gate of his housing unit with blood on his clothes. He had been stabbed 22 times by two other prisoners, with wounds to his back and head, and had to be airlifted to an outside hospital.

18

- In January 2018, a Holman prisoner came to the gate of his housing unit, bleeding.  He had been stabbed 22 times, including to his chest, upper arm, thigh, back, buttock, foot, and face, by six other prisoners.

- In January 2018, a cubicle officer at Holman noticed a prisoner walking towards the shower area covered in blood.  He had been attacked by two prisoners with a knife, resulting in a facial laceration that severed an artery.  The prisoner had to be airlifted to an outside hospital due to arterial bleeding.

- In December 2017, at Holman, a cubicle officer observed a prisoner standing at the housing unit gate bleeding from his arm and chest.  The prisoner had been assaulted and stabbed by multiple prisoners, suffering puncture wounds to his back, chest, arm, and head, as well as lacerations to his arm and head.  Due to the severity of his injuries, the prisoner had to be airlifted to an outside hospital.

- In November 2017, a Holman prisoner was stabbed in the head, back, shoulders, and both arms and legs.  He had to be transported to an outside hospital for emergency surgery.  An officer only became aware of the stabbing when he heard several prisoners banging on the cell bars and shouting to get his attention, then saw other prisoners carrying the victim, who was bleeding profusely, toward the unit's door.

- In November 2017, at Holman, a cubicle officer observed a prisoner walking towards the gate of an open dormitory with blood on his clothing, and called for assistance.  When officers arrived, they found a prisoner with a bloody face.  The prisoner, and another witness to the assault, confirmed he had been stabbed in the eye and beaten by two prisoners for resisting a sexual assault.  The victim was sent by ambulance to an outside emergency room.

- In October 2017, St. Clair officers noticed a prisoner leave his unit and enter the prison yard wearing only a blanket and socks.  Only then did staff discover that the prisoner "had been assaulted and severely beaten," appearing to have been bound and taped around his hands, ankles, mouth, and head, and had a fresh burn mark on his face.

- In September 2017, at Easterling, a prisoner was attacked in the prison yard by three prisoners and stabbed multiple times.  But no ADOC staff were aware of the assault until an officer saw several prisoners carrying the victim toward the health care unit.

- In July 2017, at Elmore, an officer observed a gathering of prisoners at the back of the dormitory and saw that one prisoner was bleeding from his chest.  He radioed for assistance and the prisoner was escorted to the health care unit.  The prisoner was taken by helicopter to an outside emergency room.  The stabbing happened when the victim tried to intercede and stop a fight between two other prisoners.

- In July 2017, a prisoner at Kilby approached the shift commander to let him know that he had been stabbed in the chest by two other prisoners.  The prisoner was sent by

ambulance to an emergency room for treatment.  Later, a homemade knife was found under the mattress of one of the suspected attackers.

- In April 2017, at Elmore, a prisoner informed an officer in an open dormitory that he had just been stabbed in the back.  The prisoner was taken by ambulance to an outside hospital where he underwent emergency surgery for a punctured lung.  The weapon used to stab the victim could not be found.

- In April 2017, an officer at Limestone saw a prisoner standing in the day room with multiple injuries to his head.  The prisoner was escorted to the health care unit and then taken to an outside hospital for treatment for facial lacerations.  The prisoner reported he had been attacked by another prisoner over a missing jug of julep (a prison-made alcoholic mixture).

- In February 2017, at Bibb, an officer saw a prisoner with blood running from his face.  He escorted the prisoner to the health care unit where he was immediately transported to an outside emergency room.  Later video review showed that the prisoner had been assaulted by two other prisoners with a mop.  The victim required numerous stitches, and because of a cut to his lung, he had to be hospitalized overnight at an outside hospital.

Another pattern that emerges in ADOC's incident reports is the prevalence of drugs in the facilities, and the effect that has on prisoner-on-prisoner violence.  ADOC management, staff, and prisoners all reported that prisoners on drugs often "wig out" and harm others, and the inability to pay drug debts has led to beatings, stabbings, and homicides.  The following are some of the many examples documented in ADOC incident reports:

- In April 2018, an officer observed that a Donaldson prisoner had blood on his clothing.  The prisoner was transported to the hospital with multiple stab wounds.  The investigation revealed that the victim "was likely under the influence of narcotics" when he began poking another prisoner, who was asleep, with a knife.  That prisoner woke up, grabbed the knife, and stabbed the first prisoner several times.

- In September 2017, officers were called to a Draper dormitory due to one prisoner bleeding from multiple stab wounds and another bleeding from the crown on his head.  The prisoner who had been stabbed admitted that he had been high on Suboxone for two days.  While he was high, the prisoner had bleach poured on him, was beaten with a broken mop handle, and was stabbed several times.  The drugged prisoner also assaulted another prisoner with a lock on a string.

- In August 2017, a Bibb prisoner stabbed another prisoner in the back multiple times while high on drugs.  The victim had to be airlifted to an outside hospital.  Officers recovered the assailant's knife.  Despite noting that the assailant had slurred speech and "appeared to be on an unknown substance," there is no indication that ADOC officers conducted a search for contraband drugs.

- In April 2017, a Bibb prisoner was stabbed in the back and left temple while asleep, and had to be airlifted to an outside hospital. This prisoner had a history of drug debts and had previously tested positive for drugs. His attacker explained that the victim owed him a $200 debt and was not going to pay, so he "got it in blood."

- In February 2017, an Elmore prisoner was killed because of a failed drug transaction. Multiple prisoners attacked the victim while he lay asleep in bed, then he was dragged on a blanket to the common room, where a correctional officer eventually discovered him. He was airlifted to an outside hospital for emergency surgery due to a brain hemorrhage. He died two days later.

Yet another pattern that emerges is the prevalence of contraband, especially homemade weapons, which appear to be very easy for prisoners to produce or procure. Many of the incidents already described demonstrate the widespread availability of such weapons, as do the following, which also illustrate just how dangerous these weapons can be:

- In April 2018, a prisoner at Ventress attacked another prisoner with a homemade hatchet. The victim was taken to an outside hospital with excessive blood loss and a possible punctured lung. ADOC described the "hatchet like weapon" as having a foot-long broom handle with a "lawn edging blade" attached to the top.

- In February 2018, an officer noted a St. Clair prisoner running down the hallway and stopped him. The prisoner turned and showed the officer that he had a knife embedded in his head. The prisoner had to be transported to an outside hospital for the removal of an eight-inch, metal homemade knife from the back of his head.

An effective prison system encourages prisoners and staff to report threats and/or violence, so that management can properly discipline assailants and seek to ensure that violence is averted. In Alabama, staff instead sometimes discipline the very prisoners who report threats or are themselves victims of assaults. For example, when a prisoner voluntarily admits to a minor rule infraction, such as accruing a debt to another prisoner, while seeking assistance or protection from violence, staff will indiscriminately discipline the very prisoners who report threats or are themselves victims of assaults. While ADOC has an interest in enforcing institutional rules, the disciplinary system should be implemented in a way that allows for discretion and avoids subjecting victims to unnecessary disciplinary actions for minor infractions voluntarily admitted when they are seeking assistance or protection from ADOC due to threatened or actual violence. A system that punishes prisoners who report violence if the victim bears any fault or has engaged in any misconduct will necessarily discourage prisoners from reporting and make it more difficult for ADOC to prevent violence in Alabama's prisons. By focusing on the reporting victim's past misconduct instead of his allegations of abuse, ADOC misses the opportunity to prevent violence while simultaneously discouraging other prisoners from coming forward. In each of the examples below, the prisoners who reported being assaulted or sought protection from ADOC were subjected to discipline because they voluntarily admitted to having accrued debts to other prisoners:

- In April 2018, a drug treatment counselor at St. Clair reported to a captain that a prisoner feared for his safety because of debts he owed to gang members. The captain questioned the prisoners he had named, all known gang members, who denied the allegations. The prisoner who made the report was disciplined for intentionally creating a security/safety/health hazard and placed in restricted housing for admitting to having accrued a debt.

- In March 2018, a prisoner at Elmore reported to the administrative lieutenant that he was in fear for his life because he owed money to four prisoners who were threatening him. The lieutenant questioned the named prisoners about the allegation, which they denied. Although those prisoners were not disciplined, the reporting prisoner was ordered to provide a urine sample and transferred pending disciplinary action for intentionally creating a security/safety/health hazard. The incident report confirms that "no further action" was taken.

- In January 2018, a Bibb prisoner approached staff to report that he had been assaulted by multiple other prisoners over a drug debt. A medical examination showed he sustained several bruises and scratches to the facial area. Video surveillance footage confirmed the assault. While the assailants were cited for assault on an inmate, the reporting prisoner was also disciplined for intentionally creating a security/safety/health hazard because he admitted to the drug debt.

    In some cases, it appears that ADOC disciplines prisoners simply for refusing to name the individuals who they fear may harm them, which requires the prisoner to choose between discipline and the danger he may face from retaliation if he identifies his assailant.

- In October 2017, a prisoner at Bibb entered the health care unit, bleeding. The prisoner had sustained two puncture wounds to the back of his neck, a bite mark to the base of his skull, and multiple scratches to his mid- and lower back. Because the prisoner declined to name the person who had assaulted him, he was given a disciplinary for intentionally creating a security/safety/health hazard. He was then reassigned to the Hot Bay.

- In September 2017, a prisoner from Draper died at Jackson Hospital. His cause of death was listed as "Inmate Death – Natural" on the facility's incident report. Two days earlier, he was found unresponsive on his bunk in a dormitory at Draper. The autopsy, however, indicated that he died of "[s]ynthetic cannabinoid toxicity (5F-ADB)." Several months prior to his death—in July 2017, while housed at Holman—the decedent had requested to be placed in segregation because he feared for his life. Although the incident report notes no wrongdoing on the part of the victim, he was subjected to discipline for intentionally creating a security/safety/health hazard after he failed to name the prisoners he feared. The decedent had expressed similar fears in August 2016, and was subject to discipline at that time as well, after failing to provide names.

The violent incidents discussed in this section of the report were all culled from ADOC's own incident reports. We have reasonable cause to believe that ADOC does not record all violent incidents in incident reports. First, high-level management in ADOC admitted to us that not all incidents are recorded in incident reports. Second, we interviewed many prisoners and received hundreds of calls to our dedicated toll-free number from prisoners and concerned family members, many of whom reported to us specific details about contemporaneous events. When we searched for evidence in ADOC's incident reports to confirm or refute what we had been told, for many of the allegations, there were no corresponding incident reports. Because ADOC did not produce most of the subpoenaed investigative files, it is possible and perhaps likely that the violence and harm to prisoners in ADOC prisons is even greater than that which we report.

### 6.      *Unchecked Extortion Presents a Risk of Serious Harm.*

Extortion of prisoners and family members of prisoners is common in Alabama's prisons. Extortion by fellow prisoners is commonly reported by prisoners calling the toll-free number established by the Department. Investigators with ADOC's I&I confirmed extortion of family members and prisoners is a significant problem in Alabama's prisons. Alabama's inability to prevent and address the extortion of prisoners and prisoners' family members leads to a substantial risk of serious harm. *Marsh*, 268 F.3d at 1028 (holding that correctional facility conditions that provide the opportunity for harm and fail to allow for adequate supervision pose a substantial risk of serious harm). For example:

- In August 2018, a prisoner at Bibb called the Department's toll-free number to report that he was forced into nonconsensual sex acts with other prisoners while being extorted for drug money. He reported that he was constantly sleeping in other dormitories to escape the prisoners. He told us that when he reported the matter to Bibb's PREA resource officer, the officer told him that because he was in debt to another prisoner, nothing could be done.

- In May 2018, a prisoner at Bibb called the toll-free number to report that in February of that year, he had been held hostage in an open dormitory over the course of several days over a money debt and was severely beaten by several prisoners. When he was finally able to escape and notify a correctional officer, an incident report confirmed the severity of his beating by noting that he was immediately sent to an emergency room and required two facial surgeries.

- Over the course of several days in February 2018, a prisoner at St. Clair was repeatedly physically and sexually assaulted at night by his cell mate, as evidenced by fresh and healing bruising on his body. When he finally approached an officer, he reported that his cell mate had been extorting him to pay $1,000 and was forcing him into sex and payment of four packs of tobacco each day until he satisfied the $1,000 debt. ADOC placed both prisoners in restricted housing.

- In January 2018, the mother of a prisoner at Ventress called our toll-free number to report that she and her son were being extorted for money to pay off an alleged $600 debt to another prisoner. Because of his failure to pay, the victim was beaten and

threatened with rape. His mother later called to report that she was being extorted by a prisoner at Ventress who texted her photos of a prisoner's genitals from a cell phone. Through texts, he threatened to chop her son into pieces and rape him if she did not send him $800. In February 2018, the inmate called our toll-free line and affirmed what his mother had reported. The following screenshots were sent to us:



*Text messages attempting to extort a prisoner's family member*

- Similarly, in December 2017, a woman reported that her brother, a prisoner at Donaldson, was being held hostage inside a cell. When a correctional sergeant sought the prisoner out, he was found with several bruises on his face and it was determined he had been assaulted. The prisoner told the correctional officers that he and his family were being extorted by his captor for money. During the investigation, the alleged perpetrator admitted that the victim had been "short on his payment," and was placed in segregation pending disciplinary action. The victim was placed in the Restricted Privileges cell.

- In October 2017, a prisoner at Staton was moved by security staff to Bibb because he was physically assaulted and extorted for $10,000 by four prisoners who were members of the Crips Gang. The gang members targeted the victim after learning that he received an inheritance following his mother's death earlier that year.

- In November 2017, a prisoner at Bullock called the Department's toll-free number to report that he believed he would soon be killed over a debt. Later that day, a correctional captain questioned the prisoner about his call. The prisoner told the captain he was indebted to other prisoners and could not pay and wanted protection.

24

The prisoner refused to provide the names of the prisoners who were extorting him. ADOC then required the victim to provide a urine sample and moved him to restricted housing while giving him a disciplinary action for intentionally creating a Security/Safety/Health Hazard.

### 7.    *Access to Dangerous Weapons Contributes to Serious Violence.*

ADOC does not effectively control the introduction, manufacture, and use of weapons. This leads to a substantial risk of violence.  While the majority of weapons recovered inside Alabama's prisons are "homemade," some weapons appear to be commercially manufactured and smuggled into the facilities.  One way control could be accomplished is to require all staff to undergo screening prior to entering a facility, as the federal Bureau of Prisons has required since 2013.  Enhanced screening of visitors would also evidence a commitment to addressing this problem.

The Constitution requires that prison officials adequately monitor prisoners and confiscate weapons and other dangerous contraband to ensure prisoners' health and safety. *Hudson*, 468 U.S. at 527 ("[Prison officials] must prevent, so far as possible, the flow of illicit weapons into the prison . . . .").  Our review of incident reports for the year 2017 revealed that in hundreds of incidents reports, weapons of some kind were used and subsequently confiscated. And any given incident report may include the collection of more than one weapon from more than one individual.  It is clear from interviews with staff and prisoners that weapons are ubiquitous in Alabama's prisons.  And, as the examples recounted previously demonstrate, stabbings are frequent throughout the system.

At Bibb, a captain estimated that perhaps 200 prisoners possess homemade knives, also known as shanks.  He told us that in May 2017, security staff collected 166 shanks at one time. He told us that prisoners were making weapons from metal cut from fences in the yard, light fixtures, dish racks, and elsewhere.  And at least one Bibb prisoner recounted seeing a correctional officer watching a weapon being made without intervening.  Prisoners at Bibb said that "everyone" has knives, and prisoners need a weapon to stay alive.  One prisoner stated that "Bibb is a place where you have to fight the day you arrive or you'll be a bitch, so you get a knife."  Another recounted being warned by officers when he arrived at Bibb that he would need a knife for protection.

From interviews with prisoners at multiple facilities, it was clear that many prisoners felt they needed a weapon for self-defense.  At facilities we visited, shift commanders estimated that anywhere from 50-75% of prisoners were armed with some sort of weapon.  Prisoners at Draper and Holman stated that knives are "everywhere."  At Holman, three different lieutenants said "all" prisoners have a weapon of some sort.  One prisoner stated that it was just "good common sense" to have one in that environment.  Another stated that no security measures can get rid of all the knives hidden in the open dormitories.

Multiple prisoners interviewed at different facilities confirmed that knives are pervasive. One prisoner at Donaldson recounted seeing knives as big as machetes.  A weapon that was essentially a small sword was recovered at St. Clair in 2017.



*Correctional officer holding a weapon recovered at St. Clair in 2017*

The number of prisoners we interviewed who had either been stabbed or had stabbed another prisoner was overwhelming—for example, one prisoner recounted that he had been stabbed 11 different times since he arrived in prison and he was currently in segregation for stabbing someone. And many of these stabbings go unreported to security staff. It is clear from these reports and from the level of violence and stabbings indicated in ADOC's own incident reports that whatever measures are in place to prevent the creation and introduction of weapons, those measures are failing.

### 8. *Ineffective and Unsafe Housing Assignments Increase the Risk of Violence.*

ADOC fails to implement effective classification and housing policies, which results in violence by commingling prisoners who ought to be kept separate within the same, under-supervised housing units. *See Marsh*, 268 F.3d at 1014 (lack of classification and risk assessment system constitutes deliberate indifference where inmates were harmed by other inmates because housing assignments did not account for the risk violent prisoners posed). ADOC's classification process has not been validated for effectiveness. In addition, classification specialists handle a large number of prisoners, limiting effectiveness. For example, at Bibb, each classification specialist handles a caseload of 360 prisoners.

While ADOC makes some attempt to separate potential predators from potential victims, prisoners can and do frequently thwart attempts to keep prisoners separate by wandering from housing unit to housing unit without staff intervention or knowing how to break into compromised cell doors. A review of incident reports from 2017 revealed over 1,100 incidents

of prisoners being in an unauthorized location.  The initial screening for determining a prisoner's custody level, and corresponding facility assignment, is done centrally.  Housing unit and bed assignment is done at the facility-level.  There is inadequate screening for prisoners' risks of being violent or sexually abusive, or for potential vulnerabilities, as is required by PREA.  And prisoner transfers are ubiquitous and numerous; almost every prisoner we talked to had been transferred to many different prisons throughout their time in the ADOC system.  Segregation is used to house prisoners who do not want to stay in general population and are fearful for their life or safety.  But segregation is also used to house prisoners being punished for rule infractions and prisoners placed there for being a threat to safety, which results in a dangerous mix of predatory and vulnerable prisoners in the same unit with inadequate supervision.

It is a common correctional practice to assign prisoners who have received disciplinary infractions to a disciplinary housing unit where they are subject to higher security measures, including segregation or reduced out-of-cell time and curtailed privileges.  ADOC utilizes a disciplinary dormitory at several of its facilities, also known as the Hot Bay, for prisoners who receive a disciplinary action for misconduct.  Most often, that misconduct involves violence, resulting in these dormitories housing a high percentage of violent prisoners.  Although some ADOC disciplinary units are termed "Behavior Modification" units, there is no additional staffing or behavioral programming offered in these units.  Prisoners are commingled and under-supervised, but still housed in an open dormitory.  They are also being denied access to programming and visits to the canteen.  Food is brought to them on trays.  They are only given access to the yard if there are enough officers to supervise outside time, which rarely happens.  These deprivations raise tension levels within the unit.  However, unlike disciplinary units in other correctional systems, which require increased correctional staffing and supervision, prisoners and staff reported that there is little supervision in ADOC's Hot Bays, greatly contributing to the high level of violence in these units.  In fact, during one facility visit, when we entered the Hot Bay, a captain muttered, "Enter at your own risk."

During our tour of Bibb, also referred to by prisoners as "Bloody Bibb," we learned that to gain the attention of correctional staff, who are rarely present in the Hot Bay, prisoners must bang on the door or chain on the door until someone responds.  Prisoners reported that rapes, torture, and physical assaults occur in the back of the dormitory, where there are blind spots preventing the line of sight for correctional staff to view activities through the windows.  Many prisoners stated that officers do not ever enter the Hot Bay, with one noting, "unless someone is killed and they have to come clean up the aftermath."  Since we inspected Bibb and informed ADOC of our initial findings that the Hot Bay was critically dangerous, ADOC closed the Hot Bay there, but similar "Behavior Modification" dormitories continue to operate at other facilities.

### 9.    ADOC's Failure to Protect Prisoners from Harm Also Negatively Impacts the Safety of Correctional Staff.

ADOC's failure to provide adequate supervision and staffing harms not just its prisoners, but also its officers working within the prisons.  The same underlying causes of prisoner-on-prisoner violence—understaffing, overcrowding, and prisoners' unfettered access to weapons and drugs—also leads to violence against correctional staff.

We interviewed a former ADOC warden who discussed with us the dangerous staffing levels at the prisons.  He called the staffing levels "barbaric" and concluded that both prisoners and correctional officers in Alabama's prisons "are in extreme danger."  Less than a month before we notified Alabama of our investigation, a correctional officer, Kenneth Bettis, was killed at Holman.  Officer Bettis was stabbed in the head by a prisoner while working in the dining hall.  The prisoner was angry that Officer Bettis refused to allow him to get a second food tray.  At the time, he was the only officer working inside the cafeteria.  Shortly after his death in 2016, correctional officers at all facilities were issued stab vests for their protection.  Despite the addition of stab vests, correctional staff continue to be harmed by prisoner violence, as the examples listed below show:

- In March 2018, at St. Clair, seven prisoners surrounded a correctional officer with homemade knives drawn.  One prisoner cut the officer in his stomach with a knife before help arrived and the prisoners were handcuffed.

- In March 2018, at Fountain, several correctional officers were performing a contraband search.  They informed a prisoner that they were going to pat search him, and he refused.  When the officers tried to place the prisoner in handcuffs, he punched a lieutenant in the face and then kicked him in the chest.  Other officers were able to subdue and handcuff the prisoner.  He was searched, and found to have on his person a five-inch box cutter with a razor blade attached.

- In February 2018, at Donaldson, a prisoner attacked a correctional officer with a lock tied to a sock.  Once he was subdued and handcuffed, officers found a handmade knife on his person.

- In February 2018, at Ventress, a correctional officer observed a prisoner with a handmade knife, approximately six inches long, in his hand.  The officer ordered the prisoner to drop the knife, and the prisoner complied.  But when the officer ordered the prisoner to turn around to be handcuffed, the prisoner punched the officer in the face.  The officer was eventually able to handcuff the prisoner.  A pat search of the prisoner revealed two more handmade knives.

- In February 2018, at Staton, a prisoner ran at a correctional officer, swinging and hitting the officer in his face.  A scuffle ensued, and after spraying the prisoner with his chemical agent, the officer was able to subdue the prisoner.  A search of the prisoner's jacket revealed two homemade knives, each about eight inches in length.

- In January 2018, in the Behavioral Modification Dormitory at Draper, a correctional officer was in a bathroom area when he noticed a prisoner starting a fire in a trashcan.  When the officer went to extinguish the flames, several prisoners surrounded him and told him to leave.  One prisoner came from behind the officer and tried to take the officer's baton.  The officer was then hit in the back of the head with a hard object.

- In December 2017, at St. Clair, a correctional officer directed several prisoners to exit a dormitory.  One prisoner hit the officer several times in the face with his fist and stabbed him in the face with a prisoner-made ice pick.

- In November 2017, at Easterling, a correctional officer ordered a prisoner to return to his dormitory.  The prisoner failed to comply, grabbing the officer around his neck and striking him twice in the face with his fist.  A subsequent pat search of the prisoner yielded a handmade knife.

- In October 2017, at St. Clair, a correctional officer ordered a prisoner to put a shirt on.  The prisoner left the area and returned with a 26-inch-long prisoner-made knife.  He began chasing the officers in the area, attempting to strike four officers.

- In August 2017, at Bullock, a lieutenant entered a dormitory to conduct a search on a prisoner.  The lieutenant discovered a cell phone in the prisoner's pants pocket.  When the lieutenant reached for it, the prisoner slapped it out of the lieutenant's hand.  The lieutenant then grasped the prisoner by his shoulders and threw him to the floor.  The incident quickly escalated.  While on the floor, the lieutenant observed multiple prisoners with broomsticks gathering behind him.  The lieutenant retrieved his pepper spray and pointed it at the group of prisoners, ordering them to move back.  He called for assistance, and four more officers arrived.  A prisoner attempted to attack the lieutenant, but another officer restrained and subdued him.  While the officers were attempting to depart the dormitory, another prisoner struck an officer in the face.  The officers pepper sprayed that prisoner and placed him in handcuffs.  Soon after, two prisoners ran towards the officers swinging broomsticks while yet another swung his fists.  The officers pepper sprayed these prisoners, eventually subduing them.

- In July 2017, at Bullock, an officer observed a prisoner walking through a door to the Receiving Unit.  He asked the prisoner why he was there, and the prisoner stated, "They are going to kill me."  The prisoner attempted to force his way into the Receiving Unit.  The officer grabbed his left arm in an attempt to stop him.  The prisoner then retrieved two handmade knives from his pocket and attempted to strike the officer.  The officer moved out of the way and was unharmed.  He called for assistance via radio and grabbed the prisoner, ordering him to drop the knives.  The prisoner refused, continuing to attempt to strike the officer.  Two officers arrived to assist.  During the officers' attempt to subdue the prisoner, the prisoner stabbed another officer in the upper right side of his back and attempted to stab the third officer in the chest but failed to puncture the skin.  Four additional officers arrived to assist.  After a protracted altercation, which included the use of physical force, a baton, and pepper spray, the officers finally subdued the prisoner.  Three officers were sent to an offsite hospital for further treatment.

- In July 2017, at Bibb, a prisoner approached an officer from behind and began to stab him in the back with a prisoner-made knife.  Another officer saw the stabbing and issued an emergency call for assistance, and additional staff arrived at the scene and

assisted in subduing the prisoner.  The officer who was stabbed was transported to Bibb Medical Center for further treatment.

- In June 2017, at Draper, a correctional officer ordered a prisoner to stand for a pat search.  The prisoner stood, but informed the officer that he was not going to be pat searched.  He then reached behind his back to retrieve a knife, and swung toward the officer.  The officer and another officer deployed pepper spray in an attempt to subdue the prisoner, but the prisoner ran away and began swinging his knife at another prisoner.  The officer was able to apprehend the prisoner after using pepper spray a second time.

- In May 2017, at Bibb, a prisoner assaulted a captain conducting routine security rounds in the Hot Bay.  The prisoner struck the captain in the face several times.  When the captain fell to the ground, the prisoner plus two other prisoners began stomping on the captain's head.

- In April 2017, at Ventress, a sergeant and an officer became involved in an altercation between two prisoners, one swinging a piece of metal towards another.  One of the prisoners threw the piece of metal down and picked up a broken broomstick.  The sergeant ordered the prisoner to drop the broomstick.  The prisoner refused and struck the sergeant across the top of his head twice and on the forearm once, causing an eight-centimeter laceration at the center of the sergeant's head.

- In April 2017, at Donaldson, several officers responded to a radio call regarding a prisoner with a weapon, and discovered an officer lying on the dormitory floor.  The responding officers assisted the officer while other officers tried to restrain the prisoner, who was swinging a knife.  The prisoner continued to fight the officers, but eventually dropped his knife and was restrained.  The officer on the floor was placed on a gurney, taken to the infirmary, and later taken to a hospital for further treatment.

- In April 2017, at Bullock, a prisoner who refused to comply with an officer's orders to return to the dormitory pulled a handmade knife from his pocket and attempted to stab the officer in the abdomen.  The officer jumped out of the way, sprayed the prisoner with pepper spray, and called for help.  The prisoner attempted to stab the officer a second time.  The officer took the prisoner to the ground but the prisoner continued to fight, stood back up, and tried to run to the dormitory.  Four additional officers responded to the scene and took the prisoner to the ground.  The prisoner continued to resist being handcuffed, but eventually he dropped the knife.

### D.   ADOC's Failure to Prevent Illegal Drugs Within Alabama's Prisons Results in Prisoner Deaths and Serious Violence.

Dangerous and illegal drugs are highly prevalent in Alabama's prisons, and ADOC appears unable or unwilling to prevent the introduction and presence of drugs in its prisons. These drugs contribute to the ongoing violence and pose a substantial risk of future violence. ADOC prisoners are dying of drug overdoses and being subjected to severe violence related to

the drug trade in Alabama's prisons.  Agents of ADOC's I&I Division, including the I&I Director, stated that "drugs are the biggest problem in prison" because prisoners are "wigging out" and harming others.  One ADOC investigator stated that "drugs are the biggest driver of violence in Alabama's prisons."  Another investigator saw five or six prisoners laid out in a hallway at Bullock after smoking the same drug and thought it looked like "triage in a warzone."

The presence of synthetic cannabinoid, frequently referred to as 5F-ADB, within Alabama's prisons presents a particularly serious health risk for prisoners.  According to the World Health Organization's Expert Committee on Drug Dependence, this substance can cause "severe and fatal poisoning," and its effects may include "rapid loss of consciousness/coma, cardiovascular effects . . . , seizures and convulsions, vomiting/hyperemesis, delirium, agitation, psychosis, and aggressive and violent behavior."

A review of autopsies from 2017 and the first half of 2018 revealed that the substance was present in many facilities, including Bibb, Bullock, Draper, Elmore, Fountain, and Staton.  An I&I investigation into a prisoner death at Bullock in December 2016 revealed that these drugs were readily and cheaply available inside the prison.  Indeed, a review of autopsy reports from prisoner deaths dating December 2016 through August 2018 revealed that at least 22 were caused by "synthetic cannabinoid toxicity" overdoses.  And since we opened our investigation into Alabama's prisons, the problem has become worse—there were three deadly overdoses in 2016 and nine in 2017.  The first half of 2018 (after which ADOC stopped producing documents to us) was especially deadly; during that timeframe, at least 10 deaths were attributed to synthetic cannabinoid toxicity.

To the extent contraband is introduced by staff, it is contributing to the problem.  ADOC staff, who are not screened for contraband upon entry to a prison, have been consistently identified by ADOC leadership as contributing to the contraband problem.  Requiring all individuals—management and line staff—to be screened at entry, would ensure ADOC takes seriously the need to prevent and address contraband within Alabama's prisons.

Often, ADOC's incident reports list the cause of overdose deaths as "Natural," and although autopsies later reveal the true cause of death, ADOC does not centrally collect or track these autopsies and is thus unable to distinguish overdose deaths from other non-homicide deaths and to fully understand the deadly effects of such dangerous contraband within its system.  The following are only a few examples of the deaths associated with synthetic cannabinoid:

- In May 2018, a prisoner at Fountain died of synthetic cannabinoid toxicity.  Incident reports list the cause of death as suspected drug overdose.  Approximately two years before his death, this same prisoner was stabbed at Holman in a drug-related altercation.

- In March 2018, at Easterling, a prisoner died from the "[t]oxic effects of 5F-ADB."  The incident report, which listed his death as accidental, stated that a correctional officer on a security check observed the prisoner lying on his bed.  The officer tapped him on the shoulder but received no response.  Despite efforts to resuscitate him, the prisoner was pronounced dead within an hour.

- In March 2018, a prisoner at Bibb was found lying on his bed unresponsive during a count.  He died at Bibb that same day.  The autopsy listed "[s]ynthetic cannabinoid (5F-ADB) toxicity" as the cause of death.  It further noted that the prisoner "was seen earlier in the day to be smoking what was believed to be spice."  In July 2016, this prisoner was reprimanded after he was identified as one of four prisoners shown in a social media video of men at Bibb lying on the floor under the influence of "flakka."

- In February 2018, a prisoner at Bibb died from synthetic cannabinoid toxicity.  The autopsy report notes that the prisoner was observed "smoking a substance and then collapsing to the floor."  The autopsy also mentions the existence of video surveillance footage showing the prisoner "sitting on his bed smoking and then collapsing to the floor."  The incident report lists his cause of death as "Natural."

- In February 2018, a prisoner at Bibb died from "[s]ynthetic cannabinoid toxicity (5F-ADB)."  He was found unresponsive and lying on his bed during an institutional count.  CPR was administered by a nurse, and he was eventually pronounced dead at an outside hospital.  The incident report listed his cause of death as "Natural."

- In January 2018, a prisoner died at Bullock from "[s]ynthetic cannabinoid toxicity."  According to the incident report, which listed the death as "Natural," another prisoner thought that the overdosed prisoner had smoked a "stick" possibly two hours prior.

- In October 2017, a Staton prisoner was found unresponsive while lying on his bed.  The autopsy noted that he was "found unresponsive in his cell after smoking a synthetic cannabinoid."  It further concluded that "the cause of death is ascribed to synthetic cannabinoid (5F-ADB) toxicity with hypertensive and atherosclerotic cardiovascular disease and cirrhosis as significant contributing factors."  ADOC's incident report, however, classified his death as "Inmate Death – Natural."

In addition to the synthetic drug overdoses, another four deaths in 2018 and one in 2017 were attributed to mixed drug toxicities resulting from methamphetamines or Fentanyl, as well as complications from the intravenous use of methamphetamine, or even an unknown "white powder."  For example:

- In May 2018, a prisoner at Bibb died from "Acute fentanyl toxicity."  According to the autopsy, a postmortem toxicology report revealed "the presence of Fentanyl and 4-Anilino-N-Phenethylpiperidine (4-ANPP).  The presence of 4-ANPP, an intermediate chemical precursor in the synthesis of fentanyl, is an impurity in non-pharmaceutical fentanyl, highly indicating illicitly manufactured fentanyl."  No incident report was located related to this prisoner's death.

- In February 2018, an Easterling prisoner died from "mixed drug (Methamphetamine, synthetic opioid U-47700) toxicity."  The incident report classified his death as "Natural" and noted that he was found "laying on the floor in the front of [his] bed."  This prisoner previously tested positive for methamphetamine and buprenorphine

(Suboxone) in November 2015 while at Staton, and again on May 14, 2017 when he was at Elmore.  He was also caught at Staton with Suboxone on his person in January 2017.

- In October 2017, a prisoner at Kilby died of an overdose from an unknown drug.  The prisoner was found face down and unresponsive on the floor next to his bed.  A piece of plastic containing a white powder, initially identified as "no-show," was found next to him.  The prisoner was taken to the Kilby emergency room where he was pronounced dead.

Synthetic drugs and methamphetamines have also been mentioned in the autopsies of homicide victims.  In 2018 alone, autopsies revealed the presence of synthetic drugs in two victims, methamphetamines in two others, and one prisoner who had both synthetic drugs and methamphetamines in his system.

Many of the prisoners we interviewed painted a portrait of a system where drugs are ubiquitous, dangerous, and contribute to violence.  Over 70% of the prisoners we interviewed specifically mentioned the prevalence of drug use within the prisons.  Many prisoners thought that part of the danger from drugs is that drug usage leads to drug debts, which leads to violence and sexual abuse when prisoners are unable to pay.  Prisoners at different facilities reported seeing other prisoners smoke something, "wig out," fall on the ground, pass out, or vomit.  A common theme in our interviews of prisoners was that correctional officers observe the drug use and take no action.

It is difficult to know the exact number of prisoners using drugs in Alabama's prisons, as drug tracking and testing is inconsistent.  In 2017, there were over 375 incident reports documenting prisoners possessing drugs, but many of these reports reflect that more than one prisoner was in possession of drugs.  Many prisoners referred to the drug problem as an "epidemic."  In fact, several prisoners we interviewed had either been stabbed by someone "wigging out" on drugs, or had stabbed another prisoner while on drugs.  One shift commander said that more than once a day she encounters a prisoner passed out or acting violently after using drugs.  Two shift commanders of death row and segregation at Holman estimated that 50-60% of their prisoners were using drugs.  One shift commander over general population at Holman estimated that 95% of that facility's prisoners were using drugs.

There are varying explanations for how the drugs are getting into ADOC's prisons.  During one facility tour, leadership admitted that drugs were arriving a variety of ways—through staff, from prisoners returning from other places, individuals throwing bags over the fence, and visitors.  Prisoners corroborated these same avenues by which drugs were entering the prisons.  An I&I investigator interviewed at ADOC headquarters, whose job includes investigating staff corruption, stated that, "without a doubt" the number one way contraband is getting into prisons is "by staff smuggling it in."  A former ADOC warden told us the same thing.  Another investigator pointed to a recent I&I investigation into staff corruption that had already ensnared 11 officers at one prison.  The investigator stated that he had not yet uncovered the end of the corruption.  In another investigation at a different prison, I&I discovered that a staff member

33

made $75,000 bringing in contraband and his accomplice, a prisoner, made $100,000. Clearly, current ADOC policies have been unable to control or limit the drug trade in its prisons.

### E.   ADOC Is Not Adequately Protecting Prisoners from Sexual Abuse by Other Prisoners.

Sexual abuse in Alabama's prisons is severe and widespread, and is too often undetected or prevented by ADOC staff. We reviewed over 600 incident reports from late 2016 through April 2018 that ADOC classified as "Sexual Assault – Inmate-on-Inmate." The majority of these incident reports described sexual abuse allegations of forced anal or oral sex. Medical examinations and ADOC investigations substantiate a significant number of the allegations of sexual abuse. In reviewing hundreds of reports, we did not identify a single incident in which a correctional officer or other staff member observed or intervened to stop a sexual assault. Because of inadequate supervision, correctional officers do not observe the rampant sexual abuse, they do not intervene, and the cycle of abuse continues. As such, ADOC fails to protect prisoners from the harm of sexual abuse. *Farmer*, 511 U.S. at 833 (holding that prison officials have a duty to protect prisoners from violence at the hands of other prisoners, including sexual assault).

### 1.   *Sexual Abuse Is Highly Prevalent in ADOC Correctional Facilities.*

ADOC documents a high level of sexual abuse within Alabama's prisons. ADOC produced 313 incident reports classified as "Sexual Assault – Inmate-on-Inmate" from the year 2017. ADOC produced 257 such incident reports from 2016. Many of the incident reports confirm that ADOC substantiated the allegations. Indeed, in 2016, the Survey of Sexual Victimization data that ADOC publicly reported pursuant to the National Standards for the Detection, Prevention, and Punishment of Prison Rape, 28 C.F.R. § 115 ("PREA standards"), confirmed that ADOC substantiated nearly 25% of all allegations of "inmate-on-inmate nonconsensual sexual act."[6] ADOC substantiated over 30% of allegations of "inmate-on-inmate abusive sexual contact."[7] Nationwide, prisons substantiate an average of 6.3% of allegations of

---

[6] Ala. Dep't of Corrs., Survey of Sexual Victimization, 2016, at 2, http://www.doc.state.al.us/docs/PREA/SSV2016.pdf. The number of substantiated incidents is likely even higher, as the investigations for 20% of the allegations of "Nonconsensual Sexual Acts" had not yet been completed at the time of publication. *Id.* "Nonconsensual Sexual Acts" are defined as:

> "Sexual contact of any person without his or her consent, or of a person who is unable to consent or refuse; AND [c]ontact between the penis and the vulva or the penis and the anus including penetration, however slight; OR [c]ontact between the mouth and the penis, vulva, or anus; OR [p]enetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument."

*Id.*

[7] *Id*. at 3. "Inmate-on-inmate abusive sexual contact" is defined as: "Sexual contact of any person without his or her consent, or of a person who is unable to consent or refuse; AND [i]ntentional touching, either directly or through the

"inmate-on-inmate nonconsensual sexual act," and 11.7% of allegations of "inmate-on-inmate abusive sexual contact." In its Survey of Sexual Victimization data for 2017, ADOC reported substantiating only 1 out of 162 allegations of "inmate-on-inmate nonconsensual sexual act" and only 1 out of 65 allegations of "inmate-on-inmate abusive sexual contact." In ADOC's 2017 Annual PREA Report, ADOC reported 227 incidents of "Inmate on Inmate Sexual Victimization," with two reports substantiated, 95 unsubstantiated, 20 unfounded, and 46 open at the time of reporting. ADOC's PREA Coordinator is the ADOC official responsible for production of data on sexual abuse, but she was unable to explain the variations and discrepancies in the 2016 and the 2017 data. While certain Alabama prisons reported more sexual abuse than others, the incidents of prisoners being sexually abused by other prisoners are widespread across the system.

In addition, it is likely that the levels of sexual abuse are actually higher than what ADOC reports. In every "Sexual Assault – Inmate-on-Inmate" incident report we reviewed, the sexual abuse was reported by the victim or a prisoner witness afterwards. Because many prisoners do not report abuse out of fear of retaliation, shame, or because they do not believe that ADOC's system to address complaints of sexual abuse will result in any changes, the incident reports coded as "Sexual Assault" do not capture the complete picture of prisoner-on-prisoner sexual abuse in the ADOC system. Moreover, we did not identify any incidents where a correctional officer or other staff member observed or intervened to stop a sexual assault in progress—leading us to conclude officers are either failing to report abuse or failing to monitor prisoners. Because correctional officers are not observing the incidents of sexual abuse, if the victim or a witness does not report it, the abuse will not be recorded or addressed.

Moreover, one of our experts reviewed numerous incident reports in which a prisoner reported an allegation of sexual abuse, but the ADOC staff member writing the incident report failed to categorize the incident as a "Sexual Assault" because staff dismissed it as consensual "homosexual activity." There is no indication that these incidents were investigated or referred to the Inspector General's office. Because they were not categorized as "Sexual Assault," they would not be included in ADOC's publicly reported PREA data. This is in violation of the PREA standards, which require that correctional agencies investigate all allegations of sexual abuse, 28 C.F.R. § 115.71(a), and results in further under-reporting of sexual abuse in Alabama's prisons.

Despite the mischaracterization of some incidents of sexual abuse and likely under-reporting, the incident reports that ADOC does code as "Sexual Assault Inmate-on-Inmate" demonstrate a pattern of undeterred systemic sexual abuse in Alabama's prisons.

### 2. *Inadequate Supervision Allows Sexual Abuse to Continue Undeterred.*

ADOC's incident reports document sexual abuse occurring in the dormitories, cells, recreation areas, the infirmary, bathrooms, and showers at all hours of the day and night.

---

clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person." *Id.* at 2. "[I]ncidents in which the contact was incidental to a physical altercation" are excluded. *Id.*

Staffing ratios are so low in some dormitories that ADOC is essentially providing no security for prisoners. Our experts found that the physical plant designs and layout of ADOC's housing units make visibility difficult, which, when coupled with deficient staffing levels, results in inadequate supervision. Large open living units with multiple bunks or stacked bunks contain many blind spots that make it impossible for the limited staff to provide adequate safety and security. There are very few convex mirrors to increase visibility. The cameras that are present are not monitored sufficiently to augment supervision by housing unit officers. Prisoners interviewed and incident reports frequently reference sexual assaults occurring in bunks that have sheets or towels hung up to conceal activity, often referred to as "the hump." The "Sexual Assault" incident reports do not document correctional officers making any effort to remove these sight barriers. Although the PREA standards require that ADOC "designate an upper-level, agency-wide PREA coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with the PREA standards," 28 C.F.R. § 115.11, ADOC's PREA Coordinator reported that she does not have the authority to direct wardens to address blind spots that pose a threat to prisoners' sexual safety within their facilities.

As discussed above, the incident reports confirm that ADOC is only alerted to prisoner sexual abuse when a victim or witness reports the incident afterwards. The fact that hundreds of documented incidents of sexual abuse occur unobserved demonstrates an unconstitutional lack of supervision in housing units throughout ADOC. *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) (holding that "evidence presented at trial of an unjustified constant and unreasonable exposure to violence" in a prison "inflicted unnecessary pain and suffering" under the Eighth Amendment standard); *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (citing *Ramos*, 639 F.2d at 575) (suggesting that inadequate staffing may rise to the level of deliberate indifference as to prisoner safety).

For example, in February 2017, a prisoner at Fountain was gang raped inside his dormitory during the evening meal. Two prisoners held him down while a third "penetrated his anus," then they "forced him to perform oral sex." A nurse's examination at the facility noted "several tears to his anus," and he was transported to the Sexual Assault Nurse Examiner's Center for further treatment. ADOC substantiated the incident. Yet no ADOC staff reported the assault. Prior to the victim giving a nurse a note stating that he had been raped the day before, ADOC staff did not report the incident. Either ADOC staff responsible for monitoring the dormitory did not observe the incident, or they observed it but did not report it.

Sexual abuse of prisoners is often connected to the drug trade and other contraband problems that result from inadequate supervision and corruption in Alabama's prisons. Our experts' on site interviews of captains and lieutenants revealed that many ADOC staff appear to accept the high level of violence and sexual abuse in ADOC as a normal course of business, including acquiescence to the idea that prisoners will be subjected to sexual abuse as a way to pay debts accrued to other prisoners. Many prisoners report that they were sexually assaulted because of debts they owed (or that the assailants said they owed), often related to drugs or other contraband. For example:

- In January 2018, a Correctional Sergeant and the Institutional PREA Compliance Manager separately questioned a prisoner at Bullock about "an incident that took place"

a few days earlier.  The prisoner admitted that he had been sexually abused.  He stated that he was in debt to several prisoners and one of them told another prisoner "he could fuck me for what I owe him."  He told his assailant "no," but the prisoner sexually assaulted him anyway.  Because the victim refused medical treatment, stated that he did not want to press charges, and signed a Release of Responsibility, ADOC determined that no further action would be taken and released the victim to his original dormitory unit.

- In August 2017, a prisoner at Bibb reported to a lieutenant that he had been sexually assaulted because he was indebted to another prisoner and could not pay the debt.  The other prisoner forced him to perform oral sex as payment.

- In June 2017, a prisoner at Bibb reported that he had been raped because he owed seven "Tops," or packets of cigarettes, to several unidentified prisoners.  The prisoner was transported to an outside hospital and ADOC substantiated the allegation based on the evidence from the resulting sexual assault kit.

- In April 2017, a prisoner at Bibb reported that he was anally raped by another prisoner to whom he owed money.  While the victim was waiting at the Health Care Unit for transportation to an outside hospital, he cut his wrist with a razor.

- In March 2017, a prisoner at Fountain reported to a nurse that he had been physically assaulted and raped the night before.  He was transported to the Sexual Assault Nurse Examiner's Center for further assessment and reassigned to segregation, pending the outcome of the investigation.  During his interview, the victim stated that he owed a debt to another prisoner, and he "assumed [he] was raped due to the debt owed."

- In November 2016, a prisoner at Fountain reported to a Mental Health Site Administrator that another prisoner had extorted him to engage in anal and oral sex over a period of two months.  The victim was placed on suicide watch and the alleged aggressor was permitted to remain in general population.  One month later, ADOC sent the victim a letter confirming that the allegation had been substantiated.

The theme of sexual abuse as a consequence of debt is so common that some incident reports specifically highlight a prisoner's debt history.  For example, in February and March of 2018, separate prisoners at Ventress each reported sexual assaults.  The incident reports each note that a review of the victim's incident history "revealed that he has not made any previous PREA related allegations," but does reflect a history of drug use and debt.  Interviews with ADOC staff revealed an understanding that debt, particularly drug debt, can result in sexual abuse.  This was a common point raised by the prisoners we interviewed on site.  Submission to sexual abuse under the threat of violence resulting from the drug trade does not indicate consent.

Many prisoners also report that they were sexually abused after being drugged, becoming incapacitated by drugs they took voluntarily, or when the assailant was under the influence.  Some of the drugs that are widely available in Alabama's prisons can have the effect of

immobilizing an individual or rendering him unconscious, which makes him vulnerable to sexual abuse. For example:

- In March 2018, a prisoner at Holman reported that he had been raped after he had passed out from smoking "flakka." He awoke to one prisoner punching him in the eye and then four or five prisoners put a partition around his bed and took turns raping him.

- In February 2018, a prisoner at Bibb reported to a mental health professional that he had been raped. At approximately 1:00 a.m. in a dormitory unit, an unidentified prisoner propositioned him to smoke a marijuana cigarette. While smoking, the victim "became incoherent" and awoke with the unidentified prisoner penetrating him from the rear.

- In December 2017, a prisoner at Limestone reported that two prisoners attempted to force him to perform oral sex, which resulted in a physical altercation, with a third prisoner coming to his aide. The incident was substantiated and the incident report notes that when one of the assailants was interviewed following the altercation, he had slurred speech and smelled of alcohol.

- In January 2017, a prisoner at Donaldson reported that a prisoner offered him a cigarette and, upon smoking it, he began "to feel funny and could not move." Two prisoners then took him into the shower and sexually assaulted him. ADOC substantiated this incident.

- In January 2017, a prisoner at Draper reported that he had voluntarily used methamphetamine and blacked out. When he regained consciousness, he was experiencing anal pains and other prisoners indicated that he had been sexually assaulted.

Many of the assaults happen at knifepoint, with no indication that ADOC conducted a comprehensive weapons search in response. For example:

- In April 2018, a prisoner at Ventress reported that he had been forced at knifepoint to perform oral sex on another prisoner. The incident report notes that the victim was reassigned to another dormitory and the victim and assailant received mental health referrals, but there is no mention of a housing change for the alleged assailant or a search of his dormitory for weapons. The incident report does note that a previous PREA-related allegation had been made against the assailant.

- In April 2018, ADOC officers interviewed a prisoner at Elmore after his mother called to report that he had been sexually abused. The prisoner stated that he had been raped at knifepoint because he owed his assailant $250. The incident report notes that the alleged assailant "submitted a written statement and was allowed to return back to population without incident." There is no mention of a search for the weapon.

- In February 2018, a prisoner at Staton reported that the night before, two prisoners had held knives to his neck while a third prisoner forced him to perform oral sex. The victim alleged that the whole dormitory was aware of the attack. The victim was escorted to the health center for a medical examination and then transferred to a holding cell while the alleged assailants remained in the dormitory. There is no mention of a search for weapons.

- In December 2017, a prisoner at Staton reported that he was jumped in the shower by a prisoner who held a knife and penetrated him from behind. ADOC transported the victim to the Sexual Assault Nurse Examiner Center and ultimately referred this incident to the County District Attorney's Office. There is no mention of a search for the weapon.

- In January 2017, the chaplain at Draper notified ADOC that a prisoner had reported to him that he had been raped that morning. At approximately 5:30 AM, three prisoners forced the victim into the shower area of the dormitory. Two of the assailants had knives. A blanket was hanging from the wall, blocking the area from view. The prisoner stated that the dormitory officer was in the hall outside of the dormitory escorting prisoners back from breakfast, which had been late that morning. One prisoner held a knife to the victim's neck and another waved a knife in his face while the third penetrated him anally. The incident report confirms the victim's transport to the Sexual Assault Nurse Examiner's Clinic and that I&I would interview the victim and secure the forensic evidence from his examination, but there is no mention of searching the dormitory for weapons.

Some prisoners suffer sexual abuse in retaliation for having reported previous sexual abuse. For example:

- In March 2018, a prisoner at Ventress reported that he had been sexually assaulted on the gym porch by a prisoner whose cousin had previously sexually assaulted the victim at Bullock. The victim reported that his assailant told him he was going to get him back for telling on his cousin. A week later, the victim reported another attack by the same assailant, which required an outside Sexual Assault Nurse Examiner assessment. However, the second incident report makes no mention of the first report.

- Also in March 2018, a correctional lieutenant "received information" that a prisoner was "being tortured" in a dormitory at Ventress. The lieutenant located the prisoner and escorted him to the Health Care Unit. The prisoner reported that he was "tied up, burned, and tortured for two days and that a broom handle was stuck up his rectum." The prisoner stated that the torture was in retaliation for his documented report of a prior sexual assault in February 2018.

### 3. Deficiencies in ADOC's PREA Screening and Housing Contribute to the Unsafe Environment.

The unsafe environment created by ADOC's deficient supervision and overcrowding is exacerbated by failings in ADOC's PREA screening, classification, and housing of prisoners. The PREA standards require that all prisoners be assessed during intake screening and upon transfer to another facility for their risk of being sexually abused by, or sexually abusive toward, other prisoners. 28 C.F.R. § 115.41(a). The PREA standards also require that ADOC use information from the risk screening "to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." 28 C.F.R. § 115.42(a).

While ADOC has basic policies in place to conduct PREA risk screenings, ADOC fails to use the information from the screenings to house prisoners safely and, even if an appropriate housing assignment is made, the classification system is defeated by lax supervision that allows prisoners to wander throughout the prison facilities without authorization. ADOC's knowledge of, and failure to comply with the PREA standards, is further evidence of ADOC's subjective recklessness with regard to prisoner safety. *Farmer*, 511 U.S. at 843; *see also Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015) (finding PREA and other such legislative enactments to be reliable evidence of contemporary standards of decency, and thus relevant in evaluating whether specific acts of sexual abuse or sexual harassment rise to an Eighth Amendment claim).

ADOC classification staff reported that the initial classification determines only a prisoner's security level, which informs his assignment to a particular prison. Once he arrives at the prison, an Inmate Control Services officer assigns the prisoner to a housing unit and bed. While the Inmate Control Services officer should have access to a prisoner's classification and screening information, it is unclear how and if this information is used, especially given the degree of overcrowding at some ADOC prisons. Documents provided from a PREA audit at Draper indicated that for three quarters of 2016, Draper had zero occurrences of a prisoner screening for risk of victimization or abusiveness, and did not use the PREA screening information for three quarters of 2016. At some facilities, ADOC case managers conduct the initial PREA screening. At Bibb, we noted that the screening setting was not private, so other prisoners could hear confidential information a prisoner reported during his screening, which could discourage prisoners from answering truthfully. When conducting and scoring the screening, case managers had no access to a prisoner's previous screening results. ADOC's PREA audits demonstrated a need for corrective action in the adequacy of PREA risk screening and the use of the screening information to house people safely within the facilities.

In addition, while ADOC's facility PREA Compliance Managers have ultimate responsibility for the PREA risk screening and for monitoring prisoners identified as potential victims or aggressors, ADOC's facility PREA Compliance Managers did not have sufficient information to accomplish these important tasks.

The PREA standards identify Lesbian, Gay, Bi-Sexual, Transgender, and Intersex ("LGBTI") prisoners as being at a heightened risk for sexual abuse. Accordingly, the PREA

standards include several provisions specifically aimed at increasing sexual safety for LGBTI prisoners.

ADOC is refusing or failing to comply with the PREA standards. For example, only one of the PREA Compliance Managers we interviewed on-site was able to give specific information about the LGBTI prisoners housed at that prison. The other PREA Compliance Managers had little or no information about LGBTI prisoners. If ADOC's PREA Compliance Managers have no knowledge of the vulnerable prisoners within the population, they cannot comply with their duties to provide a reasonable level of safety to those prisoners.

Regardless of whether prisoners receive a safe housing assignment based on an appropriate PREA screening and classification, supervision is often deficient such that prisoners can roam from housing unit to housing unit without intervention. A review of ADOC incident reports from January 2015 to early April 2018 at Bibb alone indicated 553 incidents of prisoners being cited for being in an "unauthorized location." Some of the "Sexual Assault – Inmate-on-Inmate" incident reports indicate that either the aggressor or the victim was not in his assigned housing unit at the time of the attack, but make no reference to discipline or remedial action for prisoners accessing unauthorized areas of the facility. By allowing potential predators to commingle with potential victims without adequate staff supervision, ADOC fails to effectively protect prisoners from harm of sexual abuse.

### 4. ADOC's Sexual Abuse Investigations Are Incomplete and Inadequate.

If a correctional agency does not adequately investigate allegations of sexual abuse, it will be unable to determine the factors that enable abuse to occur and the corrective actions necessary to address the problem. *See Jacoby v. PREA Coordinator*, No. 5:17-cv-00053-MHH-TMP, 2017 WL 2962858, at *5 (N.D. Ala. April 4, 2017) (citing *Farmer*, 511 U.S. at 833) (noting that failure to investigate can be a constitutional violation if the failure prevents prison officials from protecting prisoners). The PREA standards require that correctional agencies investigate all allegations of sexual abuse "promptly, thoroughly, and objectively[,]" 28 C.F.R. § 115.71(a), even if victim or witness is challenging or unwilling to cooperate. To conduct a thorough investigation, investigators must "gather and preserve direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data," and must "interview alleged victims, suspected perpetrators, and witnesses." 28 C.F.R. § 115.71(c). Although we have been unable to review I&I files related to sexual abuse because ADOC refused to produce them, we are able to make the following conclusions based on the incident reports and other evidence in our possession. And based on this evidence, ADOC fails to follow these standards and dismisses many incidents as unsubstantiated without a thorough investigation.

For example, in August 2017, a prisoner at Bibb entered the Shift Commander's office and reported that he had been held hostage and physically and sexually assaulted over the past few weeks. The sergeant "observed several bruises and abrasions to the facial area" of the prisoner. However, when the incident was closed as "unsubstantiated," the report incredibly notes that "no evidence was found to substantiate [the prisoner's] claims that he was physically assaulted."

In addition, ADOC's incident reports confirm that many allegations are declared "unsubstantiated" on the basis that the victim declined to press criminal charges or otherwise cooperate with the investigation, which is not a sufficient reason for reaching such a conclusion in an administrative investigation.  For example:

- In February 2018, a prisoner at Bibb notified the facility PREA Compliance Manager that he had been "forcibly sexually assaulted" two days prior and that he had not bathed, so the perpetrator's semen was still inside him.  The prisoner was examined by the facility nurse and upon completion of the medical examination, the prison physician advised that the prisoner should be transported to an outside hospital for a Sexual Assault Kit.  Although the prisoner named his rapist, the incident report confirms that upon conclusion of the investigation, the victim "stated that he did not desire to prosecute and signed a waiver of prosecution.  Therefore, this allegation is unsubstantiated."

- In May 2017, "several" prisoners reported to a captain that two other prisoners were held and assaulted in a dormitory unit at Fountain over the weekend by a group of four or five prisoners.  One of the identified victims provided a written statement of allegations of sexual assault, while the other reported a physical assault.  ADOC provided the first victim with written confirmation that the allegation of sexual assault was "found to be unfounded and exceptionally cleared due to your lack of cooperation with the prosecution of [his assailant] for reported Sexual Assault and you[r] signing of a Prosecution Waiver Form."

Although a victim's refusal to press charges could complicate an attempt to criminally prosecute an assailant, it is not a valid reason to find an administrative investigation unsubstantiated, particularly where there are other indicia of sexual abuse.  Indeed, some incident reports confirm that ADOC has other options.  For example:

- In March 2017, a prisoner at Donaldson reported that he had been sexually assaulted in his cell the night before.  He was transported to the Sexual Assault Nurse Examiner's Clinic for an assessment.  Although the victim refused to provide a written statement to I&I, the I&I Director substantiated the allegation of sexual assault based on the facts presented.

- In December 2016, a prisoner at Bibb reported that a prisoner in his dormitory had raped him at knifepoint.  When the other prisoner responded to the allegation by claiming that he had consensual sex with the victim, the victim "became belligerent and refused to cooperate with the investigation."  Ultimately, ADOC deemed the allegation "substantiated but cleared as refusal to cooperate or prosecute."

When ADOC dismisses reports of sexual abuse as unsubstantiated on the sole basis of a victim's refusal to pursue criminal charges, it also fails to take action to prevent future abuse.  For example, multiple incident reports from St. Clair in late 2017 confirm not only that the report of sexual abuse "had been concluded with a disposition of 'unsubstantiated'" that is "based on"

the victim's refusal to prosecute, but go on to state that a "sexual abuse incident review" was conducted and no "further action" would be taken.  Indeed, despite the high number of sexual abuse reports documented by ADOC, there is no record of meaningful corrective action to address the problem in ADOC's prisons.

### 5. ADOC Discourages Reporting of Sexual Assaults.

Many ADOC incident reports reflect conduct that likely discourages additional reports of sexual abuse.  As discussed above, ADOC has a tendency to dismiss claims of sexual abuse by gay prisoners as consensual "homosexual activity" without further investigation, implying that a gay man cannot be raped.  Some victims are given a Release of Liability to sign after reporting sexual abuse.

In other cases, in addition to the trauma of a sexual assault, the victim is subjected to disciplinary action for facts he discloses as part of the investigative process.  For example, in February 2017, a prisoner at Donaldson reported that he had been raped two days earlier, and named his assailant.  He was transported to the Sexual Assault Nurse Examiner Clinic for an assessment and returned to Donaldson at approximately 10:00 PM.  The next morning at 4:45 AM, he was interviewed by the PREA Compliance Manager and stated that he was in debt to the prisoner who had raped him and several other prisoners, but "was adamant" that he had been sexually assaulted.  The PREA Compliance Manager advised the victim that he would receive a disciplinary action for "Intentionally Creating a Safety, Security and/or Health Hazard" for admitting that he had accrued debt to other prisoners.

As noted with regard to prisoners who report violence, while ADOC has an interest in enforcing institutional rules, it should implement its disciplinary process in a way that avoids discouraging victims from reporting sexual abuse.  ADOC should give due consideration before subjecting victims of sexual abuse to disciplinary actions if, in the context of seeking assistance or protection from ADOC, they voluntarily admit to past, minor rule infractions.  Experts confirm that the current practice, which appears to punish victims for any wrongdoing they may confess while seeking assistance or protection, has a chilling effect on reporting.  Especially given that the rampant sexual abuse in Alabama's prisons is almost never reported by correctional officers, a system that punishes prisoners who report violence if the victim is not blameless will discourage victims from reporting and allow sexual abuse to continue unabated in Alabama's prisons.

### 6. ADOC Improperly Subjects Victims of Sexual Abuse to Segregation.

ADOC commonly places a victim in segregated restricted housing after he reports sexual abuse, often in response to a prisoner's request for protection from harm, which can subject the victim to further trauma.  While accommodating a prisoner's request for segregated housing is not inappropriate, due to the seriously unsafe conditions that exist in Alabama's prisons, ADOC has created a situation where vulnerable prisoners who have already suffered sexual abuse have no other choice if they want to stay safe from further sexual abuse.  For example:

- In April 2018, a prisoner at Bullock reported that over three days, he had endured extortion; punching, kicking, and beatings with a stick; and anal and oral rape by a group of four prisoners. He finally reported the abuse after one of the prisoners told him "he had more work to do." Although ADOC identified all of the perpetrators, after the victim returned from the Sexual Assault Nurse Examiner Center, he was placed in segregation "per inmate's request."

- In January 2018, a prisoner at Bullock resorted to cutting his wrist after an attempted sexual assault and physical assault "because he feared being in population and needed to be placed in a single cell." He reported that two nights prior, two prisoners had attempted to rape him but were unable to penetrate him because he defecated during the assault. The prisoners then poured hot water on him, causing burn marks to his buttocks and the back of his head. ADOC placed the victim in segregation and allowed the perpetrators to remain in general population. The incident report notes that the perpetrators would receive "disciplinary actions for assault," and that no further action would be taken.

- In December 2017, a prisoner at Bibb sent a letter to the Assistant PREA Compliance Manager stating that he had been sexually abused at knife point. The victim reportedly requested placement in segregation because he feared for his safety, so the victim was placed in segregation while his alleged assailant remained in his assigned living area. ADOC substantiated this allegation.

While incident reports often note that the victim is being placed in segregation at his own request, if a victim of sexual abuse has no other realistic way to stay safe, a request for segregation may be the product of a lack of other, more suitable options. Restricted housing in Alabama's prisons houses prisoners seeking protection, as well as prisoners being punished for rule infractions and prisoners who are a threat to safety. Subjecting victims of sexual abuse to segregation can inflict further trauma. This is why the PREA standards require that victims of sexual abuse not be involuntarily segregated for their own protection unless "an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers." 28 C.F.R. §§ 115.43(a), 115.68. Alternatives utilized by other correctional facilities include vulnerable persons units that provide a safe environment for prisoners whose screening indicates they are at risk for being abused or protective custody units that do not result in a restriction of privileges. By failing to offer these or other options to keep victims of sexual abuse safe from further abuse, ADOC is not adequately presenting such victims with a reasonable alternative to segregation.

In addition, the size of ADOC's prison system presents the opportunity to transfer prisoners between facilities to protect victims from retaliation. For example, in February 2017, a prisoner at Elmore reported that he was raped at knife point in the dormitory shower area. Following an examination at the Sexual Assault Nurse Examiner's Clinic and an interview by I&I, the victim was transferred to Draper "at his request." However, in the vast majority of incident reports, there is no indication that ADOC is making a determination that no safe alternative exists before placing victims of sexual abuse into segregation. Because ADOC has no alternate means of keeping victims of sexual abuse safe from harm, ADOC requires

vulnerable prisoners to subject themselves to the punitive conditions of segregation and the potential trauma that may entail, so that the prisoners can obtain the reasonable level of safety guaranteed by the Constitution.

### F.   Facility Conditions in Alabama's Prisons Violate the Constitution.

The Constitution requires that officials provide prisoners with adequate shelter, which includes maintaining facility conditions in a manner that promotes prisoner safety and health. *See Helling*, 509 U.S. at 32.  The Eighth Amendment's prohibition of cruel and unusual punishments imposes a duty on corrections officials to "provide humane conditions of confinement" and to "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832-33 (quoting *Hudson*, 468 U.S. at 526-27).

ADOC prisons do not provide adequate humane conditions of confinement.  They have a number of significant physical plant-related security issues that contribute to the unreasonable risk of serious harm from prisoner violence.  These problems include defective locks; insufficient or ineffective cameras; a lack of mirrors; deteriorating electrical and plumbing systems; as well as structural design issues and weaknesses with the buildings and their perimeters.  These problems allow prisoners to leave secure areas, obtain contraband, and improperly associate with or assault other prisoners.  Even if no single one of these conditions of confinement would be unconstitutional in itself, "'exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment.'"  *Rhodes*, 452 U.S. at 363 (quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 322-23 (D.N.H. 1977)).  ADOC's failure to correct these issues poses a serious risk to prisoner safety and health.

For example, at Bibb, there was a tall chain link fence separating the two halves of the facility, and both halves could only be exited through a gate opened and closed with a physical key.  We heard from several prisoners that victims of stabbings had waited for an extended time at the gate, often bleeding profusely, while staff searched for the key to open the gate.  Visibility in the back of large dormitories containing bunkbeds is also an issue, as reflected in the large number of violent incidents that happen unobserved in the back of such dormitories.

Short of new facilities or drastic renovations, there are relatively simple physical plant corrections that could increase safety in the facilities.  For example, there were few convex mirrors in the living units we visited.  Adding such mirrors would increase the visibility of areas within the units, especially given the many large open living units in the prisons.  Yet ADOC has not made this easy fix.  In addition, many incident reports reference assaults occurring in bunks in which sheets or towels are hung to conceal prisoner activity, but there appears to be no concerted effort by security staff to remove these visibility barriers.

The deficiencies in the facilities' infrastructure are well-known to ADOC officials.  In February 2019, the Governor noted that the physical condition of ADOC's prisons have been described as "deplorable," "horrendous," and "inadequate."  Just one month earlier, Commissioner Dunn commented publicly that repairs and renovations are needed because facilities have outlived their usefulness.  These concerns have been acknowledged for years.  In 2017, for example, Commissioner Dunn noted the system's "outdated, outmoded, and overgrown

infrastructure." He has said that over 70% of the prisons "are well beyond their useful life and must be replaced." Yet, despite this knowledge, ADOC has been unable to improve its infrastructure.

It should be noted that while we did not visit every prison in Alabama, those that we did visit were in incredibly poor physical shape, and—based in part on the Governor's and Commissioner's public statements—are largely representative of the prison system as a whole. The Governor and Commissioner Dunn have frequently discussed the "crumbling infrastructure" within ADOC prisons. As one of our experts opined, the physical structure of the prisons we visited is "severely worn," which leads to dangerous conditions for prisoners and staff alike. Another expert commented that she was "shocked and dismayed at the state of the . . . prisons we visited." The prisons are old and have not undergone serious renovation, and thus have deteriorated significantly. The physical conditions of ADOC prisons present a safety risk. A February 2017 inspection by engineering consultants hired by ADOC noted that not a single facility has a working fire alarm.

Based on our site visits, hundreds of prisoner interviews, and public statements made by ADOC officials, it is clear that decrepit conditions are common throughout Alabama's prisons. During facility visits, we observed makeshift showers created because the original showers were not functioning. We also saw numerous showers and urinals that were leaking or broken. Because the facilities house far more prisoners than they were designed to hold, there is enormous strain on plumbing, electrical systems, ventilation, showers, sinks, and toilets, leading to unsanitary conditions. We heard repeatedly about showers covered in mold, and without hot water. Numerous prisoners mentioned toilets, sinks, and showers that leak, get stopped up, or are otherwise broken. One prisoner told us that a mop sink was being used as a urinal because the toilets were backed up.

 

 

*Images of bathroom facilities at Donaldson, Draper, and Holman*

In February 2017, nearly eight months before we toured Draper, Commissioner Dunn provided a tour of Draper to the press.  In a video of that tour, he pointed out the poor condition of portions of the kitchen floor, which had become so compromised that the concrete subfloor was all that remained.  We noticed similar conditions in the kitchen floors at Donaldson and Holman.  In the video from Draper, Commissioner Dunn went on to say that the kitchen at Draper would be closed, and that food would be cooked offsite at Staton, and be shipped back to Draper.

Prisoners with whom we spoke throughout ADOC consistently told us about the poor state of the facilities.  Some mentioned that spiders and other bugs would regularly fall from the ceilings.  More than one prisoner discussed seeing rats and bugs in the kitchen and food storage areas.  Prisoners in segregation described especially poor conditions.  One prisoner described large cockroaches in segregation.  Several told us that a plate covered the only window in their unit, so that they could never see out and there was little ventilation.  Numerous prisoners described having no light in their cell.  Some mentioned broken toilets and sinks, as well as leaky roofs, and a lack of heat.

While new facilities might cure some of these physical plant issues, it is important to note that new facilities alone will not resolve the contributing factors to the overall unconstitutional condition of ADOC prisons, such as understaffing, culture, management deficiencies, corruption, policies, training, non-existent investigations, violence, illicit drugs, and sexual abuse.  And new facilities would quickly fall into a state of disrepair if prisoners are unsupervised and largely left to their own devises, as is currently the case.

G.    **Evidence Suggests Some ADOC Officials Are Deliberately Indifferent to the Risk of Harm.**

Federal law precludes corrections officials and staff from acting with "deliberate indifference" to the substantial risk of serious harm posed to prisoners.  *Farmer*, 511 U.S. at 828.  An official acts with deliberate indifference when she or he "knows of and disregards an excessive risk to prisoner health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*. at 837.  A court may conclude that "a prison official knew of a substantial

47

risk from the very fact that the risk was obvious." *Id.* at 842. In other words, "an official responds 'in an objectively unreasonable manner if he knew of ways to reduce harm but knowingly declined to act or if he knew of ways to reduce the harm but recklessly declined to act.'" *Johnson v. Boyd*, 701 F. App'x 841, 847 (11th Cir. 2017) (quoting *Rodriguez v. Sec'y for Dep't of Corrs.*, 508 F.3d 611, 620 (11th Cir. 2007)).

In determining whether conduct violates the deliberate indifference standard of the Eighth Amendment, there must be persuasive evidence of the following: (1) facts presenting an objectively substantial risk to prisoners and awareness of these facts on the part of the officials charged with deliberate indifference; (2) the officials drew the subjective inference from known facts that a substantial risk of serious harm existed; and (3) the officials responded in an objectively unreasonable manner. *Doe v. Ga. Dep't of Corrs.*, 248 F. App'x 67, 70 (11th Cir. 2007); *Marsh*, 268 F.3d at 1028-29.

ADOC has long been aware that conditions within its prisons present an objectively substantial risk to prisoners. Yet little has changed. As early as 1975, a federal court enjoined ADOC from accepting any new prisoners, except escapees and those who had their paroles revoked, into four of its prisons until the population in each was reduced to design capacity. *James v. Wallace*, 406 F. Supp. 318 (M.D. Ala. 1976). In 2011, that same court found that ADOC facilities were understaffed and overcrowded. *Limbaugh v. Thompson*, No. 2:93cv1404–WHA (WO), 2:96cv554–WHA, 2011 WL 7477105 (M.D. Ala. July 11, 2011). Indeed, language from a 2002 federal court opinion related to Alabama's prison housing women indicates that ADOC is aware of its Eighth Amendment obligations and of the specific types of conditions that run afoul of the Eighth Amendment. In *Laube*, the U.S. District Court for the Middle District of Alabama found that conditions at Julia Tutwiler Prison for Women were unconstitutionally unsafe as a result of overcrowded and understaffed open dormitories:

> The sheer number of inmates housed in open dorms pose a significant security problem. Idleness is less of a safety concern when each inmate is confined to her own cell or shares a cell with just a few other inmates. In dormitories, however, idleness heightens the potential for disruptive behavior because each potentially aggressive idle inmate now has other inmates whom she may target, as well as other potentially aggressive inmates with whom she may congregate. Dorms at Tutwiler hold 60 to 228 inmates, and some of these inmates sit idly during the day. While the evidence submitted does not reveal the extent to which inmates are idle at Tutwiler, even limited periods of idleness can engender safety problems. Open dorms are particularly dangerous when a facility is also plagued by, among other things, inadequate supervision, increased violence, and inmate access to weapons, as discussed below.

*Laube*, 234 F. Supp. 2d at 1233.

Our investigation into the violence, contraband, corruption, and harm occurring in Alabama's prisons evidences issues previously known to ADOC. For instance, several years before we initiated our investigation, ADOC was acutely aware of extensive problems at St. Clair. In 2014 alone, there were at least three publicly reported prisoner-on-prisoner homicides.

48

In April 2014, the Equal Justice Initiative ("EJI") urged ADOC to investigate, among other violence, the fatal and non-fatal stabbings that were escalating at St. Clair.  Following another homicide in June 2014, EJI renewed its formal request that ADOC address the violence.  In the face of ADOC's inaction and yet another homicide, in October 2014, a group of prisoners incarcerated at St. Clair filed a class action lawsuit in federal court.  The suit alleged an extraordinarily high rate of violence at St. Clair, including six homicides in the preceding three years.  The plaintiffs asserted that the violence in the severely overcrowded facility could be traced to poor management, noncompliance with protocols and procedures, the prevalence of drugs and other contraband, and corruption.  Three years later, in November 2017, the plaintiffs and ADOC reached a settlement.  ADOC promised many reforms in the settlement.  For instance, ADOC promised to ask the Alabama Legislature for funding to install video cameras for monitoring at the prison.  ADOC did not make good on that promise.  By June 2018, ADOC had not satisfied several of the settlement requirements.  The parties went back into mediation in June 2018—only eight months after ADOC made all of its promises to reform St. Clair.

ADOC management is acutely aware of the substantial risk of harm caused by its critically dangerous understaffing.  Alabama officials, from the Governor to ADOC's Commissioner, have recently reiterated that overcrowding and understaffing continue to plague the system.  In ADOC's most recent Annual Report, Commissioner Dunn even highlighted "critical shortages in correctional officer staffing" as a major challenge.  And, in early 2019, he explicitly acknowledged the direct link between the levels of violence in Alabama's prisons and the understaffing:  "We are still down to 50 percent or lower staffing at many facilities.  There's a direct correlation between the shortage of officers and violence."

Due to the extreme staffing shortages, correctional officers are tired, and there are simply not enough individuals to adequately and safely staff Alabama's prisons.  Incident reports from 2017 reveal numerous instances of correctional officers not showing up for work or refusing to work mandated overtime.  We also found numerous incident reports where correctional officers were found sleeping in cubicles, in hospitals, and in perimeter security vehicles.  These security problems have persisted despite ADOC's awareness of our investigation and our numerous on-site inspections of several facilities.  In fact, the majority of the examples of unconstitutional conditions described throughout this letter occurred *after* we began our investigation.

Throughout this investigation, ADOC has not responded consistently when alerted to serious issues within its prisons.  On multiple occasions, we notified ADOC legal counsel of calls we received from prisoners afraid for their lives and physical safety.  We received little information as to what was being done by ADOC to address these calls.  On occasion, we learned that a prisoner was transferred to another facility; however, we often received follow-up calls from fearful prisoners stating that ADOC had taken no meaningful action.  Additionally, following our site visits of each facility, we coordinated calls with ADOC and prison management to share our experts' preliminary conclusions.  In these calls, our experts outlined specific conclusions about the unsafe conditions in the prisons that we visited.  During these calls, ADOC officials rarely, if ever, asked substantive questions of our experts.  And the violence in Alabama's prisons has only increased since our inspections and those calls took place.

In other ongoing litigation, ADOC has admitted that its prisons are dangerously understaffed.  In *Braggs v. Dunn*, the plaintiffs sued ADOC for failing to provide adequate medical and mental health care, and for discriminating against prisoners with disabilities.  The court ordered ADOC to determine how many correctional officers were needed to adequately staff its prisons.  In February 2019, ADOC filed a report indicating that it needs to hire over 2,200 correctional officers and 130 supervisors over the next four years in order to adequately staff its men's prisons.  These staggering staffing deficiencies were determined by ADOC's own experts.  A former ADOC warden told us that he did not think it would be possible to hire and train over 2,000 correctional officers with "the proper education, the proper sense of duty, and with the proper mindset" in the next four years.  Our corrections consultant opined that ADOC will require more than two years to overcome its current staffing deficiencies, even with its best efforts and under ideal conditions.

## V.    MINIMAL REMEDIAL MEASURES

To remedy the constitutional violations identified in this Notice, we recommend that ADOC implement, at minimum, the remedial measures listed below.  We recognize ADOC has begun to make some positive changes in recent years.  For example, in 2015, ADOC hired its first ever Inspector General to conduct security audits and inspection of facilities, teach and train employees, and provide assistance to employees.  As of December 2017, the Inspector General had conducted one security audit using ADOC staff.  In 2018, after revising its state code, ADOC addressed compensation issues for staff, providing a location pay differential for correctional officers and a pay raise to assist with recruitment and retention.  And in November 2018, ADOC announced that 35 new correctional officers had graduated from its correctional academy.  Recently, after ADOC's head of operations retired after being placed on administrative leave pending the outcome of a misconduct investigation, ADOC hired a new Deputy Commissioner for Operations with experience at the federal Bureau of Prisons.  ADOC is again proposing a pay increase for correctional staff to be addressed in the current legislative session.  Finally, ADOC announced on February 28, 2019, that it is conducting a joint operation with other law enforcement agencies targeting contraband at St. Clair and plans to conduct similar operations at other prisons in the future.

In addition, ADOC has made some changes in response to conditions we identified during our investigation.  For instance, shortly after we visited Draper and shared our observations about its overall deplorable conditions, we learned that ADOC closed that prison.  Additionally, after we visited Bibb and our experts reported to ADOC their shock at the critically dangerous conditions present in Bibb's Hot Bay, ADOC closed the Bibb Hot Bay.  Nevertheless, these efforts have been inadequate, as evidenced by the serious issues that continue to plague the prisons, described above.  The following remedial measures are necessary.

**A.** **Immediate Measures**

1.  Understaffing and Overcrowding.  ADOC should:

*   Immediately deploy resources to staff and electronically monitor the perimeters of Alabama's prisons and assist in screening anyone entering facilities.

*   Within one month, consult a nationally recognized expert, approved by the Department, with experience realigning low-risk, nonviolent prison inmates to local oversight, to assess such feasibility in Alabama.

*   Within two weeks, contact the Acting Director of the National Institute of Corrections ("NIC") to arrange a joint conversation among ADOC, NIC, and the Department to discuss the areas in ADOC prisons that need immediate attention. Within the confines of its fiscal resources, NIC will provide follow up with an action plan of both sequential and overlapping elements to address the areas that need immediate attention, consistent with the Department's findings.  Any direct technical assistance that is able to be provided by NIC will be done at no cost to the state of Alabama.  NIC will also identify other federal resources that may be available to Alabama in addressing the identified issues.

*   Within time frames identified with NIC, properly screen, hire, and fully train 500 corrections officers.  Determine how many of these new officers will be assigned to each facility, based on current vacancy rates.  Within six months, in consultation with NIC, staff prisons with at least 500 additional individuals to provide security.

*   Within six months, commission a study to examine the feasibility of transferring prisoners to non-ADOC facilities in numbers sufficient to provide adequate staffing for the remaining prisoners.

*   Within six months, assess the leadership skills of all Wardens (I, II, and III) and institutional coordinators, in a process overseen by ADOCs Commissioner, Inspector General, and the Director of Operations, in concert with NIC.  Based on this assessment, make determinations about staffing all Warden (I, II, and III) positions and implement those determinations within the next three months. Provide ongoing professional development for all personnel in supervisory and leadership positions.

2.  Violence.  ADOC should:

*   Immediately revise ADOC's disciplinary process to avoid subjecting victims to unnecessary disciplinary actions for conduct unrelated to the instant abuse, when they seek assistance or protection from harm.

- Within two months, in consultation with NIC, and with the aid of a consultant approved by the Department, review all relevant ADOC, and individual facility, policies and procedures.  Based upon the review, ADOC should, within two months, make appropriate changes to ADOC's—and to each individual prison's—policies and procedures.

- Within six months, provide remedial training on security measures, with a curriculum approved by the Department, to all correctional staff.  Thereafter, provide at least 40 hours of in-service training to all staff annually.

- Within two months, ensure that security rounds are conducted in all living areas at least once every hour, and at least once every half hour in any special management population areas (segregation, mental health housing, etc.), or more frequently as required for prisoners on suicide watch.  These rounds should be documented in a bound log book maintained on each housing unit, as well as a master log for each prison, and the documentation should be reviewed at least weekly by facility leadership and not less than quarterly by ADOC leadership.  Deficiencies in complying with these requirements should be addressed immediately.

- Within two months, develop a centralized system that will contain autopsies of all prisoners who die in ADOC custody.  ADOC should conduct an interdisciplinary administrative and medical post mortem following each death and, at least quarterly, assess the system for patterns and trends, and implement remedial measures to correct any identified issues.

3.  Contraband.  ADOC should:

- Immediately implement shakedowns such that at least 15% of all housing units are searched every day, with congregate areas searched weekly; written documentation showing the results of those shakedowns must be maintained.  ADOC should immediately implement daily searches of the interior of the perimeter, the yard, and congregate feeding and recreation areas before and after each use by prisoners, and searches of visiting rooms (including restrooms) before and after every visiting period, with the results of these searches documented.  Those results should be analyzed for patterns and trends.  ADOC should implement plans to address any patterns or trends discovered.

- Within one month, draft a policy requiring the screening of *every* individual who enters a facility (staff, visitors, volunteers, etc.).  Once the policy has been submitted to the Department and approved, implement the policy system-wide within one month.

- Within two months, ensure that each facility has working metal detectors at every entrance, and that each facility has implemented a procedure to use them on all persons entering the prison.

- Within one month, consult with a nationally recognized expert, approved by the Department, to determine other methods of detecting illegal drugs and other contraband being brought into the facilities, for those drugs that will not be detected by metal detectors. Include recommended measures in ADOC policy on screening.

- Within six months, implement any reasonable additional screening procedures for illegal drugs and other contraband that cannot be detected by a metal detector.

- Within two months, provide adequate medical treatment, using evidence-based treatment, for all prisoners detoxifying as illegal drugs and other contraband are reduced and eventually eliminated from the facilities.

4. Sexual Abuse.

   ADOC should:

- Immediately revise ADOC's disciplinary process to avoid subjecting victims to unnecessary disciplinary actions when they seek assistance or protection from ADOC due to threatened or actual sexual abuse.

- Immediately institute a process whereby every allegation of sexual abuse is investigated and the investigation is properly documented. In order to do so, ADOC should ensure a professional investigation unit is in place with the training, skills, and sufficient staffing to investigate every allegation within 60 days.

- Within one month, hire a nationally recognized expert on PREA, to be approved by Department, who will produce a report within two months of hiring. The report should suggest immediate and long-term remedies to address the sexual safety issues in Alabama's prisons. ADOC should implement all immediate measures within three months of receiving the report.

- Within three months, reclassify every prisoner for sexual safety issues, and ensure that potential predators are separated from potential victims.

5. Facility Conditions. ADOC should:

- Within one month, identify all broken locks in Alabama's prisons, and identify how they will be repaired or replaced. Within a month after that, secure funds for such repairs or replacement, and hire a contractor to perform the job within 30 days.

- Within six months, ensure that at least 80 percent of toilets, sinks, and showerheads at each prison are in working condition.

53

- Within six months, install cameras throughout all prisons that will remain open for more than one year, with locations to be approved by the Department.  All video should be retained for 90 days unless an assault on a prisoner or staff occurs in an area surveilled, in which case the video should be preserved until the matter is fully investigated and prosecuted or dismissed by authority of the Commissioner.  Wardens should review video at least monthly.  Any out-of-service video equipment should be replaced within 72 hours.

- Within 90 days, identify the three prisons in the worst physical condition and take preliminary steps to ensure remedies are initiated which provide humane living conditions.

**B.**   **Long-Term Measures**

ADOC should:

- By 2020, staff Alabama's prisons consistent with the requirements of the *Braggs* staffing orders.

- Establish competitive base starting salaries and benefits packages for employees.

- Ensure that applicants for ADOC employment can apply and interview in their local area, and provide frequent testing for applicants.

- Continuously track correctional officer turnover by year, breaking out exits by years of service, age, gender, ethnicity, and facility, and use information learned through this tracking to remedy reasons for attrition.

- Employ systematic exit interviews of correctional officers and report annually on reasons for departures, cross-tabulated by age, gender, ethnicity, and facility.

- Ensure that prisoner housing areas are adequately supervised, through direct supervision, whenever prisoners are present.

- Ensure that prisoners are tested for synthetic drugs on a regular, but random, basis.  Each prisoner should be tested at least every six months, and the testing should be documented and the results reviewed by ADOC administrators.

- Develop a plan and implement a policy for detecting and reducing the amount of contraband throughout ADOC facilities, including the appointment of a Chief Interdiction Officer for contraband interdiction.

- Ensure that ADOC has, and is following, policies and procedures for an appropriate, objective classification system that separates prisoners in housing

units by classification levels in order to protect prisoners from unreasonable risk of harm.

- Discontinue the use of "behavior modification" dormitories ("Hot Bays") unless mental health professionals play a role in both the assignment of prisoners to such placements and are involved in the treatment provided.

- Ensure that every prisoner-on-prisoner assault is documented and investigated, and that staff is trained on how to prevent and address such incidents.

- Comply with PREA and its implementing regulations, the National Standards to Prevent, Detect, and Respond to Prison Rape (28 C.F.R. §§ 115 *et seq.*).

- Develop and implement a policy on prevention, detection, reporting, and investigation of prisoner-on-prisoner and staff extortion of prisoners and their families.

- Develop a written institutional plan to coordinate actions taken in response to an incident of physical abuse, sexual abuse, and/or extortion among staff first responders, medical and mental health practitioners, investigators, and facility leadership.

- Develop an effective substance abuse disorder program.

- Develop and implement an effective grievance process. In the event that a grievance is filed against a staff member, the submission process must allow for options of submission that are neither seen by, nor referred to, the staff member who is the subject of the complaint.

- Develop and implement a plan to prevent prisoners from entering housing units other than the ones to which they are assigned.

- Implement procedures to ensure sanitary prisons.

---

## VI.   CONCLUSION

---

The Department has reasonable cause to believe that ADOC violates the constitutional rights of prisoners housed in Alabama's prisons by failing to protect them from prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions.

We are obligated to advise you that 49 days after issuance of this letter, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies identified in this letter if State officials have not satisfactorily addressed our concerns. 42 U.S.C. § 1997b(a)(1). The Attorney General may also move to intervene in related private suits 15 days after issuance of

this letter.  42 U.S.C. § 1997c(b)(1)(A).  Please also note that this Notice is a public document. It will be posted on the Civil Rights Division's website.